1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
2

3      ------------------------------------------------------------
                                        )
4                                       )
       August Technology Corporation,   )  File No. CV-05-1396
5      a Delaware corporation, and      )         (MJD/AJB)
       Rudolph Technologies, Inc., a    )
6      Delaware corporation,            )
                                        )  Minneapolis, Minnesota
7            Plaintiffs,                )  February 10, 2009
                                        )  9:30 a.m.
8      vs.                              )
                                        )
9      Camtek, Ltd., a foreign          )
       corporation,                     )
10                                      )
             Defendant.                 )
11                                      )
                                        )
12     ------------------------------------------------------------

13

14

15

              BEFORE THE HONORABLE MICHAEL J. DAVIS and a Jury
16                 UNITED STATES DISTRICT COURT JUDGE

17

18

                           **(TRIAL - VOLUME VII)**
19

20

21

22

23

24        Proceedings recorded by mechanical stenography;
       transcript produced by computer.
25

                        LORI A. SIMPSON, RMR-CRR
                           (612) 664-5104

```
 1    APPEARANCES

 2      For the Plaintiffs:        Merchant & Gould, P.C.
                                   DANIEL W. McDONALD, ESQ.
 3                                 ERNEST W. GRUMBLES, III, ESQ.
                                   HEATHER J. KLIEBENSTEIN, ESQ.
 4                                 JOSEPH E. LEE, ESQ.
                                   RACHEL C. HUGHEY, ESQ.
 5                                 3200 IDS Center
                                   80 South Eighth Street
 6                                 Minneapolis, Minnesota 55402

 7      For the Defendant:         Fish & Richardson, P.C.
                                   DAVID R. FRANCESCANI, ESQ.
 8                                 EDMOND R. BANNON, ESQ.
                                   JOHN D. GARRETSON, ESQ.
 9                                 MICHAEL F. AUTUORO, ESQ.
                                   WING H. LIANG, ESQ.
10                                 Citigroup Center - 52nd Floor
                                   153 East 53rd Street
11                                 New York, New York 10022

12                                 Fish & Richardson
                                   MICHAEL FLOREY, ESQ.
13                                 ANN CATHCART CHAPLIN, ESQ.
                                   3300 Dain Rauscher Plaza
14                                 60 South Sixth Street
                                   Minneapolis, Minnesota 55402
15
        Court Reporters:           LORI A. SIMPSON, RMR-CRR
16                                 TIMOTHY J. WILLETTE, RDR-CRR
                                   1005 U.S. Courthouse
17                                 300 South Fourth Street
                                   Minneapolis, Minnesota 55415
18

19

20

21

22

23

24

25
```

1                    **P R O C E E D I N G S**

2                          **IN OPEN COURT**

3                         **(JURY PRESENT)**

4              THE COURT:  Let's continue.

5              MR. GRUMBLES:  Your Honor, the plaintiffs call

6    Mayson Brooks back to the stand to complete his testimony.

7              THE COURT:  Good morning.

8              THE WITNESS:  Good morning, sir.

9              THE COURT:  You are still under oath.

10             THE WITNESS:  Yes, sir.

11        (Witness previously sworn.)

12                      **(David Mayson Brooks)**

13                      **REDIRECT EXAMINATION**

14   BY MR. GRUMBLES:

15   Q.  Good morning, Mr. Brooks.

16   A.  Good morning.

17   Q.  I just want -- I've just got a few more questions for

18   you.

19             MR. GRUMBLES:  Todd, can you pull up Defendant's

20   Exhibit 184, please.

21   BY MR. GRUMBLES:

22   Q.  Mr. Brooks, you were asked about this document

23   yesterday, correct?

24   A.  That's correct.

25   Q.  And, again, what is this document?

```
 1    A.  It's an e-mail from R-Ken Huang, one of my Taiwan sales
 2    managers, about some information customers gave him about
 3    development needed for our 3Di inspection system.
 4    Q.  And I just have a quick question for you.  The second
 5    bullet at the top of the e-mail says, "We cannot do 3D
 6    defect detection"?
 7    A.  That's correct.
 8    Q.  Can you explain that to the jury.  What was the status
 9    of that feature at the time?
10    A.  The main purpose of 3D inspection systems is to measure
11    the height in microns of the solder bumps.  In this case
12    he's saying that some customers are actually wanting to do
13    probe mark inspection on the solder bumps, something us nor
14    any of our competitors can really do now.  And so we have
15    had some customers, as he is reporting, that are starting to
16    ask for this feature.
17    Q.  So this was basically just a customer wanting a feature
18    that didn't really exist in the market at the time?
19    A.  That's correct.
20    Q.  And that neither you nor Camtek would have had?
21    A.  That's correct.
22          MR. GRUMBLES:  Todd, can you pull up Defendant's
23    Exhibit 176, please.
24    BY MR. GRUMBLES:
25    Q.  Mr. Brooks, you were asked a question briefly about this
```

1   document.  Again, what is Defendant's Exhibit 176?

2   A.  It's a presentation given for sales training in August

3   2006.

4         MR. GRUMBLES:  Todd, can you pull up the page in

5   this that's 41119.

6   BY MR. GRUMBLES:

7   Q.  Explain to the jury, what was the purpose of this sales

8   team meeting?

9   A.  Training on products, but also for the sales team, who

10  are the eyes and ears from the customer to the headquarters,

11  of what our customers are telling us we need to do and to

12  continue to improve in our equipment.

13  Q.  And, again, why does it matter what sales team members

14  think about what customers might need?

15  A.  Well, they're the ones in front of the customer on a

16  daily basis, so we -- part of their job responsibilities is

17  to give us that feedback.

18  Q.  So this is part of August's quality control and the way

19  to improve products?

20  A.  And continued improvement.

21  Q.  Yesterday, Mr. Brooks, you were asked about several

22  documents referring to various inspection companies; is that

23  correct?

24  A.  That's correct.

25  Q.  Were many of those documents regarding companies that

1   were operating outside the United States?

2   A.   That's correct.

3   Q.   And were many of them documents related to time periods

4   prior to 2005?

5   A.   They were.

6   Q.   Aside from the ICOS sale that you discussed to Cree

7   yesterday, did counsel show you any documents that you

8   believe are inconsistent with your testimony that the only

9   two companies competing for finished wafer inspection in the

10  United States during the time period 2005 to 2008 were

11  August and Camtek?

12  A.   No.

13  Q.   You were asked about a number of documents in which

14  August was responding to various customer issues and

15  concerns?

16  A.   Correct.

17  Q.   Did counsel ask you about any issues yesterday that are

18  not the kind of issues that companies such as August and

19  Camtek have to deal with on a daily basis?

20  A.   We deal with them on a daily basis, not just August and

21  Camtek, but any company supplying equipment to this

22  industry.

23  Q.   Are you typically able to resolve those kind of issues?

24  A.   Always.

25  Q.   Were any of the issues that you were asked about

```
 1   yesterday, customer concerns, so insurmountable that you

 2   would not have been able to resolve them and make the sales

 3   that were identified?

 4   A.  Some are short fixes, some are a little longer, but we

 5   always resolve all the issues.

 6   Q.  If Camtek had not been selling against you with August's

 7   own technology, you would have been able to make those

 8   sales?

 9   A.  Very much so.

10             MR. GRUMBLES:  No further questions, Your Honor.

11                    RECROSS EXAMINATION

12   BY MS. CHAPLIN:

13   Q.  Good morning, sir.

14   A.  Good morning.

15   Q.  I just have a couple of questions.  I'll try to be

16   brief.

17             Yesterday with Mr. Grumbles you talked about Intel

18   having high specifications, correct?

19   A.  Correct.

20   Q.  And IBM certainly has demanding specifications like

21   Intel, right?

22   A.  Similar.

23   Q.  And you understand that RVSI's tool is the benchmark for

24   IBM, right?

25   A.  That's correct.
```

1   Q.  Now, you testified that you never saw RVSI competing for

2   a sale in the U.S. from 2005 forward?

3   A.  Correct.

4   Q.  Were you aware that Delphi indeed considered the Falcon,

5   the NSX, and RVSI's machine?

6   A.  I don't think so.

7   Q.  And were you aware that Texas Instruments also

8   considered the Falcon, the NSX, and the RVSI machine?

9   A.  I don't think so.

10  Q.  And yesterday you talked just a little bit about Semicon

11  West, the trade show?

12  A.  Correct.

13  Q.  And you talked about it being the biggest trade show for

14  this industry in the world, right?

15  A.  Correct.

16  Q.  And that's the trade show that's in the United States,

17  somewhere in the San Francisco Bay area?

18  A.  Correct.

19  Q.  And different companies come to show their wares to

20  potential customers at that show, right?

21  A.  Correct.

22  Q.  And companies like KLA come and exhibit at the show?

23  A.  Correct.

24  Q.  And KLA is also located in the United States, correct?

25  A.  Correct.

1    Q.  And you're certainly aware that ICOS purchased KLA in

2    2008 -- I'm sorry -- that KLA purchased ICOS in 2008?

3    A.  That's correct.

4    Q.  And that now ICOS operates as a division of KLA, right?

5    A.  That's my understanding.

6    Q.  And you're aware that ICOS has a sales and support

7    office in California, right?

8    A.  I know that's where KLA is headquartered, so I would

9    have to assume they moved into the KLA facility.

10   Q.  And ICOS certainly displayed at the Semicon West show in

11   2008, didn't it?

12   A.  I don't recall.  I don't go see all the competitors'

13   booths.

14   Q.  Now, you do know that Texas Instruments in Dallas

15   evaluated an ICOS machine in 2006; isn't that right?

16   A.  I have no knowledge of that.

17   Q.  Mr. Brooks, I've handed you what is Defendant's

18   Exhibit 1035 and that is an e-mail that you received on or

19   about August 25, 2006; isn't that right?

20   A.  Correct.

21            MS. CHAPLIN:  Your Honor, we move for admission of

22   Defendant's Exhibit 1035.

23            MR. GRUMBLES:  No objection, Your Honor.

24            THE COURT:  Be admitted.

25   BY MS. CHAPLIN:

```
 1    Q.  Now, Mr. Brooks, this is an e-mail talking about a

 2    meeting that one of your salespeople had --

 3              MR. BANNON:  The Judge needs to switch over.

 4              MS. CHAPLIN:  I'm sorry.  Could you switch over,

 5    Your Honor, so it can come up on the screen.

 6              THE COURT:  Sure.

 7              MS. CHAPLIN:  Thank you.

 8    BY MS. CHAPLIN:

 9    Q.  So, Mr. Brooks, this is an e-mail talking about a

10    meeting that August Technologies had with Texas Instruments

11    trying to get their business in 2006, correct?

12    A.  Correct.

13    Q.  And you received this e-mail, right?

14    A.  Yes.

15    Q.  And I would like to look on the first page down about

16    three-quarters of the way down.  It says, "TI Dallas people

17    do not have good things to say about Rudolph's TI account

18    management, do not call on people enough, no attempt at

19    building a relationship, do not bother to understand TI's

20    needs."  Right?

21    A.  That's what it says.

22    Q.  And let's turn to the next page, if you would.  I'll

23    direct your attention to the middle of the page where it

24    says, "Other Points."  The fifth bullet point underneath

25    that, sir, says, "TI Dallas is evaluating an ICOS."  Do you
```

1    see that?

2    A.   I do.

3    Q.   And let's look under Action Items of the meeting, the

4    next section.   The first action item for August Technology

5    was to provide Mary K. at Texas Instruments a Rudolph

6    Technologies vs. Camtek vs. ICOS comparison; isn't that

7    right?

8    A.   That's what it says.

9    Q.   And do you recall that August Technologies was trying to

10   get business from Fairchild Semiconductor in the United

11   States in 2006?

12   A.   I do.

13   Q.   And August was in direct competition with Camtek and

14   ICOS for that business; isn't that right?

15   A.   I don't recall.

16   Q.   Now, you talked about Topcon as a foreign competitor,

17   right?

18   A.   Correct.

19   Q.   And there came a point in 2006 when you were notified

20   that one of your salespeople had been contacted by a

21   distributor who wanted to distribute Topcon products in the

22   United States, right?

23   A.   That's correct.

24   Q.   And indeed that distributor was looking for a U.S. sales

25   manager to represent the Topcon line of inspection systems

1   in the U.S., right?

2   A.  Correct.

3   Q.  And you were notified that Topcon was going to open

4   offices in San Jose and Chicago, right?

5   A.  I don't recall Chicago.  I would certainly assume

6   San Jose.

7   Q.  Now, Mr. Brooks, I've handed you what's been marked as

8   Defendant's Exhibit 1028.  And do you recognize that as an

9   e-mail that you received, sir, on or about January 7, 2006?

10  A.  I do.

11          MS. CHAPLIN:  Your Honor, we move for admission of

12  Defendant's Exhibit 1028.

13          MR. GRUMBLES:  No objections.

14          THE COURT:  Be admitted.

15          MS. CHAPLIN:  Thank you.

16  BY MS. CHAPLIN:

17  Q.  And, sir, this is the e-mail that you received about

18  Topcon calling one of your salespeople, correct?

19  A.  Correct.

20  Q.  And we've already talked about some of the top of the

21  e-mail, so I will skip over that.  Let's talk about the

22  third paragraph from the bottom.  It says, "He also stated

23  that Toray is coming to the U.S. market this year as well.

24  Can't confirm this.  He does not rep Toray.  Just the rumor

25  he passed on to me."  Correct?

1   A.   That's what it says.

2   Q.   And let's look at the next paragraph.  I'll jump to the

3   second to the last sentence.  It says, "I am guessing that

4   he was here calling on Cree and Unitive.  This is shaping up

5   to become a very interesting year for the U.S. and for

6   August from a competitive standpoint in general."  Right?

7   A.   That's what it says.

8   Q.   And let's look at the last paragraph.  It states, "We

9   had better get engineering on board with delivering on all

10  the enhancements we need.  We are looking down the barrel

11  and we are not as good as our competitors and we will most

12  certainly experience lots of pricing pressure this year.

13  Relationships and salesmanship is only going to carry us so

14  far."  Right?

15  A.   Correct.

16  Q.   And that was written to you by one of your sales force?

17  A.   Correct.

18          MS. CHAPLIN:   Thank you.

19          THE COURT:   Anything further?

20          MR. GRUMBLES:   Just a couple questions, Your

21  Honor.

22              **FURTHER REDIRECT EXAMINATION**

23  BY MR. GRUMBLES:

24  Q.   Mr. Brooks, to your knowledge, did RVSI sell any

25  products in the United States during the time period 2005 to

1      2008?

2      A.   None to my knowledge.

3      Q.   And aside from the Cree sale by ICOS that you've already

4      testified about, to your knowledge has ICOS ever been

5      successful at convincing anybody else in the U.S. to buy any

6      of its products?

7      A.   None to my knowledge.

8      Q.   Let me ask you some questions about your relationship

9      with TI.  How would you describe that relationship right

10     now?

11     A.   Ongoing customer.  They have a lot of our tools.  They

12     have a lot of Camtek tools.

13     Q.   Have any of the things they've asked you about in

14     connection with TI not been resolved?

15     A.   None that I know of.

16     Q.   They asked you about Topcon and Toray and the sales --

17     your salesperson's concern that perhaps Topcon and Toray

18     were coming to the United States.  Did that ever happen?

19     A.   No.  I know they were evaluating U.S. market, as Todd

20     reported.  I also know they never came to the U.S. market.

21              MR. GRUMBLES:  No further questions.

22              THE COURT:  You may step down, sir.

23              Call your next witness, please.

24              MR. GRUMBLES:  Your Honor, the plaintiffs call

25     Frances McCloskey.

```
 1            (Witness sworn.)

 2                 MR. GRUMBLES:  Your Honor, may I provide the

 3       witness a copy of the exhibits?

 4                 THE COURT:  Would you state your true and correct

 5       name for the record, please.

 6                 THE WITNESS:  Yes.  My name is Frances Mehen,

 7       middle name is spelled M-e-h-e-n, McCloskey, spelled

 8       M-c-C-l-o-s-k-e-y.

 9                 THE COURT:  You may inquire.

10                       (Frances McCloskey)

11                       DIRECT EXAMINATION

12       BY MR. GRUMBLES:

13       Q.  Good morning, Ms. McCloskey.

14       A.  Good morning.

15       Q.  Where do you live?

16       A.  I live and work in Minneapolis, Minnesota.

17       Q.  And what is your profession?

18       A.  I'm an accountant.

19       Q.  And who do you work with?

20       A.  I work with a firm called Financial Advisors and our

21       office is in downtown Minneapolis.

22       Q.  And why are you here today?

23       A.  I'm here today because I was asked to give an opinion

24       about the damages that August suffered as a result of the

25       patent infringement by Camtek.
```

1    Q.  And have you formed an opinion as to the damage August

2    suffered in this matter?

3    A.  Yes, I have.

4    Q.  What is that?

5    A.  That August is entitled to lost profits as a result of

6    the infringing sales of the Camtek Falcon system.

7    Q.  Very good.  We'll talk more about that.

8             You mentioned that you live in Minneapolis.  How

9    long have you lived in Minnesota?

10   A.  I've lived in Minnesota for 25 years.

11   Q.  Are you married?

12   A.  Yes.

13   Q.  And any kids?

14   A.  I have two children, a daughter and a son.

15   Q.  Ms. McCloskey, did you attend college?

16   A.  Yes, I did.  I went to Middlebury College in Vermont.

17   Q.  And what year did you graduate?

18   A.  1984.

19   Q.  What was your degree in?

20   A.  I have a bachelor's in economics and a minor in Spanish.

21   Q.  Did you attend any schooling after college?

22   A.  Yes.  I went to the University of Minnesota and I got a

23   master's in business administration in 1989.

24   Q.  Any particular concentration?

25   A.  I had a focus in marketing with coursework in both

1   finance and marketing.

2   Q.  Excellent.  Any professional training after your MBA?

3   A.  Well, I'm a certified public accountant and so I have

4   continuing education requirements where every year I have to

5   take a certain number of classes in order to keep up my

6   certificate.

7   Q.  And you passed the CPA exam?

8   A.  Yes, I did.  I took the CPA exam in 2002 and I passed it

9   on the first attempt.

10   Q.  Is that difficult to do?

11   A.  Some say that it is, yes.

12   Q.  What is a CPA?

13   A.  Well, a certified public accountant has a license from

14   the state in which you practice and you perform different

15   kinds of services.  You might review financial statements

16   for a company and provide an opinion about an audit.  You

17   might look at a person's individual financial information

18   and prepare a tax return.  And then in this particular

19   circumstance I reviewed and analyzed information and I'm

20   giving an opinion as to damages in this lawsuit.

21   Q.  Is what you are doing in this case sometimes referred to

22   as forensic analysis?

23   A.  Yes, forensic analysis or forensic accounting.  It's a

24   branch of accounting.

25   Q.  Have you ever done fraud investigations?

1    A.  Yes, I've done a number of fraud investigations.

2    Q.  What does that entail?

3    A.  Well, it entails looking at the books and records or the

4    accounting information from a company and then trying to

5    determine if fraud has occurred or a theft has occurred and

6    then providing an opinion about what I've seen and how that

7    is all laid out, for the court usually.

8    Q.  With regard to financial forensics, are there any kinds

9    of certifications that are available for that?

10   A.  Yes.  The governing body of accountants, which is called

11   the American Institute of Certified Public Accountants, they

12   also have a certification in addition to a certified public

13   accountant and it's called a -- you are certified in

14   financial forensics.

15   Q.  And, again, what is financial forensics?

16   A.  It's the performance of accounting and financial

17   analysis in a legal context.  The term "forensic" means in a

18   legal case or a legal context.

19   Q.  So that would be like there's forensic medicine?

20   A.  Right.  So like, you know, in the old -- I'll date

21   myself.  In the old days there was Quincy, the forensic

22   scientist, that looked at and performed autopsies, I guess,

23   on people to try to help solve a crime.

24   Q.  So forensic accountants are accountants who come into

25   legal proceedings in a similar fashion to do analysis?

1    A.   Exactly.

2    Q.   Are you a member of any professional organizations

3    besides the -- I think you said the American Institute of

4    CPAs?

5    A.   Yes.  I'm also a member of the Minnesota Society of

6    CPAs, which is our state chapter.

7    Q.   Have you ever written any articles or publications in

8    the area of accounting or damages?

9    A.   Yes.  I've written several papers on the calculation of

10   patent infringement damages and I presented those papers at

11   Minnesota continuing legal education classes for the

12   Minnesota State Bar Association.

13   Q.   Do you have any teaching experience in the area of

14   accounting or damages?

15   A.   Yes.  I frequently teach classes to the Minnesota State

16   Bar Association and other continuing legal education

17   organizations.  So I teach damages to lawyers, basically.

18   Q.   Are lawyers easy to teach?

19   A.   Some of them.

20   Q.   Let's talk about your work after college.  Where did you

21   work after college?

22   A.   Immediately after college I worked at General Mills,

23   they are located in Golden Valley, Minnesota, and I was a

24   financial analyst and an accountant for them.

25   Q.   For how long, approximately?

1    A.  I was there for four years, from 1984 to 1988.

2    Q.  Okay.  Then what did you do after you left General

3    Mills?

4    A.  After General Mills, then I went into an accounting

5    field and I worked for an accounting firm that's now called

6    Price Waterhouse Coopers and at the time that I worked there

7    it was called Coopers & Lybrand and I worked in their

8    Minneapolis office.

9    Q.  What were your job responsibilities when you were at

10   Price Waterhouse?

11   A.  I worked on a number of different kinds of projects, but

12   I was in an area that did primarily fraud investigation and

13   forensic accounting and then I also did a few other things,

14   like feasibility studies for convention centers and sports

15   stadiums.

16   Q.  Does that involve any sports stadiums here in town?

17   A.  Yes.  We looked at building the new Mariucci Arena at

18   the University of Minnesota.  We looked at building the new

19   County Stadium in Milwaukee.  And the group that I worked

20   for had done the financial feasibility study for the

21   Metrodome.  That was kind of the type of work that we did.

22   Q.  Excellent.  How long were you at Price Waterhouse?

23   A.  I was there for eight years, from 1989 to 1997.

24   Q.  And, again, you said you were at a company called

25   Financial Advisors?

1    A.   That's right.  When I left Coopers & Lybrand, which is

2    now called Price Waterhouse Coopers, I started a firm with

3    another person that I worked with at Coopers & Lybrand and

4    that happened in 1997.  So we went off on our own and

5    started a firm that did this kind of financial analysis or

6    forensic accounting.

7    Q.   Does Financial Advisors do any other work besides

8    forensic accounting?

9    A.   Yes, we do.  We do valuations and then we also do

10   analysis of the feasibility of buying and selling companies

11   for small business owners and -- primarily, though, our work

12   relates to forensic accounting and the calculation of

13   damages.

14   Q.   You mentioned valuations.  What is valuations?

15   A.   A valuation is performed to determine the value of a

16   company usually.  So you look at the financial information

17   about a company and you look at its future prospects and

18   then you perform a calculation of what that company could be

19   bought or sold for.  It's usually done in the context of a

20   transaction where someone wants to buy or sell a company.

21   Q.   Is this your first time to serve as an expert in a case?

22   A.   No.

23   Q.   How many times have you served as an expert before?

24   A.   Well, I've testified in court about two dozen times,

25   about 24, 25 times, but I've been hired as an expert many

1   times, probably over several hundred times, but not many of

2   the cases go to trial.

3   Q.  So you have significant experience, then, in doing

4   forensic accounting?

5   A.  Yes.

6   Q.  And then presenting that in court?

7   A.  Yes.  I've been doing it since 1989 basically, so that's

8   20 years.

9   Q.  What kinds of cases have you done forensic accounting

10  in?

11  A.  Well, many types of cases.  In this case we're a patent

12  infringement matter.  I've also done damage calculations in

13  the theft of trade secret cases, in failed merger and

14  acquisition situations, in breaches of contract, in

15  employment cases where someone has been wrongfully

16  terminated from their job, and a variety of other kinds of

17  cases.  Those would be some examples.  I could go on and on.

18  Q.  Have you worked for both plaintiffs and defendants in

19  cases?

20  A.  Yes, I have.

21  Q.  What have you been asked to do specifically in

22  connection with this matter?

23  A.  I was asked to analyze all the financial information and

24  then other relevant information to the damages and prepare

25  an opinion of what I believed the damages were that August

1  suffered as a result of the alleged infringement of the

2  Camtek Falcon system.

3  Q.  And, again, have you reached an opinion as to the

4  damages August suffered as a result of Camtek's

5  infringement?

6  A.  Yes.

7  Q.  Have you put together any slides to assist the jury with

8  following your testimony today?

9  A.  Yes, I have.  We could show the first slide.  It's my

10  opinion that the fair compensation to August is $11,627,020

11  as a result of Camtek's infringement during the period 2005

12  to 2008.

13  Q.  Let's talk about your process to reach that opinion.  In

14  connection with your analysis in this case, did you look at

15  any information or documents?

16  A.  Yes, I looked at quite a few documents and information.

17  At my office I have about eight boxes full of pieces of

18  paper, many of which were produced by Camtek and August.

19        I read a number of depositions that were taken in

20  this case.  I spoke with a number of people at August,

21  including people in their finance area, their marketing

22  people, their salespeople, their manufacturing people, and

23  the technical people or the inventor of the patent, patented

24  invention.

25        Then I also did some of my own research and I

1    reviewed marketing material and other kinds of information

2    that was available from both August and Camtek.

3    Q.  Did you review the patent in this case?

4    A.  Yes, I did.

5    Q.  Are you an expert in patent law?

6    A.  No.  I read it as an accountant, so I read it as a way

7    to understand what was being claimed here.  However, I have

8    no expertise in the technical aspects of patents.

9    Q.  Have you ever seen August's -- any of August's machines

10   in operation, inspection machines?

11   A.  Yes, I did go and visit August's facility in

12   Bloomington, Minnesota, it's located down on 494, and I

13   watched an NSX machine inspect a silicon wafer; and that was

14   very interesting, to see it actually in operation.

15   Q.  Are there any other types of, generally that you can

16   recall, other types of info or documents that you reviewed?

17   A.  Well, whenever I do a project like this, I always make

18   sure that I'm up to date on the latest methods for

19   calculating damages.  So I used different professional

20   articles and information that's available to me.

21           But primarily I looked at financial information

22   and marketing information and I looked at all the e-mails

23   and the other kind of information that was -- you know,

24   we've seen in the last couple days.

25           MR. GRUMBLES:  Your Honor, I am going to move the

 1    admission of a list of exhibits -- it's a little bit

 2    lengthy, but I will just read them in -- in connection with

 3    Ms. McCloskey's testimony.  The following exhibits:

 4    Plaintiffs' Exhibit 107, 110, 123, 126, 127, 128, 129,

 5    Plaintiffs' 131, 132, 134, 135, 136, 168, 180, 194, 240,

 6    245, 246, 247, 248, 260, 278, 272, 275, 285, Plaintiffs'

 7    290, 291, 293, 469, 471, 475, 476, 586 through 588, 619,

 8    620, 621, 622, 623, 624, 625, 626, 627, 628, 629, 630, 631,

 9    632, 633, 634, 635, 636, and 637.

10              MS. CHAPLIN:  May I have just one moment, Your

11    Honor?

12         (Pause.)

13              MS. CHAPLIN:  Your Honor, we have one objection on

14    180 on 403 grounds.

15              MR. GRUMBLES:  Can you state what those are?

16              MS. CHAPLIN:  I believe we should be heard at

17    sidebar on that, Your Honor, just briefly.

18              THE COURT:  Okay.  Sidebar.

19         **(At sidebar.)**

20              MS. CHAPLIN:  This is the exhibit.  It's our SEC

21    filing.  Our only objection is there's one paragraph that

22    talks about a patent infringement lawsuit brought by another

23    company against Camtek.  And if that was redacted, then we

24    would have no objection.  I have to find it.  I'm sorry.

25              MR. GRUMBLES:  No objection to that redaction.

1    THE COURT:  There's no objection to the redaction.

2    Let's make sure that we know what it is so we're not arguing

3    about it at the end of the trial.

4    MS. CHAPLIN:  Yes.

5    MR. BANNON:  This reference is to a lawsuit

6    against Orbotech, Your Honor, and it's sort of normal

7    language that appears in this type of document and we would

8    just like that to be redacted.

9    MR. GRUMBLES:  No objection.

10   THE COURT:  Those two paragraphs -- that's the

11   only two paragraphs that you are concerned about?

12   MS. CHAPLIN:  I'm trying to see if this one refers

13   back up.  I think those are the only two, yes, Your Honor.

14   THE COURT:  Those are the two paragraphs that will

15   be redacted.  Please review the document again to make sure

16   that there isn't anything else in it that talks about any

17   other types of lawsuits and then we can address those

18   issues -- those paragraphs later to make sure that there's

19   no objection from the plaintiff.  All right?

20   MS. CHAPLIN:  Thank you, Your Honor.  We

21   appreciate that.

22   **(In open court.)**

23   MR. GRUMBLES:  Just to be clear for the record,

24   Your Honor, we move for the admission of the foregoing long

25   list of documents that I just referred to.

1    THE COURT:  Be admitted with the redaction in

2    Exhibit Number --

3         MR. BANNON:  It's 180.

4         MR. GRUMBLES:  180, Your Honor.

5         THE COURT:  -- 180.

6    BY MR. GRUMBLES:

7    Q.  Ms. McCloskey, let's talk about your opinions in this

8    matter.  Let me ask you first generally, what are the types

9    of money remedies that you can get for patent infringement?

10   A.  There are two types of damages that are available to

11   plaintiffs in a patent infringement case.  The first type is

12   called lost profits and effectively lost profits are the

13   profits that the patent owner would have made if there had

14   been no infringement.  So in this situation, it's the

15   profits that August would have made if Camtek had not sold

16   the infringing Falcon systems.

17   Q.  Is there another type of damages available in patent

18   cases?

19   A.  Yes, there's a second type of damages available and

20   that's called a reasonable royalty and that is the minimum

21   amount of damages that could be awarded.  A reasonable

22   royalty is effectively like a fee or a rent that's paid to

23   have the right to use the patented invention.  Now, in this

24   case it's my opinion that lost profits is the appropriate

25   measure of damages.

1    Q.  Can you get both types of damages in a case?

2    A.  Well, you have to look at the specific instances of

3    infringement, so each system that was sold, and you have to

4    decide could August have made that sale; and if August could

5    have made that sale, they would get lost profits on that

6    sale.  If August could not have made that sale, then they

7    would be entitled at a minimum to a reasonable royalty.

8            So you could potentially in the end have both

9    kinds of damages in the award, but each individual sale

10   would be looked at to determine is it appropriate to give

11   lost profits because August could have made that sale or, in

12   the alternative, then you would fall back to the minimum

13   reasonable royalty.

14   Q.  And, again, have you reached an opinion as to which of

15   those two measures of damages are appropriate in this case?

16   A.  Yes.  It's my opinion that August could have made every

17   single one of the sales that Camtek made of its Falcon tool

18   in the United States in the period 2005 to 2008.

19           And so it's also my opinion that reasonable

20   royalty is not really necessary in this situation because

21   August would have made the sale and would be entitled to its

22   lost profits, so there's no reason to fall back to the

23   royalty.

24   Q.  How did you reach that conclusion and determine lost

25   profits in this case?

1    A.  Well, there's an ultimate question that has to be

2    answered in order to decide if lost profits is appropriate

3    and that question is what profits could the patentholder

4    have made if there had been no infringement.

5         And so you can go about demonstrating that in

6    several different ways.  One of the ways that you could look

7    at it is that you would look at each sale and you would

8    decide could August have made this sale.  If they could,

9    then what is the profit that they would have made and you

10   add those all up.

11        There are -- there is a way that I have gone about

12   calculating -- well, I guess, describing this that I can go

13   through for the jury so that they can follow along with this

14   method.

15   Q.  Proceed.

16   A.  We want to switch to the next slide.  So there are four

17   factors that you can consider when you're looking at lost

18   profits and whether the plaintiff should receive lost

19   profits.

20        The first is was there customer demand for the

21   patented product.  That means did customers want a product

22   that had the benefits of the patented invention.  And the

23   products in this situation are the Falcon product and the

24   NSX and the 3Di.  Those are the products were sold with the

25   patented invention in them and so we would look to see did

1    customers want those products.

2         Second would be were there acceptable alternatives

3    that were not subject to the patent and what did

4    customers -- were customers willing to accept and buy

5    products that did not have the patented invention in it.

6         Third, did the patent owner, in this case August,

7    have the ability to make the sales, meaning could they

8    have -- did they have all the selling capability and all the

9    relationships that they needed to make the sales and could

10   they have actually built them, you know, or manufactured the

11   systems assuming that a Falcon wasn't able to be sold.

12        And then the fourth factor is really what's the

13   appropriate amount.  It's the calculation of the lost

14   profits themselves.

15        So we'll walk through each of these factors.

16   Q.  Turning to that first factor that you mentioned,

17   customer demand, have you come to a conclusion as to whether

18   there was any demand for the patented technology?

19   A.  Yes, I have.  There are several things to think about

20   here.  We've heard Mr. Brooks testify that there were quite

21   a few sales of the August NSX and 3Di systems.  There were

22   over 100 million dollars' worth of those products sold and

23   in the period of time that we're talking about, 2005 to

24   2008, there were 54 products sold.  And, in fact, August has

25   sold those systems all over the world.

1    So if you could show the first bullet on the

2    slide.  So August has sold 100 million dollars' worth of

3    inspection systems in the U.S. and over 400 million

4    worldwide.  Now, these are the patented systems.

5    Q.  Did you consider the importance of the technology

6    itself?

7    A.  Absolutely.  I mean, the invention has to do with

8    creating a fast-moving inspection using a fast light and a

9    continuous motion, at least that's my understanding of it as

10   an accountant.  I'm not a technical person.  But that

11   provided significantly better throughput or speed for the

12   customers.

13   And so if a customer bought an August system or a

14   Falcon system, it was going to be able to get better

15   throughput; and there are a lot of documents that talk about

16   how throughput was very important.  If you look at the

17   customer quotations that were provided by August and by

18   Camtek, they were always promoting faster throughput; and

19   that was provided as a result of the patented invention.

20   Q.  What are some of the materials, again, that you looked

21   at?  You mentioned quotes.  Any other materials that you

22   considered?

23   A.  The marketing materials, like the brochures, the

24   leave-behind materials that they would give to customers,

25   the specification sheets, the invoices, the information that

1    talked in any way about the attributes of the products, of

2    these inspection systems, would always promote throughput

3    and speed.

4         I also looked at depositions and heard the

5    testimony of Mr. Brooks and listened to some of the

6    depositions that were read in, as well as I read deposition

7    testimony of many people that were taken in this case.

8    Q.  Did Camtek itself ever talk about the importance of the

9    Falcon product to its company?

10   A.  Yes.  Well, Camtek had quite a bit of success in sales

11   of the Falcon.  If you can show the second bullet.  Camtek

12   sold at least 23 million dollars of inspection systems in

13   the U.S. and millions of dollars more worldwide.  Their own

14   website said that they sold 150 Falcon systems worldwide.

15   That was still on their website as of this past weekend.

16        And then in many of their investor materials and

17   financial statements they alluded -- they discussed the fact

18   that the Falcon system was very significant to their

19   company.

20        In 2004 they stated -- if you would just show the

21   box on the slide -- "Our strategy for growth is now the

22   Falcon.  We believe this is the single most important growth

23   engine for the company and so far we have seen significant

24   success from this product."

25        And then the second quote actually came from early

1   2005, a first quarter investor press release.  "The Falcon's

2   very positive market acceptance confirms our assessment that

3   it is becoming a significant growth engine for us."

4          So they themselves, Camtek, are describing the

5   fact that there was significant market acceptance for the

6   Falcon machine.

7   Q.  And significant success itself, sales success?

8   A.  Absolutely.  Both August and Camtek had significant

9   sales success.  And one of the key ways to show that

10  customers wanted the patented product is that they were

11  sold.

12         And in this situation we heard Mr. Brooks testify

13  that the customers in the U.S. that wanted an inspection

14  system in the back end or in this finished wafer inspection

15  pretty much only considered Camtek and August once they made

16  their final purchase decision because only Camtek and August

17  made sales, really, in the United States during that period

18  of time.  We don't really have evidence of anyone else

19  making sales, and that alone is evidence that the patented

20  products were widely demanded.

21  Q.  Before we turn to the next factor, I just had a question

22  for you.  Did you make any critical assumptions in this case

23  in connection with your opinion?

24  A.  Yes.

25  Q.  What are those?

1    A.  Well, first I had to assume that the patent is valid and

2    that it's enforceable.  And then second I had to assume that

3    the Falcon infringed the patent.  Those are fundamental

4    assumptions.

5    Q.  What was the next factor that you considered in

6    connection with your lost profits calculation?

7    A.  The second factor is whether there were acceptable

8    alternatives.  And in order to determine if there are

9    acceptable alternatives, you have to understand the context

10   in which the products are sold.

11          So first of all you look at the marketplace in

12   which Camtek and August were competing, and Camtek and

13   August competed head to head in what in trial has been

14   called the finished wafer inspection market.  Now, some

15   people also refer to that as back-end inspection.  So those

16   two terms are synonymous.

17   Q.  What is a market -- when you say "a market," what do you

18   mean by that?

19   A.  Well, it's where buyers and sellers come together to

20   create a marketplace where things are exchanged, a product

21   is purchased and exchanged for money.  That's a market.

22   Q.  Were you focusing on the world market overall or were

23   you focusing on the United States market?

24   A.  Only on the United States.  The patent is enforceable in

25   the United States, so we're talking about products or

1    systems that were sold in the United States.

2    Q.  Was there any time period limitation with regard to the

3    market that you looked at?

4    A.  Yes.  I only looked at the time period 2005 to 2008

5    because that is the period of time that has been established

6    as appropriate to calculate damages.

7    Q.  What was the next step that you did in evaluating --

8    after you determined what was the relevant market?

9    A.  The second is we would look at what did the customers

10   need; and that included this idea of throughput, they needed

11   fast -- a fast system and they wanted it to be accurate

12   inspection.  Obviously why inspect unless it's not -- if

13   it's not accurate, there's no point to it.  And then third,

14   they needed it to be flexible because there were a lot of

15   different kinds of applications.  And we heard Mr. Brooks

16   talk at length about the importance of accuracy, speed, and

17   flexibility.

18          Second of all, customers needed product support or

19   service because this is a very complicated machine.  I went

20   to August to look at the machine and watch it in action

21   because it's very complex and it's large, it's the size of

22   like three refrigerators, and it's got a lot of technology

23   involved in it both as it relates to the physical aspects of

24   the technology as well as the software.  And so it's

25   complicated and the customers need a lot of help to get

1    started in operating it and get trained up on it, and

2    Mr. Brooks talked at length about that and the importance of

3    that to customers.

4         And then thirdly we would look at who were the

5    competitors, who were offering products and were those

6    products acceptable.  So it's my understanding, based on

7    everything that I've seen, including documents that might

8    say that there were other companies trying to compete here,

9    but, in fact, only August and Camtek, which were providing

10   products that practiced the patent, were successful in

11   selling in the United States.  So there were no other

12   acceptable alternatives.  The other -- ICOS and RVSI and

13   other companies were not successful because their products

14   were not doing everything that the customer needed.

15   Q.  Let's talk about that briefly.  What did you do to

16   determine the existence of acceptable substitutes?

17   A.  As far as it related to the other companies that were

18   offering products?

19   Q.  Correct.

20   A.  Well, first of all you'd look at who all was mentioned

21   as a possible company that was offering an inspection

22   product, did they make any sales, was their product

23   considered seriously by the customers, and then ultimately

24   what made the difference in the sale, what was purchased.

25   So first -- and were they offering everything that the

 1    customer wanted.

 2            So first of all I looked at -- if we can phase in

 3    the first line there.  We know that August was offering the

 4    NSX and the 3Di machines.  They had a significant support

 5    structure in the U.S. with customer service and training and

 6    very hands-on support.  They made 54 system sales in the

 7    period of time that we're talking about and customers

 8    obviously felt that this was an acceptable product.  It was

 9    used exclusively at some customers.

10            Second of all, Camtek, which also -- which sells

11    the Falcon system in the U.S., they had a U.S. support

12    system.  They provided on-site technicians just like August

13    did.  They made sales -- 36 sales of systems and their

14    product was considered acceptable by customers.

15            And then we've also heard about some other

16    companies.  We've heard about ICOS.  Based on what I've seen

17    and what Mr. Brooks testified to, ICOS was not really a

18    presence in the United States other than at the company

19    called Cree they made a sale and that was a specialized

20    installation.  But other than that sale, they've made no

21    other sales.  Whether they've been considered or whether

22    they tried to make a sale, they never made another sale and

23    so therefore there must have been something about their

24    product that was not acceptable.  And as far as we know,

25    Mr. Brooks said that he didn't believe that ICOS had the

1    patented invention.

2             Next we heard about RVSI.   RVSI was struggling as

3    a company.   They financially were having some difficulties

4    and there were concerns on the part of customers and others

5    in the marketplace that they were not long -- would not be

6    able to provide long-term support.   They did not make any

7    sales in the 2005 to 2008 time frame in the United States

8    and so there was something about the RVSI product that was

9    not acceptable.   We heard Mr. Brooks state that RVSI was

10   purchased by August in the last few years.   They purchased

11   it because of their 3D technology, but their two-dimensional

12   inspection technology was not as well developed, I think he

13   said, so there was something that was not acceptable about

14   it.

15            And then thirdly we heard about Solvision.   They

16   were a Canadian company.   They did not have a real presence

17   in the United States, they didn't make any sales in the

18   United States, and Solvision has eventually gone out of

19   business and their systems were not acceptable to U.S.

20   customers either.

21            So it's my conclusion that there were no other

22   acceptable alternatives in the marketplace.

23   Q.  And market acceptance is part of your analysis in

24   determining the acceptability of an alternative?

25   A.  Well, market acceptance, yes.  If nobody is buying these

1   other companies' systems, then there's something about them

2   that they don't want.  They want the systems from August and

3   Camtek.  And the differentiating factor there is the speed

4   of the two-dimensional inspection, which is enabled by the

5   patented invention.

6   Q.  What was the next step that you undertook in your lost

7   profits analysis?

8   A.  The third factor that we talked about already is did

9   August have the ability to make the sales.

10          And so first let's look at each of the customers

11  that bought Falcon systems.  There were 12 customers in the

12  United States that bought Falcon systems, so there were --

13  as I mentioned before, there were 36 systems sold for a

14  total of -- let's see.  Camtek took in sales revenue of

15  $22,894,110 as a result of selling those 36 systems and

16  these are the systems that were sold in the U.S. from 2005

17  to 2008.

18          Now, it's important to note that -- and if you

19  would advance the slide.  As I said, there were 12 -- did I

20  count that correctly?  There were 12 customers that bought

21  Falcon systems.  Nine of them were August customers, August

22  had NSX or 3Di systems installed at nine of these customers.

23          And then with Allegro, in the sale to Allegro only

24  August and Camtek were competing and I base that on

25  documents that I reviewed that were produced by August and

1    Camtek.  And August lost that sale because of price and

2    Camtek came in with a low price.  Otherwise, August would

3    have made that sale.

4         If we look at Cypress, Cypress's sale was proposed

5    by August and Camtek only, there were no other competitors

6    in that sale.  And August lost the sale because of speed,

7    but that speed was achieved through use of the patented

8    technology.

9         And then third, at Peregrine only August and

10   Camtek competed for that sale.

11        So every single one of these situations were

12   situations where August was the provider of inspection

13   systems already, where they had the systems installed and

14   they were servicing them and they were calling on them

15   routinely and they were proposing for this business.  And

16   we've already heard from both Mr. Brooks and from the

17   deposition that was read in from Mr. Weiss, that being the

18   incumbent provider is a significant advantage.

19   Q.  What does that mean, "incumbent"?

20   A.  That means that you are the party whose systems are

21   already in place at that customer.  So that customer is

22   already familiar with your system and has used your system

23   and is comfortable and trained on those systems.

24        And then, as I said, nine of the customers were

25   already August customers and had August systems and then the

1    three specific ones, Allegro, Cypress, and Peregrine, were

2    competitive situations where only August and Camtek were

3    bidding for those opportunities.  So August had the capacity

4    to make the sales.  They had relationships with all of these

5    parties.

6              So if we could move to the next slide.  So as it

7    relates to marketing capacity, August could have made every

8    single one of those sales and would have if Camtek had not

9    been selling the Falcon system.

10             But remember that I also said that you also have

11   to look at the manufacturing, did August have the ability to

12   actually build these systems.  There were 36 of them.  We

13   heard Mr. Brooks talk about production capacity at August

14   and he stated that they easily could have made all 36 of

15   those tools because they had at least -- and I reviewed the

16   same records that Mr. Brooks looked at -- they had at least

17   capacity for 20 more systems every year and we're talking

18   about four years here.  So they could have made at least 80

19   more systems without even having to add a second shift and

20   they could have added a second shift or a third shift.  So

21   there was no problem with actually manufacturing the sales.

22             So if you just want to show the next bullet point.

23   So August had both sufficient marketing capability and they

24   had sufficient manufacturing capability.  Camtek never sold

25   any more than 17 systems in the U.S. in any one year, so

1   there was no issue here.

2   Q.  So August could have physically made all the tools that

3   Camtek sold in the United States --

4   A.  Absolutely.

5   Q.  -- during that time period?

6   A.  Absolutely.  They had the parts available.  They had the

7   people available.  They had the capacity to do it.

8   Q.  Okay.  What's next in your analysis?

9   A.  Well, just to kind of summarize what we've done, we've

10  covered the first three factors in terms of determining

11  whether August is entitled to lost profits.

12          So first, that there was customer demand.  We know

13  that because customers bought a lot of Falcons and a lot of

14  NSX machines and really nobody else's machines.  Second,

15  there were not acceptable alternatives because no one was

16  successful in selling anything else.  Third, August had the

17  capability or the capacity to make every one of those 36

18  sales.

19          And so what that leads us to, then, is the fourth

20  factor, which is that we have to calculate what August's

21  lost profits were.

22  Q.  How did you calculate the lost profits?

23  A.  Well, you have to first determine the number of

24  infringing systems that were sold.  I've said this a number

25  of times.  There were 36 infringing systems sold, 36 Falcon

1   systems, from 2005 to 2008.

2              And then second, you have to determine what

3   August's average profit was per system.  And I went through

4   a lengthy process of trying to determine what August's

5   profits were.  They were on average $322,973 per system, and

6   that is based on a lot of financial information from August

7   and I talked with their financial people and asked a lot of

8   questions about the different kinds of costs that would be

9   incurred in order to sell more systems than they had already

10  been selling.  So that means that they have to buy more

11  parts.  They have to pay their people to put them together.

12  They have to sell the additional tools and service the

13  additional tools.  And it's my understanding from what

14  Mr. Brooks testified to, that there was a small amount of

15  additional selling expense, which I've included in this

16  profit amount.  And this amount was calculated based on

17  August's historical profits and their actual profits from

18  2005 to 2008 on all their other systems that they sold.

19  Q.  So basically you take the number of machines times the

20  incremental profit of August that it would have received?

21  A.  Right, how much would August have made if they made

22  additional sales of these 36 tools.

23  Q.  And to do that you remove the incremental costs to make

24  those additional sales, right?

25  A.  Right.  You take the sales revenue and then you take --

1    you deduct the costs to make it and the costs to sell it, an

2    additional machine, and then that leaves you with the

3    incremental profit, how much they would have made on each

4    one of those tool sales.

5         So the third step is really just simple math.  You

6    multiply the number of infringing systems, the Falcon -- 36

7    Falcon systems, times the average profit per system, so

8    that's 36 times 323,973, and that gets you to $11,627,020.

9    Q.  What's your final conclusion in connection with your

10   expert testimony in this case?

11   A.  It's my opinion that the fair compensation to August

12   for -- as a result of the sales of the infringing Falcon

13   tools from 2005 to 2008 in the United States was

14   $11,627,020.

15        MR. GRUMBLES:  No further questions.

16        MS. CHAPLIN:  Your Honor, could you please switch

17   over again to our computer.  Thank you.

18                    **CROSS EXAMINATION**

19   BY MS. CHAPLIN:

20   Q.  Good morning, Ms. McCloskey.

21   A.  Good morning.

22   Q.  I want to see if there's first a couple of things you

23   and I can agree on at the beginning.

24        So not all patents are of equal value; isn't that

25   right?

 1    A.   Yes.

 2    Q.   And just because someone has been issued a patent by the

 3    Patent Office does not automatically mean that the patent

 4    has substantial value?

 5    A.   That could be true.

 6    Q.   And it may or may not have value depending on the

 7    circumstances, correct?

 8    A.   Yes.

 9    Q.   And you're here to testify about damages, right?

10    A.   Yes.

11    Q.   And damages in a patent case are meant to provide

12    reasonable compensation to the patent owner only if the

13    patent is found to be infringed and valid, correct?

14    A.   That's right.  Those are two fundamental assumptions

15    that have to be made by me in order to calculate damages.

16    Q.   And you mentioned the relevant time period here as being

17    2005 to 2008, right?

18    A.   Yes.

19    Q.   And specifically it's February 1st of 2005 through 2008,

20    correct?

21    A.   Yes.

22    Q.   And even though the patent issued earlier, you agree

23    that August is not entitled to damages from before

24    February 1, 2005, right?

25    A.   Well, I haven't made a calculation from prior to that

1    period.  I guess it's up to the Court to decide what the

2    period of entitlement is.

3    Q.  But you understand that August did not mark its products

4    with the patent number, correct?

5    A.  You know, I don't know the details of the marking.  I do

6    know that you mentioned February 1st of 2005 and that was

7    the date, I believe, that the complaint was filed in the

8    case.  So that would start the period of damages.

9    Q.  Ms. McCloskey, do you remember asking for information

10   about whether August had marked its products with the patent

11   number in this case?

12   A.  I may have asked.  I don't recall.

13   Q.  And you have no information that they did indeed mark

14   their products with the patent number, right?

15   A.  I didn't -- I don't recall.  I didn't look into it

16   deeply.

17   Q.  Now, in your presentation in your slides you talk some

18   about foreign sales by Camtek and by August, correct?

19   A.  Yes.

20   Q.  And yet we're dealing only with the United States sales

21   of Camtek here, correct?

22   A.  Right.

23   Q.  And August is not entitled to any damages for any sales

24   of the Falcon machine outside of the United States, correct?

25   A.  I don't know whether they're entitled to any based on

 1    other countries' laws, but what we're here today to do, I

 2    believe, is to calculate the damages related to the U.S.

 3    sales.

 4    Q.  And that's the 36 machines that you talked about, right?

 5    A.  Yes.

 6    Q.  So let's talk about lost profits, which you discussed in

 7    your testimony, because it's your contention that August

 8    would have made every single sale for those 36 machines,

 9    right, that Camtek actually made?

10    A.  Right.  We're answering the ultimate question, if Camtek

11    had not infringed, what would August have made.  And so if

12    Camtek wasn't competing for those sales with an infringing

13    machine, would August have made the sale and what profit

14    would they have made on it.

15    Q.  And I want to talk about your demonstrative where you

16    had the four factors that we consider in looking at lost

17    profits.

18            MS. CHAPLIN:  So could we bring up Ms. McCloskey's

19    demonstrative number 3, please, on the screen.

20    BY MS. CHAPLIN:

21    Q.  Now, August has the burden to prove each one of these

22    factors to get lost profits; isn't that right?

23    A.  Yes.

24    Q.  And all four of them have to be proven, correct?

25    A.  That's -- this is one of the ways that you can prove

1    lost profits damages.  There are other ways.

2    Q.  But this is the way that you've presented here, right?

3    A.  I've used this as an example, but there is this

4    overarching question that you have to answer, which is if

5    Camtek had not infringed, what would August have made.

6    Q.  And to look at that you've looked at the demand, the

7    lack of noninfringing acceptable substitutes, August's

8    capacity to make the sale, and then your calculation,

9    correct?

10   A.  Right.

11   Q.  Okay.  And I want to start with factor number one, which

12   is customer demand.  And you say, "Customer demand for the

13   patented product"; is that right?

14   A.  Yes.

15   Q.  And the test really is August has to prove demand for

16   the patented feature, correct?

17   A.  I think that's a legal question.  I think that -- my

18   understanding is was there customer demand for the patented

19   product is the way that I've seen it written and explained.

20   Q.  Okay.  So would you agree with me that lost profits are

21   appropriate only if there's -- if demand for the product is

22   driven by the patented invention?

23   A.  That has to be one of the reasons that the product is

24   bought is because of the benefits or the features received

25   as a result -- that are provided to the product as a result

1    of the patent.

2              So in this case, you know, speed, throughput,

3    flexibility, accuracy, those are the benefits that a

4    customer would demand and if those are provided by, in part,

5    the patented feature.

6    Q.  And so just to make it clear, you recognize there's a

7    difference between the patented invention being the entire

8    product and the product having certain patented features,

9    correct?

10   A.  I'm not sure I understand the question.

11             THE COURT:  Let's stop here.  Let's have our

12   break.  Let's take a 15-minute break and come back and

13   continue with the cross.  All rise for the jury.

14        (Recess taken at 10:50 a.m.)

15                    *    *    *    *    *

16

17

18

19

20

21

22

23

24

25

1           (11:05 a.m.)

2                           IN OPEN COURT

3       (Jury enters)

4               THE COURT:  Please be seated.

5               You may continue.

6               MS. CHAPLIN:  Thank you, your Honor.

7               Mr. Roberts, could we have that slide back up,

8       please?  Thank you.

9       BY MS. CHAPLIN:

10      Q.   Now, Ms. McCloskey, we were talking about number one on

11      your slide when we took our break and that was customer

12      demand, and I want to talk about exactly what we're looking

13      for, demand for what, okay?

14      A.   Okay.

15      Q.   So you would agree with me that there is a difference

16      between assuming that the patented invention is the entire

17      product versus the patented invention being one aspect of the

18      product, right?

19      A.   Right.

20      Q.   And there would be a difference in value created by the

21      invention if it was just a part, feature of the product,

22      correct?

23      A.   Well, that would depend.  If that patented feature was

24      one of the primary reasons that people bought the product,

25      then that would have -- add significant value to the product.

1   Q.   But you'd want to look at what features are patented,

2   right?

3   A.   Yes, that's an important aspect of it.

4   Q.   And in this case, what did you identify as the patented

5   features?

6   A.   It's my understanding that the fast light or a strobing

7   light with continuous motion provides enhanced throughput on

8   the inspection system and that's one aspect of the patented

9   features.  There are other elements that are in the patent

10  that are being -- that may be asserted, but that's the

11  primary one that I looked at.

12  Q.   So the strobe light with continuous motion were the

13  features that you considered as the patented features.

14  A.   Well, within a system.  I mean, those have to function

15  together within a system with other elements in order to

16  conduct the inspection, and so a system having those

17  attributes is what my understanding was of the patented

18  invention.

19  Q.   So when you say that you -- a system, right, that you

20  considered, did you then assume that the patent covered the

21  entire machine?

22  A.   No, I didn't think that it covered the entire machine.

23  The machine has various elements to it.

24  Q.   Including unpatented elements, right?

25  A.   Right.  I mean, there's not a patent on the metal case

1    or other sort of basic aspects of it.

2    Q.   And in your presentation earlier, you did not talk about

3    what portion of the machine cost is attributable to the

4    strobe light with continuous motion, correct?

5    A.   No, but that isn't relevant anyway.

6    Q.   You didn't do an apportionment of percentage of profits

7    by feature of the products, correct?

8    A.   No, that's not appropriate in the damage calculation to

9    do an apportionment like that.

10   Q.   Now, a patented feature does not always have demand in

11   the marketplace, correct?

12   A.   Yes, and in those instances then you would provide a

13   reasonable royalty as a damage amount.

14   Q.   Right.  So if there was not demand for it, the patented

15   feature, it would be inappropriate to provide lost profits,

16   correct?

17   A.   I guess, yes.  Well, let me just qualify that a little

18   bit.

19          I think that the question that has to be answered

20   is if there had not been infringement of August's patent what

21   would August have made, and so if that meant that the Falcon

22   wasn't sold or the Falcon was sold with some other means of

23   inspection that didn't use the patented invention, would --

24   then would August have made the sales.

25   Q.   And so as part of that analysis, we need to look at

1    demand for the patented feature.

2    A.   That's one of the ways to show that.  It isn't the

3    exclusive way, but that's one of the ways.

4    Q.   Now, you understand that the '6,298 patent that we're

5    all here talking about at length is a continuation patent, is

6    that right?

7    A.   I believe that's correct.

8    Q.   And there's an earlier patent that I believe you talked

9    about in your deposition that's been referred to as the

10   '4,298 patent, correct?

11   A.   Right.

12   Q.   And do you recall that patent coming up as a subject at

13   your deposition in this case?

14   A.   Yes.

15   Q.   And I presume then at some point you took a look at that

16   '4,298 patent, is that right?

17   A.   I don't believe that I ever did.

18   Q.   Okay.  So you did not look at the '4,298 patent to

19   compare it to the patent in this case to see what, if

20   anything, the '6,298 patent added, correct?

21   A.   Right.

22   Q.   Now, I believe you reviewed lost order reports that were

23   generated by August Technology's employees that listed the

24   reasons that August believes it lost sales, right?

25   A.   Right.

1    Q.   And you recall that some customers indicated that they

2    preferred Camtek's Falcon over the NSX machine for technical

3    reasons, right?

4    A.   Right.

5    Q.   I think the box was "technical advantage" on the forms.

6    Do you recall that?

7    A.   Right.

8    Q.   And one of the reasons that customers preferred the

9    Falcon over the NSX was the fact that the Falcon had 3D

10   capability, right?

11   A.   That might have been one of the reasons.

12   Q.   Right.  And that was listed on multiple lost order

13   reports, correct?

14   A.   Right, but August had a machine that could do 2D and 3D

15   just like the Falcon could.

16   Q.   But apparently August was trying to sell an NSX machine

17   to that customer, correct?

18   A.   Well, I think Mr. Brooks testified that they would --

19   they would sell a machine that they understood was going to

20   meet the specifications of the customer.

21   Q.   And the lost order reports that we looked at were lost

22   orders where August specifically stated it was trying to sell

23   an NSX machine, isn't that right?

24   A.   Yes.

25   Q.   And you recall the problems with August's customer

1    service were also mentioned in the lost order reports, right?

2    A.    Yes.

3    Q.    And you've mentioned in your presentation earlier today

4    that product service was important, right?

5    A.    Absolutely.  These are really complex machines that need

6    a lot of hand-holding.

7    Q.    And you've seen documents indicating that Camtek's

8    customer service was very good, isn't that right?

9    A.    I've seen both, that Camtek's customer service was good

10   or that there were problems with Camtek's customer service.

11   I think both August and Camtek had good experiences and bad

12   experiences with customers.

13   Q.    Okay.  So in answer to my question, you did see

14   documents indicating that some customers had a good

15   experience with Camtek service, correct?

16   A.    Some did.

17   Q.    And you saw in the lost order reports that customers

18   attributed ease of use as a factor to why they bought the

19   Falcon machine, right?

20   A.    That was one of the reasons stated.

21   Q.    And you recall in certain circumstances one of the boxes

22   checked was that August was unable to do the application.  Do

23   you remember that?

24   A.    Yes, that was listed there too.

25   Q.    Do you recall that customers wanted on-site dedicated

1    service engineers for no cost?

2    A.   Well, that was something that was stated there, but

3    typically that was not usually the case that they would get

4    on-site service for no cost, but Camtek started to offer that

5    and so then that became an expectation of customers.  Now, if

6    Camtek hadn't been there competing because they didn't --

7    they weren't able to use -- sell the Falcon because of their

8    infringement, that expectation wouldn't have been created.

9    Q.   You would agree with me that Camtek even before the date

10   you claim that our damages period starts, that there were

11   previous sales to customers, right, that August is not

12   entitled to seek damages on, correct?

13   A.   That's the damage period, but the behavior related to

14   infringement is also relevant whether it occurred in the

15   damage period or not.

16   Q.   And you remember in the documents that customers wanted

17   custom software applications, correct?

18   A.   Some did.

19   Q.   And some customers noted that the Falcon had better

20   throughput than August, right?

21   A.   As it was configured at the test, yes, not consistently,

22   though.  August won a number of sales because of their better

23   throughput.

24   Q.   And you certainly saw some documents in which August had

25   better throughput, but they lost the sale, isn't that right?

1    A.   Yes, maybe because of price because Camtek came in with

2    a low price.

3    Q.   But you don't know why, right?  I mean, you saw that

4    August claimed to have higher throughput and yet lost the

5    sale, correct?

6    A.   Right.  Well, it says on the lost order reports why they

7    lost the sale, and sometimes they had the higher throughput,

8    but maybe Camtek came in with a lowball price.

9    Q.   And sometimes Camtek had a better defect capture rate,

10   correct?

11   A.   Well, that could have been one of the things.

12   Q.   And that goes to the accuracy of the machine, right?

13   A.   I believe so, yes.

14   Q.   And so regardless of how fast your machine can run, it's

15   only -- speed is only so valuable if you have an accurate

16   machine, right?

17   A.   Right.  I mean, that's why those three, you know, sort

18   of mantra words:  accuracy, speed and flexibility are three

19   very important things to customers.

20   Q.   And you understand that some customers wanted a free

21   demo machine for a period of time, right?

22   A.   Well, some customers were offered a free demo machine.

23   I don't know that they required it.

24   Q.   Do you remember when I was talking with Mr. Brooks about

25   the reasons why on the lost order reports people choose the

1    Falcon machine?  Do you remember that?

2    A.   Yes.

3    Q.   And let's take a look -- and we'll have to pull it up on

4    the screen.  It's previously admitted as Defendant's Trial

5    Exhibit 173.  I don't believe I have it in my book, so I'm

6    not sure if you do either, but it was admitted yesterday.

7              Do you see that document?

8    A.   Yeah.  It's in my book.

9    Q.   Oh.  Very good.  And do you recall Mr. Brooks testified

10   about that document?

11   A.   Right.

12   Q.   And I'd like you to look at the chart at the bottom that

13   summarizes the reasons from the lost order reports why people

14   chose the Falcon machine.

15   A.   Okay.

16   Q.   All right.  Now, on that chart not a single one of those

17   items mentions anything about the strobe light, correct?

18   A.   Yeah, I don't see it listed here.

19   Q.   And I don't actually see throughput on that list either.

20   Do you?

21   A.   I see "better throughput" as one of the items on the

22   left.

23   Q.   Very good.  Your eyes are better than mine.  Thank you.

24             And this indicated in that case that the Falcon had

25   better throughput, correct?

1    A.   In that particular -- well, in whatever circumstance --

2    I mean, this is a summary of a variety of different reports.

3    Q.   Right.  I understand.  And let's turn to the next page,

4    if you would with me, for the single main reason why Camtek

5    won these sales with its Falcon device.  The biggest one on

6    this pie chart is the fact that it had both 2D and 3D, isn't

7    that right?

8    A.   Right, and August had a machine that could do 2D and 3D

9    as well.  I mean, I think we're -- we need to answer the

10   question if the Falcon wasn't sold or wasn't able to be sold

11   with the infringing element to it, what would August have

12   made, and you're obfuscating it with this pie chart.  I mean,

13   if there was no Camtek Falcon, August would have made the

14   sale.  I mean, it's as simple as that.

15   Q.   And you claim they would have made every one of these,

16   right?

17   A.   Yes.

18   Q.   All right.  Let's talk about those, the infringing

19   element as you just referred to it, right?

20          So you recognize that 3D inspection is not an

21   element that's covered in the patent, correct?

22   A.   Right.

23   Q.   And in fact, you wrote in your report in this case that

24   the '6,298 patent describes an automated 2D macro inspection

25   tool, correct?

1    A.   Right.

2    Q.   And I know you were here yesterday and so you heard some

3    testimony from Mr. Brooks talking about throughput, right?

4    A.   Right.

5    Q.   And you understand from that testimony that alignment

6    matters for throughput, doesn't it?

7    A.   Right.

8    Q.   And that the speed of the camera matters for throughput,

9    right?

10   A.   Right.

11   Q.   And that the ability to focus, the camera's ability to

12   focus, matters for throughput, correct?

13   A.   Right.

14   Q.   And I think earlier you talked about the strobe light

15   and continuous motion, right?

16   A.   Right, but that goes to speed, mm-hm.

17   Q.   Mm-hm.  And I want to make sure you understand that

18   continuous motion was present in unpatented earlier products,

19   right?

20   A.   Perhaps it was.

21   Q.   And did you hear Mr. Brooks indeed testified about the

22   NSX-90, which is not covered under the patent-in-suit,

23   correct?

24   A.   Right.

25   Q.   And that that machine had continuous motion, right?

1    A.    Maybe it did.  I mean, Mr. Brooks testified.  I don't

2    know for a fact.

3    Q.    Okay.  But you recognize that there are unpatented 2D

4    macro inspection tools, correct?

5    A.    There are some, yes.

6    Q.    And the NSX-80 was such a machine.

7    A.    Right, although during the period of time that we're

8    talking about, it was long since discontinued.

9    Q.    And there was an NSX-90.  There was also an unpatented

10   2D macro inspection machine, right?

11   A.    Right, but they don't really come into play here related

12   to the damage period that we're talking about.

13   Q.    And focus more on features, and so I want to talk with

14   you a little bit about these machines.

15         Now, you did not specifically analyze whether there

16   was any consumer demand for the strobe light feature,

17   correct?

18   A.    I based my analysis of demand on the fact that the

19   Falcon infringed the -- allegedly infringes the patent, that

20   there was high market acceptance for the Falcon, there was

21   also high market acceptance for the NSX products, and that as

22   a result of the sales activity of products that incorporated

23   the patent, that presumptively demonstrates that there was

24   customer demand.

25   Q.    But my question was different.  My question was:  You

1    did not analyze whether there was consumer demand for the

2    strobe light feature, correct?

3    A.   It was my understanding that the strobe light feature

4    led to incrementally faster inspection and therefore, as a

5    result of customers' continual demand for better and faster

6    inspection, that the strobe light feature was part of the

7    customers' demand for speed.

8    Q.   Okay.  Let's take a look at your deposition.

9         MS. CHAPLIN:  Mr. Roberts, could you please bring

10   up page 184, lines 10 to 11?

11   Q.   Because you were deposed in this matter, correct?

12   A.   Yes.

13   Q.   And you testified there under oath.

14   A.   Yes.

15   Q.   All right.  And do you see your testimony there on the

16   screen where it says:  "I didn't perform an analysis about

17   demand of the strobe light"?

18   A.   Right, and I think that's what I just said.  I said that

19   the demand was for speed and that the strobe light provided

20   incrementally better speed in the inspection.

21   Q.   Now, you do know that August Technology does not claim

22   to have invented the first strobe light ever, right?

23   A.   That's true, but it was my understanding that I have to

24   assume that the patent is valid, okay --

25   Q.   Right.  I understand that's your assumption, yes.

1    A.    -- and that the Falcon infringes, and so I don't really

2    get into the details of what came before or whether a strobe

3    light is patentable or not.  That's for someone else to

4    decide.

5    Q.   All right.  So after demand, let's look back at your

6    slide where we walked through these four factors.

7               The second one is lack of any acceptable

8    alternatives, correct?

9    A.   Yes.

10   Q.   And August has the burden of proving that no acceptable

11   noninfringing alternatives existed for the patented product,

12   right?

13   A.    Right.

14   Q.   And I know you described this in your report as a

15   fundamental part of any "but for" analysis for lost profits,

16   correct?

17   A.   If you're performing an analysis based on these four

18   factors, this is an important element for satisfying the test

19   for lost profits.

20   Q.   Would you agree with me that the lack of any acceptable

21   noninfringing alternatives is fundamental to any "but for"

22   analysis regarding entitlement to claim lost profits?

23   A.   Yes.

24   Q.   Now, as part of this factor that we're looking at, the

25   lack of acceptable alternatives, you need to define the

1   market, right?

2   A.   Well, that's one way of doing it.

3   Q.   And indeed you talked about defining the market in your

4   testimony earlier, correct?

5   A.   Right.

6   Q.   All right.  And let's take a look at that.  I believe

7   that was your slide number five.

8            And there at the top you have:  "Define relevant

9   market:  finished wafer inspection," correct?

10  A.   Right, which is synonymous with backend inspection.

11  Q.   And are you aware that August has a machine called the

12  AXi that they say falls under the patent in this case?

13  A.   Right, and that's for front end applications or during

14  the manufacturing process of wafers --

15  Q.   Right.

16  A.   -- but I was trying to talk about and I testified before

17  that the relevant market is where Camtek and August compete,

18  and that's finished wafer inspection.

19  Q.   Okay.  So you're excluding the front end from your

20  market definition, correct?

21  A.   Right.

22  Q.   Now, this definition, finished wafer inspection market,

23  is different from the definition that you had in your expert

24  report, isn't that right?

25  A.   This is a term that has been used previously in the

1    trial, so I was trying to be consistent, but it's synonymous

2    with the market definition that I used in my report.  It just

3    uses slightly different words so that the jury hears the same

4    term.

5    Q.   All right.  And I'd like to look at the words that you

6    used in your earlier report.  If you could -- I have

7    Defendant's Exhibit 1025 for demonstrative purposes.

8         MS. CHAPLIN:  We move to admit Defendant's Exhibit

9    1025 just for demonstrative purposes.

10        MR. GRUMBLES:  No objection.

11        THE COURT:  Be admitted.

12   Q.   Now, Ms. McCloskey, if you could turn your attention to

13   that Exhibit 1025.  It's on your screen there or in your

14   book, whatever is more convenient.

15        I've taken your slide and I've added your

16   definition from your report where you said the relevant

17   market in this case was automated 2D macro inspection market

18   for silicon wafers, correct?

19   A.   Is that the quote from my report, yes.

20   Q.   Yes.  And the 2D, right, the two-dimensional inspection

21   aspect of that definition is not something that you talked

22   about earlier, correct?

23   A.   I'm sorry.  In what context?

24   Q.   When we look at how you define the relevant market in

25   your earlier testimony, it was just basically all backend

1    inspection, right?

2    A.   Right.

3    Q.   And now in your report, though, you were much more

4    precise about two-dimensional inspection in the backend

5    inspection arena, right?

6    A.   Well, that's primarily what goes on in the backend is

7    two-dimensional inspection.  There's only a small amount of

8    3D inspection that's done during the bumping process and not

9    everyone even uses 3D inspection in the backend.

10   Q.   And so in your report and at your deposition you

11   excluded three-dimensional inspection in the backend from

12   your relevant market, correct?

13   A.   I wouldn't say I excluded it, but we're talking about

14   backend inspection or finished wafer inspection.  That's

15   primarily two-dimensional throughout almost the process of

16   the backend or finished wafer inspection, and then a small

17   portion of it includes a three-dimensional piece, but you

18   still have to do -- you always do two-dimensional inspection

19   in the backend and a little bit of it is three-dimensional.

20   Q.   So this definition that's in the red from your report,

21   do you agree that that's the relevant market to consider for

22   damages here in this case?

23   A.   Absolutely.

24   Q.   All right.  And indeed, you came to that definition that

25   I had up in the red, the two-dimensional for silicon wafers,

1    based on your discussions with August Technology's management

2    and review of documents in this case, correct?

3    A.   Right.

4    Q.   And you define a relevant market because you need to

5    know where the parties are competing to know if there's other

6    competitors, correct?

7    A.   Right.

8    Q.   And you testified that it's your opinion that in that

9    market it's only August and Camtek, right?

10   A.   In the United States.  Those are the only competitors

11   that have had any sales success.

12   Q.   Now, in coming to your analysis of who is in the market,

13   I know in your report it states that there is not a formal

14   market study about market share for this market, right?

15   A.   Right.

16   Q.   And in your reports you did not express an opinion about

17   what Camtek's market share was versus August's market share,

18   right?

19   A.   Right.  I mean, it's pretty easy to do the math, though.

20   Thirty-six and 54 are the systems that were sold in the U.S.

21   market and then you just figure out who has what share.

22   Q.   Now, you understand that there are companies that sell

23   machines that do both two-dimensional inspection and have

24   three-dimensional capability, right?

25   A.   Right.  The Falcon has that and the August 3Di has that

1    capability.

2    Q.   And if a machine is sold having both two-dimensional and

3    three-dimensional inspection capability, you'd agree that

4    that machine would be a competitor for the NSX products,

5    right?

6    A.   Perhaps, but the test that we have to meet here is that

7    they were acceptable, and I think that I've already testified

8    that there was a lack of acceptability of the other

9    customers' 2D/3D machines.

10   Q.   But you'd agree that there were a number of companies

11   offering for sale 2D and 3D inspection devices for the

12   backend, right?

13   A.   Right, there were, but they never made any sales because

14   we presume that there was something about them that wasn't

15   acceptable, they weren't fast enough or they didn't meet some

16   other criteria.

17   Q.   Right, and that's a presumption on your part, right?

18   A.   Well, we don't have any evidence to the contrary.

19   Q.   Right.  And you don't have access to ICOS's sales

20   documents, correct?

21   A.   No, we don't.

22   Q.   And you had no access to RVSI's sales documents.

23   A.   We do now because August bought RVSI.

24   Q.   They did.  But you did not have access to see if RVSI

25   had sales during the relevant period, correct?

1    A.   No.  I went -- I based my analysis on discussions with

2    August salespeople and what they knew based on their calling

3    on customers and then later we confirmed that RVSI had no

4    sales.

5    Q.   And you had no access to SolVision sales documents,

6    right?

7    A.   Right.

8    Q.   And you did not have access to documents from ICOS on

9    whether they called on a customer to try to sell a backend

10   inspection device, right?

11   A.   Right.

12   Q.   And you had no access to RVSI's documents on whether

13   they tried to call on a customer for selling a backend

14   inspection device, right?

15   A.   Right.

16   Q.   And the same for SolVision.

17   A.   Right.

18   Q.   And indeed, as you testified at your deposition, you

19   understand that RVSI had a machine that did 2D and 3D

20   inspection, right?

21   A.   That's my understanding.

22   Q.   And you've heard testimony about RVSI's machine that did

23   three-dimensional inspection, right?

24   A.   Right.

25   Q.   And indeed, you state in your report:  "RVSI was

1    marketing its tools in the United States during the relevant

2    time period," correct?

3    A.    They may have been marketing, but they weren't selling.

4    Q.    And you knew that the RVSI WS series machines did 2D and

5    3D inspection, correct?

6    A.    Right.

7    Q.    And before August or Rudolph acquired RVSI, you

8    understand that RVSI was located on the East Coast in the

9    United States, right?

10   A.    That's right.

11   Q.    And you understand that in some of the situations where

12   Camtek sold Falcon machines, RVSI was also competing for

13   those sales, correct?

14   A.    I don't think we know that they were competing for those

15   sales, but we know that RVSI systems were being tested with

16   the others.  I have no idea whether they had actually

17   proposed anything or had made a quote.

18   Q.    But you know they were present in those situations, is

19   that right?

20   A.    Well, I only know of a few.

21   Q.    Okay.  But you know that RVSI was present at a few.

22   A.    Well, I don't know if their salespeople were present,

23   but their machine was being tested, and I don't know if that

24   was because that customer already owned an RVSI machine or if

25   there was an active sale going on.

1    Q.   Because you didn't have access to those records,

2    correct?

3    A.   Not at the time that I did my report.

4    Q.   And you certainly reviewed information, public

5    information, about RVSI, right?

6    A.   Right.

7    Q.   And you've reviewed documents indicating that RVSI said

8    it was making product sales, right?

9    A.   Yes.  RVSI was claiming to be making product sales,

10   although it isn't clear where because they weren't -- the

11   August salespeople never saw them.

12   Q.   And even through RVSI's financial trouble, right, there

13   were some articles and materials that you reviewed about

14   RVSI, right?

15   A.   Right.

16   Q.   And from those you know that there were articles saying

17   that RVSI was aggressively pursuing sales of its wafer

18   inspection devices, correct?

19   A.   They could have said that.  I don't recall specifically.

20   Q.   And in your reports you disclose that RVSI was a company

21   that was competing here, right?

22   A.   I probably did, yes.  I mean, they were -- they were a

23   United States company.

24   Q.   And at your deposition you also talked about ICOS as

25   being another company that you referred to as being in the

1    mix here.  Do you remember that?

2    A.   Right.

3    Q.   And I know you mentioned on your direct testimony about

4    ICOS selling eight tools to CREE in the United States,

5    correct?

6    A.   Right.

7    Q.   And other than Texas Instruments, are you aware of any

8    Camtek customer that bought eight or more machines?

9    A.   I don't think so.

10   Q.   And eight machines is a big sale of these devices,

11   right?

12   A.   Yes, certainly.

13   Q.   And you looked at public information available about

14   ICOS, didn't you?

15   A.   Yes.

16   Q.   And I presume you would have looked at ICOS's web site,

17   right?

18   A.   Right.

19   Q.   And thus you would have seen that in 2005 ICOS was named

20   a recipient of Intel Corporation's Preferred Quality Supplier

21   Award for its efforts in supplying Intel with semiconductor

22   inspection equipment.  Do you remember that?

23   A.   Yes.

24   Q.   And you're aware then that ICOS has an office in Redwood

25   City, California, right?

1    A.   I think I heard that from Mr. Brooks' testimony, but I

2    don't know that I knew that already before today.

3    Q.   All right.  I know you said you looked at their web site

4    and I can direct you to Defendant's Exhibit 1032.  It's in

5    your binder there.

6            MR. GRUMBLES:  Your Honor, we object on hearsay

7    grounds.  There's some kind of third-party press release.

8            MS. CHAPLIN:  Your Honor, it's a document she

9    identified, that she went to ICOS' web site, and it's

10   actually not a press release.  It's just a location list.

11           THE COURT:  Did she say that she looked at it?

12           MS. CHAPLIN:  She said that she look at their web

13   site.

14           MR. GRUMBLES:  Your Honor, there's no foundation

15   that she actually looked at this document.

16           THE COURT:  It's cross-examination.  Go ahead.

17   It's your expert.  If she looked at it, she can cross-examine

18   on it.

19   BY MS. CHAPLIN:

20   Q.   Now, Ms. McCloskey, do you have Defendant's Exhibit 1032

21   in front of you?

22   A.   Yes.

23   Q.   All right.

24           MS. CHAPLIN:  And, Mr. Roberts, if you could bring

25   that up on the screen.

1235

1    Q.   You recognize from being at ICOS's web site that this is

2    a page from the web site, correct?

3    A.   I've never seen this page.

4    Q.   Okay.  Could you look at the second page with me at the

5    bottom of the page.  Do you see that ICOS identifies itself

6    as having a U.S. office at Redwood City, California?

7    A.   That's what it says here.  I don't know.  This doesn't

8    have a date on it.  It doesn't have a URL from the Internet,

9    so I don't know anything about this document.  I've never

10   seen it before.

11   Q.   All right.  Now, looking at ICOS's information from the

12   web site like you talked about, you're aware that ICOS took

13   over the 2D wafer inspection technology of Siemans AG in

14   2004, right?

15   A.   I don't recall that.

16   Q.   Okay.  And you certainly heard of KLA during these

17   proceedings.

18   A.   Yes, I'm familiar with the company KLA.

19   Q.   And you know that they're a company in the United

20   States, right?

21   A.   Right, but they do -- their systems do a different level

22   of inspection.

23   Q.   You're talking about their front end inspection devices,

24   right?

25   A.   That's right.

1    Q.   Okay.  And were you here this morning when Mr. Brooks

2    testified about the fact that KLA has acquired ICOS?

3    A.   Yes.

4    Q.   And that that happened in 2008, right?

5    A.   I believe that's what he said.

6    Q.   And you know that ICOS's machine does both two

7    dimensional and three-dimensional inspection, right?

8    A.   I believe that that's the case, but I don't know

9    specifically.

10   Q.   Now, in your report you wrote:  "There were two

11   companies that offered 2D macro inspection products in the

12   U.S. market, RVSI and ICOS," correct?

13   A.   Yeah, I see that on page 21 of my report you're reading

14   from.

15   Q.   Yes, that's correct.

16   A.   Mm-hm.

17   Q.   And then at your deposition you also talked about the

18   company called SolVision as also being in the mix here.  Do

19   you recall that?

20   A.   Yes.

21   Q.   And you acknowledge that in certain circumstances there

22   were other companies competing for sales in the U.S. with

23   Camtek and August, right?

24   A.   That's right, but the existence of a competitor or an

25   offer doesn't make it acceptable.  It has to have the

1   attributes that are offered by the patented invention in

2   order to make it an acceptable substitute.

3   Q.   And that's your opinion.

4   A.   No, that's I believe right out of the professional

5   literature and the case law, but I'm not a lawyer, so I'll

6   let you lawyers argue about it.

7   Q.   All right.  So even though RVSI was out competing for

8   sales that Camtek got, you ended up dismissing them from your

9   analysis as if they did not exist, correct?

10  A.   Not as if they didn't exist.  I acknowledged their

11  existence and reviewed all of the information that I could to

12  understand whether they were acceptable or not and they

13  weren't acceptable.  No one ever bought their products in the

14  United States.

15  Q.   That you're aware of.

16  A.   Well, that anybody's aware of at least in this case,

17  because we haven't heard of anybody buying anything from

18  them.

19  Q.   Let's take a look at your deposition, because we asked

20  you this question there.  It's page 167, starting at line 24

21  and going to page 168, line 3.  You were asked:

22          "Question" -- talking about RVSI -- "Okay.  So you

23  just dismissed them as if they didn't exist, right?

24          And you answered:  "Based on all of my analysis of

25  RVSI, yes."

1    Correct?

2    A.   Well, that's what it says there based -- that I

3    dismissed them as if they didn't exist?  Well, that they

4    weren't acceptable.

5    Q.   And you also ended up dismissing ICOS from your analysis

6    as if they did not exist, correct?

7    A.   Well, they weren't an acceptable substitute.

8    Q.   So the answer to my question is yes?

9    A.   Yes.

10   Q.   And the same thing for SolVision, correct?

11   A.   Right.

12   Q.   Now, you realize from Mr. Brooks' testimony and from

13   probably earlier testimony in this case that people can also

14   choose to do manual inspection, right?

15   A.   Well, they can, but I think Mr. Brooks said that once

16   they've switched to automated inspection they don't go

17   backwards.

18   Q.   Were you here to hear the testimony about Flip Chip and

19   the fact that they have some manual inspection still in other

20   countries?

21   A.   I believe so.

22   Q.   And August also sold a WAV product.  I believe we say it

23   WAV, W-A-V.  Do you remember that?

24   A.   Right, the WAV 1000.  It was a product that they

25   acquired from a firm called STI.

1   Q.   Yes.  Thank you.  And you did not consider the WAV 1000

2   as a noninfringing alternative in your analysis, correct?

3   A.   Right.  I mean, by the time that -- we're talking about

4   the sales competition between Camtek and August.  The

5   WAV 1000 was being discontinued and it was considered to be

6   an inferior product as compared to the NSX and 3Di products.

7   Q.   And August considered it an inferior product; is that

8   what you're saying?

9   A.   Right.

10  Q.   Now, it's your understanding that there is a separate

11  market for 3D-only machines, is that right?

12  A.   There was a need for 3D-only machines in the bumping

13  process in the backend, or that could also be accomplished by

14  a combination 2D/3D machine.

15  Q.   And you see that as a separate market, this 3D market,

16  right?

17  A.   Well, they're selling to the same customers, but it's a

18  separate market from the one that Camtek and August competed

19  in, which was a 2D/3D combined market.

20  Q.   And you recognize that if a customer needed 3D

21  inspection capability, then a two-dimensional inspection

22  device would not suffice, right?

23  A.   Well, it depended on what kind of 3D inspection that

24  they needed.  The NSX could do a limited kind of 3D

25  inspection, but maybe not probe inspection or bump height

1    measurement and that sort of thing.

2    Q.   Now, we've been talking about 36 machines of Camtek's,

3    right, at issue here?

4    A.   Yes.

5    Q.   And most of those machines are capable of doing 3D

6    inspection, correct?

7    A.   Right, many of those were capable.  They were 2D/3D

8    combined machines.

9    Q.   Indeed, 21 of the 36 machines had this 3D capability,

10   right?

11   A.   Right.

12   Q.   And that was -- Camtek's 800 series had 3D capability,

13   correct?

14   A.   The Falcon 800 had 2D and 3D capability combined in one

15   machine and it was sold as one machine, and there were other

16   Falcon machines where 3D was added on, could be added on if

17   the customer wanted that.

18   Q.   And those -- the add-on component of 3D was if it had

19   the CCS, the LTS or CTS component, right?

20   A.   Right.

21   Q.   And it's your understanding, isn't it, that the NSX

22   machines were strictly 2D inspection systems?

23   A.   Right.  I mean, with a very limited kind of ability to

24   do some 3D, but yes, they primarily were a 2D inspection

25   system for the backend.

1   Q.   Okay.  I'd like to look at your deposition testimony,

2   page 90, line 6 to 10, where we were asking about the NSX

3   machine.  Do you recall testifying:

4        "It's my understanding that the NSX machines are

5   strictly 2D inspection systems and they don't -- they don't

6   have a 3D module that I'm aware of."

7        Correct?

8   A.   Right, that's correct, but we did hear Mr. Brooks say

9   that there was a limited ability of the NSX to do a little

10  bit of 3D, but I don't want to present it as it was capable

11  of doing the same kind of 3D that a 3Di machine could do.

12  Q.   Or that a Falcon could do, right?

13  A.   Or that a Falcon could do, right.  It was a 2D machine

14  and it was designed for two-dimensional inspection.

15  Q.   Now, in the 3D category, you realize that there were

16  suppliers who offered 3D-only inspection devices, right?

17  A.   Right.

18  Q.   In addition to August, in addition to the machines that

19  we've talked about thus far, is that right?

20  A.   Right.

21  Q.   And indeed, I'm sure you heard that RVSI's machine with

22  3D capability was the benchmark for IBM.

23  A.   Right.

24  Q.   Now, in your analysis, you assumed that if a customer

25  bought a Camtek 800 series machine with 3D capability, that

1    that customer would have bought August's 3Di machine, right?

2    A.   Right.  For purposes of my calculation, I assumed that a

3    Falcon 800 -- if they had not been able to sell a Falcon 800,

4    that customer would have bought a 3Di.

5    Q.   And then in looking at the Camtek sales that included

6    the 3D module, the three letters that we had talked about,

7    right the add-on, right, the CCS, LTS or CTS module, right,

8    then you assumed that the customer would have chosen either

9    an NSX or a 3Di machine from August if Camtek was not

10   available, right?

11   A.   That's right.

12   Q.   But you weren't sure which one they would buy, correct?

13   A.   Right.  It wasn't clear, because sometimes Camtek would

14   propose a Falcon machine and August would propose an NSX

15   machine, and then ultimately Camtek would sell a Falcon

16   machine with a 3D option on it.  So it wasn't clear

17   whether -- that the customer initially wanted both 2D and 3D,

18   or if the customer wanted just 2D and then later added on the

19   3D option once the sale was finalized.  There wasn't enough

20   information to know that, so I tried to create a combination

21   of either they would have bought an NSX or they would have

22   bought a 3Di in the absence of a Falcon.

23   Q.   And so that combination that you're talking about, I

24   know you represented it in your report as NSX/3Di, right?

25   A.   Right.  I made a calculation of a blend of the profit

1    between those two systems without knowing how the customer

2    would have actually decided it.  I mean, we can't know that

3    because the customer bought a Falcon, so we have to make an

4    assumption that they would have either bought an NSX or a 3Di

5    depending on their application.

6    Q.   Right.  Because there wasn't a machine that was an

7    NSX/3Di, to avoid confusion.

8    A.   Right, there wasn't.  That was just something that I did

9    in order to create a profit amount that would allow the

10   customer to -- you know, sort of customer preference to drive

11   the sale, and that was based on the historical sales of NSX

12   and 3Di.

13   Q.   And if I remember right, that historical sales mix

14   showed that nine-tenths of people chose the NSX over the 3Di,

15   correct?

16   A.   Right, and that's pretty consistent with the type of

17   inspection that goes on in the finished wafer inspection part

18   of the process.  The majority of the inspection that goes on

19   in the backend is two-dimensional inspection and then

20   sometimes there is three-dimensional inspection of bumps.

21   Q.   Now, in trying to figure out which product they would

22   have bought to come to this analysis, you spoke with a

23   Mr. Rick Trevino, who's a salesperson for August, correct?

24   A.   Right.

25   Q.   And in that discussion he noted that the 3Di was a much

1    more expensive machine, right?

2    A.    That's right.

3    Q.    And the NSX machine lacked the 3D capability, right?

4    A.    Yes.

5    Q.    And so he said it was hard to say how that would have

6    played out.

7    A.    Exactly, so that's why I had to make a blended profit

8    amount.

9    Q.    Now, during our damages period, so February 1st, 2005

10   through 2008, August only sold three 3Di machines in the

11   United States during that entire time period, right?

12   A.    Yes.

13   Q.    And specifically, August did not sell a single 3Di

14   machine in 2007, correct?

15   A.    That's right.

16   Q.    And they didn't sell a single 3Di machine in the first

17   half of 2008, right?

18   A.    Right.

19   Q.    I think that's as far as your data went in 2008 in your

20   report, if you recall that.

21   A.    Yes.

22   Q.    And you recall that customers expressed concerns about

23   August's 3Di machine, right?

24   A.    Some did, others were satisfied with it.

25   Q.    And you know that some concerns were that the 3Di

1    machine had much slower throughput than other competitors'

2    machines, right?

3    A.    That was in the 3D portion of it, yes.  The 2D portion

4    was similar throughput as an NSX, because it basically was an

5    NSX machine with 3D bolted onto it.

6    Q.    But when the 3Di machine did 3D inspection, it had much

7    slower throughput than other machines, right?

8    A.    Than other competing 3D machines.

9    Q.    Exactly.  And throughput's extremely important, I

10   believe you said, right?

11   A.    Well, it's my understanding that throughput is really

12   important in the 2D inspection portions of the backend, and

13   when it relates to 3D inspection, obviously throughput is

14   important, but they're not usually inspecting a hundred

15   percent.  They're just inspecting a portion or a sampling.

16   So the speed of a 3D is always going to be slower than a 2D

17   just because of the way that the technology works, as I

18   understand it.

19   Q.    But you'd certainly expect a customer in choosing among

20   various 3D machines that are available to look at the

21   throughput to see how fast it can operate.

22   A.    Oh, sure, absolutely, yeah.  It's very important.

23   Q.    Let's turn to a specific situation and that is on Texas

24   Instruments, because you claim that August would have made

25   every single sale that Camtek made to Texas Instruments,

1    right?

2    A.    Yes.

3    Q.    And that's 16 machines.

4    A.    Right.

5    Q.    So a significant portion of our 36 machines, right?

6    A.    Right.

7    Q.    Now, you're aware that Texas Instruments did an

8    evaluation of six different machines before it decided to buy

9    from Camtek, correct?

10   A.    Right.

11   Q.    And let's take a look at that.  That's Defendant's Trial

12   Exhibit 930 in your binder.

13           MS. CHAPLIN:  Your Honor, we previously discussed

14   this exhibit with opposing counsel and we move for its

15   admission, Defendant's Exhibit 930.

16           MR. GRUMBLES:  No objection.

17           THE COURT:  Be admitted.

18           MS. CHAPLIN:  Thank you, your Honor.

19   Q.    Do you have it there in your binder?

20   A.    Yes, I do.

21   Q.    All right.  So let's take a look at that on the screen,

22   and it has a declaration on the front of it from a gentleman

23   from Texas Instruments talking about these documents coming

24   from Texas Instruments.

25           And if you turn to page -- it's behind Exhibit A,

1     the first page.  It probably will look more familiar to you.

2              Do you see that?  It's marked CAM 36276.  Are you

3     there?

4     A.   Yes.

5     Q.   All right.  And you recognize this as an evaluation or a

6     report on an evaluation that Texas Instruments did on

7     Camtek's Falcon machine.

8     A.   Yes.

9     Q.   And this is a document that you discussed at your

10    deposition, correct?

11    A.   Right.

12    Q.   And you understand from this document that Texas

13    Instruments looked at the Camtek Falcon, right?

14    A.   Right.

15    Q.   And also that they looked at RVSI's WS 2500 tool, isn't

16    that right?

17    A.   Right.

18    Q.   And they also looked at August's WAV 1000 tool, right?

19    A.   Right.

20    Q.   And they also looked at August's NSX-95, NSX-105, and

21    the 3Di machine, right?

22    A.   Right.

23    Q.   Let's look at the first page, the summary at the top,

24    just so everyone can see it or hear it.  I'll read that first

25    little section.  It says:

1           "The Camtek AVI tool was determined to be the best

2    alternative out of 6 vendors with a value of 7.9 with the

3    nearest vendor being RVSI with a value of 7.8 based on 6

4    categories:  defects, capacity, engineering/technology,

5    program time, company strength, and cost."

6           Do you see that?

7    A.   Yeah.  It just -- the one thing I'd clarify is it says:

8    "ENG/TECH," which I think doesn't mean technology.  I think

9    it means engineers or technicians.

10   Q.   Very good.  Thank you for that correction.

11   A.   Yup.

12   Q.   All right.  But you would agree me that this report

13   shows that the RVSI machine got the second highest score

14   after Camtek's Falcon machine, right?

15   A.   Right.

16   Q.   And that company strength was something already

17   considered by Texas Instruments in coming to the value that

18   it gave to the RVSI machine, correct?

19   A.   Right.

20   Q.   And I know I talked about one exhibit with Mr. Brooks

21   yesterday and I'd like to turn your attention there.  It's

22   not in your book, but it's previously admitted, so we'll

23   bring it up on the screen, and that's Defendant's Exhibit

24   201.

25           I know it's a little hard to see on your screen

1    there, so I'll tell you a little bit of what it is and then

2    we can zoom into a particular spot.

3              This is an e-mail -- I'm looking at the bottom of

4    that first page -- that Robert Backie sent to Mr. Brooks on

5    July 26th, 2006, and on the second page, August 50713, it

6    reports feedback that Texas Instruments DBUMP provided to

7    August.

8              Do you remember this document?

9    A.   Yes, I do.

10   Q.   All right.  And so this is one of the documents that you

11   saw that showed that there were some serious issues with

12   August's customer service, correct?

13   A.   Yeah.  Looks like they were pretty mad.

14   Q.   It does.  And despite this fact, you still contend that

15   August would have sold all 16 machines to Texas Instruments

16   if the Camtek Falcon was not in the market, right?

17   A.   Absolutely, because --

18   Q.   And that's despite the fact that the RVSI machine scored

19   second above the August machines, correct?

20   A.   I think you have to take this document in the proper

21   context.

22             First of all, August absolutely would have made

23   these sales.  August had products, systems in place at Texas

24   Instruments.  They obviously were having some difficulty and

25   Mr. Brooks testified about this and now today there are not

1    issues with Texas Instruments.

2          If the Falcon wasn't offered, August would have

3    continued to be the provider to Texas Instruments, and

4    RVSI -- and RVSI, while it scored on this rubric here in this

5    analysis which you didn't actually show, there are weighted

6    elements to this that talked about the different elements

7    there.  If you take away the number of technicians that were

8    involved to operate the machine, the August machines would

9    have scored the highest.

10   Q.   But in order to get there we'd have to take away the

11   technicians number for RVSI, right?

12   A.   Well, what that meant was then, on defect analysis,

13   wafer capacity, the programming and the company strength,

14   August would have beat RVSI.  And so the number of

15   technicians is sort of immaterial here if the technology was

16   better.  RVSI was already in the tube or down -- in

17   bankruptcy, basically, at this point in time.

18          So, you know, I just don't see how RVSI would have

19   made this sale.  There's just no evidence that they would

20   have.

21   Q.   But Texas Instruments took the time to look at them,

22   right?

23   A.   Well, I think Texas Instruments may have already owned

24   an RVSI at that time.  We don't know whether RVSI was

25   actually competing here.  I think they were just trying to

1    compare the Falcon, which was a new offering, and so they

2    compared it to what they knew.

3    Q.   And that's your assumption, though.

4    A.   It -- there's -- there's not a lot of other evidence to

5    the contrary.

6    Q.   Let's talk about Flip Chip, all right?  It's a hard one

7    to say, Flip Chip.

8              Now, you claim that August would have sold its

9    products to Flip Chip if Flip Chip had not bought the Falcon,

10   right?

11   A.   Yes.

12   Q.   And you understand that August subpoenaed Flip Chip for

13   documents in this case, right?

14   A.   Right.

15   Q.   And you certainly would have looked at those documents,

16   right?

17   A.   Yes.

18   Q.   And are you aware that Mr. Gardiola of Flip Chip came

19   and testified here with us?

20   A.   I believe so.

21   Q.   All right.  And do you recall that he testified about a

22   Mr. Pablo Soriano that worked at Flip Chip's bumping

23   division?

24   A.   I wasn't present for his testimony, so I don't know what

25   he said.

1    Q.   All right.  And you haven't reviewed the transcript of

2    his testimony.

3    A.   No.  I'm sorry.  I haven't.

4    Q.   Okay.  Now, did you indeed, though, look at these

5    customer documents, right, as part of your analysis of what

6    these customers would have done?

7    A.   Well, I looked at a number of documents.

8    Q.   Okay.  Why don't we --

9    A.   I assume so.  I mean, I'd have to see the document to

10   know for sure whether I'd seen it before.

11   Q.   Let's take a look at then, Defendant's Trial Exhibit

12   1009, please.  It's in your book.

13   A.   (Witness complies).

14   Q.   It's a document produced by Flip Chip in response to a

15   subpoena in this case talking about when Flip Chip analyzed

16   the Falcon.

17   A.   Right.

18   Q.   Okay.  So you recognize that document?

19   A.   I do.

20   Q.   All right.

21          MS. CHAPLIN:  Your Honor, we move for admission of

22   Defendant's Exhibit 1009.

23          MR. GRUMBLES:  No objection.

24          THE COURT:  Be admitted.

25   Q.   Now, I'm going to direct you based on the Bates numbers

1   at the bottom, the little FC numbers, and FC 132 shows that

2   the objective was to qualify the Camtek tool to perform 3D

3   measurements on bumped wafers.

4            Do you see that?

5   A.   Yes.

6   Q.   All right.  And let's turn to page FC 137, which is a

7   Bump Height (Bump to Bump Comparison in Microns) chart.

8            Do you see that?

9   A.   Okay.

10  Q.   Okay.  And do you see that in that chart, the machines

11  that were doing the measurements were RVSI and Camtek?

12  A.   Okay.

13  Q.   All right.  And let's look at the next page, FC 138,

14  which is another Bump Height (Die to Die Comparison in

15  Microns) chart.  Do you see that in that chart the machines

16  that were doing the measurements were also Camtek and RVSI?

17  A.   I see that.

18  Q.   And yet it's your contention that August would have made

19  the sales to Flip Chip that Camtek made if Camtek was not in

20  the market, right?

21  A.   That's right.  Flip Chip was a customer of August, not

22  necessarily at this particular facility that they're talking

23  about, but Flip Chip had bought a number of products from

24  August. And I'm sure -- I think Mr. Brooks testified that

25  they frequently called on Flip Chip.

1    Q.   And specifically the bumping division?

2    A.   That I don't remember.

3    Q.   One thing that you talked about in your deposition

4    was -- well, and here today -- was about calculating damages,

5    right?

6    A.   Right.

7    Q.   And that you looked at profitability numbers, correct?

8    A.   Yes.

9    Q.   And so I know that in some of your calculations in this

10   case you looked at Camtek's spending on research and

11   development, right?

12   A.   Not as it related to lost profits I didn't.

13   Q.   Okay.  But you certainly looked at that information,

14   right, in this case, research and development numbers?

15   A.   I may have.

16   Q.   All right.  And you determined that Camtek's spending on

17   research and development was high, totaling 24 percent of

18   their total sales amount.  Do you remember that?

19   A.   I think you'll have to refresh my recollection.

20   Q.   Let's look at -- I'm looking at an answer from your

21   deposition, although I don't have my specific page here.

22        You said that:  "Camtek's R&D expense seemed really

23   out of whack.  It's almost -- it's 24 percent of their total

24   sales."

25        Does that sound right?

```
 1    A.    I may have said that.

 2    Q.    Okay.  And you remember that August's R&D spending was

 3    ten percentage points lower than that, correct?

 4    A.    Is that what I testified in my deposition?

 5    Q.    How about I'll read you this part and you tell me if

 6    it's accurate.

 7              "Whereas August's is ten percentage points lower

 8    than that and they're spending -- August is spending less

 9    money overall nominally than Camtek.  August only spends a

10    little over $3 million and Camtek is spending like five

11    million."

12              Does that sound right?

13    A.    If I testified to that, I'm sure it was correct.  I

14    just -- I can't get there from -- I can't remember.

15    Q.    I understand.

16    A.    Okay.

17    Q.    That's fine.  And unfortunately I'm lacking my page

18    number, so don't worry.

19              THE COURT:  Let's stop here.  We'll start up again

20    at 2 o'clock, 2 o'clock.

21              All rise for the jury.

22              (Lunch recess taken at 12:20 p.m.)

23                        * * * * *

24

25
```

1    (2:10 p.m.)

2                           **IN OPEN COURT**

3                           **(JURY PRESENT)**

4           THE COURT:  You may continue.

5           MS. CHAPLIN:  Thank you, Your Honor.

6    BY MS. CHAPLIN:

7    Q.  Ms. McCloskey, when we took our break we had just been

8    talking about research and development expenses.  I failed

9    to have my page at the deposition there for you, so let's

10   take a look at that quick, which is page 212 of your

11   deposition, line 7 to 16.

12          And I believe that it states, "So, you know, I

13   mean, my initial concern, which I think I already mentioned,

14   is that their R&D expense seemed really out of whack.  It's

15   almost -- it's 24 percent of their total sales.  Whereas,

16   August's is 10 percentage points lower than that and they're

17   spending, August is spending less money overall, nominally

18   than Camtek.  August only spends a little over $3 million

19   and Camtek is spending like 5 million."  Do you see that?

20   A.  Yes.

21   Q.  Okay.  And that was your testimony at your deposition,

22   correct?

23   A.  Right.

24   Q.  Now, when we talked about ICOS's machine and when you

25   testified earlier about the ICOS machine, you said that it

1   was not an acceptable alternative, correct?

2   A.   Right.

3   Q.   And yet Cree bought eight of those machines.  So it was

4   acceptable to them apparently, right?

5   A.   It was acceptable to Cree for the purpose that they were

6   using it.

7   Q.   That's right.  And the August machine, in order to get

8   it ready for Cree's purposes would have taken 1 million

9   dollars' worth of development, correct?

10  A.   Right.  And I think the ICOS machine was also going to

11  require modification, but ICOS was willing to do it for no

12  charge.

13  Q.   Okay.  Are you aware that ICOS sold the machine to

14  Tessera in the United States during the period at issue

15  here?

16  A.   I've never heard of Tessera.

17  Q.   Okay.  Are you aware that ICOS sold the machine to

18  Silicon Microstructure in the United States during the

19  relevant period here?

20  A.   I've never heard of that company either and I don't

21  believe that Mayson Brooks, who is more familiar with this

22  marketplace, had ever heard of those two companies.

23  Q.   And you certainly looked at August's documents talking

24  about competition in this marketplace, correct?

25  A.   Yes.

1   Q.  I'd like to have you look at one more, which I don't

2   have in your binder, so I will bring you a copy.

3           Ms. McCloskey, I've handed you what's been marked

4   as Defendant's Trial Exhibit 1036, which is a document

5   produced by August Technologies bearing production number

6   August 44258 -- I'm sorry -- 253 to 44255.  Do you see that?

7   A.  Yes.

8   Q.  And you reviewed documents like this about competition,

9   correct?

10  A.  If you could just give me a second, I'll read it.

11  Q.  Of course.

12          (Pause.)

13  A.  I've read other documents like this.  I don't recall

14  this particular one.

15  Q.  All right.  But you certainly looked at documents about

16  August trying to get sales in the United States, right?

17  A.  Yes.

18          MS. CHAPLIN:  Your Honor, we move for admission of

19  Defendant's 1036.

20          MR. GRUMBLES:  No objection.

21          THE COURT:  1036 will be admitted.

22  BY MS. CHAPLIN:

23  Q.  Now, Ms. McCloskey, you will see, if we look at the top

24  of this e-mail string that's dated November 29, 2006, that

25  it's about Fairchild Semiconductor in Pennsylvania.  Do you

1    see that?

2    A.   The "PA" stands for Pennsylvania?  Because that isn't

3    obvious.

4    Q.   Well, if you look at the next page, it talks about

5    Mountain Top, PA, and gives a 570 area code, so it appears

6    to be in the United States.  Do you see that?

7    A.   Okay.

8    Q.   And I'd like to direct your attention on the first page

9    to what's the third e-mail down from Todd Brown, who I

10   believe we have learned as a salesperson for August, on

11   November 29, 2006 talking about doing an application study

12   for Fairchild.

13           And looking at the last paragraph of that e-mail,

14   it states, "As usual, the sooner we can get to it the better

15   off we will be.  We are in direct competition with Camtek

16   and ICOS for this business.  Thus I want to demonstrate

17   edge, back side, and ADC as differentiator capabilities."

18   Do you see that?

19   A.   Yes.

20   Q.   So you understand that August was competing with ICOS

21   and Camtek for sales of back-end inspection devices, right?

22   A.   Well, at Fairchild they were, but I'm not aware that

23   ICOS was a competitor in any of the sales that Camtek won

24   and I don't know the extent to which ICOS was even being

25   considered other than what it says in this e-mail.

1    Q.  All right.  Now, if Camtek was not in the marketplace,

2    right, you have said that August would get all of these 36

3    sales, right?

4    A.  Yes.

5    Q.  And yet it's certainly possible if Camtek was not in the

6    marketplace, that ICOS would have become even more popular;

7    isn't that right?

8    A.  It depends on ICOS's product and whether it was

9    acceptable.

10   Q.  Right.  And it's possible that Topcon could have become

11   more prominent in this market, right?

12   A.  Oh, I don't think that Topcon was really a factor in the

13   United States.

14   Q.  Are you aware that Topcon sold a machine to PolarFab in

15   Minnesota?

16   A.  I'm not aware of it.  And it was my understanding from

17   my discussions with Mayson Brooks and with the salespeople

18   at August as well as all the documents that I reviewed that

19   Topcon was really not a viable competitor in the United

20   States.  It was an Asian competitor.

21   Q.  And you relied on those discussions and the documents

22   that you saw, correct?

23   A.  Right, and the testimony that I heard here from

24   Mr. Brooks.

25   Q.  Now, I know you had a slide, and we don't need to turn

1   to it, that talked about 100 million dollars' worth of sales

2   in the United States by August.  Do you remember that?

3   A.  Yes.

4   Q.  And yet we've talked about the sales of 54 machines by

5   August during the relevant time period, right?

6   A.  Right.

7   Q.  And just to be clear, the sale of 54 machines would not

8   come out to $100 million, correct?

9   A.  That's right.  The 100 million is a combination of all

10  the inspection machines that August sells, both the AXi and

11  the NSX and the 3Di.

12  Q.  And the AXi machine is the front-end machine, right?

13  A.  That's right.  It's for a different application.

14  Q.  Okay.  Now, as part of your damages analysis, in your

15  report you included an opinion that August should be awarded

16  a reasonable royalty if the jury determines that lost

17  profits are not appropriate, correct?

18  A.  Yes.

19  Q.  And you did not present that analysis on reasonable

20  royalty here earlier today, correct?

21  A.  That's right.  I didn't think that it was necessary

22  because I thought that lost profits on all of the sales, the

23  36 Falcon systems, was appropriate.

24  Q.  And you understand that Camtek's expert, damages expert,

25  has opined that a reasonable royalty is the appropriate

1   measure of damages in this case, right?

2   A.  I understand that, yes.

3   Q.  And that it's his opinion that a 5 percent royalty would

4   be the appropriate measure to use, right?

5   A.  I believe that's what he opined in his report.

6   Q.  And so if this jury were to determine that lost profits

7   was not appropriate in this case, do you agree with

8   Mr. Troxel's 5 percent reasonable royalty figure?

9   A.  No.  My analysis of the reasonable royalty was that it

10  should be 9 percent.

11  Q.  Okay.  And in your presentation earlier today I don't

12  believe that you talked about the reasons why you would

13  opine on a 9 percent royalty rate, correct?

14  A.  I didn't discuss that today, no.

15  Q.  And if you were to apply a 9 -- your 9 percent royalty

16  rate, that total amount comes up to much less than the

17  $11 million, correct?

18  A.  That's right.  That's why I said that a reasonable

19  royalty is the minimum available.  However, I think that

20  there is quite a bit of information to support the fact that

21  all 36 tools would have been sold by August if it had not

22  been for Camtek's infringing Falcon system.

23  Q.  That you have assumed to be infringing for your

24  purposes, correct?

25  A.  Well, that's right.  That's obviously a subject that

1    will have to be decided by the jury.

2    Q.  All right.  Now, if we apply your 9 percent royalty

3    rate, in looking at your report that comes to $2,117,561,

4    right?

5    A.  Yes, that's right.

6    Q.  Okay.  And I've created a demonstrative slide just so we

7    can have that number up here while we discuss it, which is

8    Defendant's Exhibit 1024.

9            MS. CHAPLIN:  Your Honor, we move to admit

10   Defendant's 1024 for demonstrative purposes.

11           MR. GRUMBLES:  No objection.

12           THE COURT:  Be admitted.

13           MS. CHAPLIN:  Thank you.

14   BY MS. CHAPLIN:

15   Q.  So I would like to talk with you about how you came to

16   your 9 percent reasonable royalty figure just a little

17   while.

18           So reasonable royalty damages can be calculated by

19   looking at what's called the Georgia-Pacific factors,

20   correct?

21   A.  Yes.

22   Q.  And those are 15 factors from a case that we all use for

23   reasonable royalty; is that right?

24   A.  Yes.

25   Q.  All right.  And a part of that analysis is to use a

1   hypothetical negotiation, sort of a make-believe negotiation

2   between August and Camtek that would have taken place before

3   the alleged infringement began; is that right?

4   A.  That's right.

5   Q.  And you wrote about that in your report, correct?

6   A.  I did.

7   Q.  And that's a sit-down between two companies where they

8   hammer out an agreement for a license to practice the '6,298

9   patent in the United States and what that would be worth,

10  right?

11  A.  That's right.

12  Q.  What Camtek would be willing to pay, right?

13  A.  That's right.

14  Q.  And what August would be willing to accept, correct?

15  A.  Right.

16  Q.  And in that negotiation you imagine that both were

17  reasonably and voluntarily trying to reach an agreement; is

18  that right?

19  A.  Yes.

20  Q.  And it's a two-way street, that conversation, correct?

21  A.  Yes.

22  Q.  And August would get to make its points in that

23  negotiation, right?

24  A.  Yes.

25  Q.  And Camtek would get to make its points about the

1    patent, correct?

2    A.  Right.

3    Q.  And you imagine that August would be a prudent patentee

4    who is willing to grant a license, right?

5    A.  In a hypothetical negotiation, yes.

6    Q.  And the hypothetical negotiation requires that we assume

7    that both parties are willing to enter a license, right?

8    A.  We assume that even though that's not the case.  They

9    are obviously in a lawsuit together.

10   Q.  That's right, but this reasonable royalty analysis

11   includes doing this hypothetical negotiation, which you

12   wrote about in your report, correct?

13   A.  That's right.

14   Q.  Okay.  And the total of that amount, applying your

15   royalty percentage, comes to a little more than $2 million

16   that we have on the screen here, correct?

17   A.  That's right.  If you apply 9 percent to the 23 million

18   dollars' worth of sales that Camtek made on these 36 tools,

19   you'd get 2.1 million, but that's not the damage opinion

20   that I am giving here.

21   Q.  Right, I understand that.

22   A.  Okay.

23   Q.  I understand that you're saying lost profits and I just

24   want to talk about this reasonable royalty opinion that you

25   also provided to us in your report.

1     Now, you are aware that no one has ever offered

2    $2.1 million to August to get a license to this patent,

3    correct?

4    A.  I don't think that August made this patent available for

5    licensing.

6    Q.  My question was:  Has anyone ever come to August and

7    offered to pay them $2.1 million for a license to this

8    patent?

9    A.  I don't think so.

10   Q.  You're not aware of anyone that's come to August and

11   offered to pay them a 9 percent royalty to have a license to

12   this patent, correct?

13   A.  Well, I think -- no, but August doesn't make its patents

14   available.  That's not their policy.  They use their

15   patented inventions to their own advantage to make their

16   product more competitive than others, and they have a right

17   to do that if the patent is valid and they can enforce it.

18   Q.  But the answer to my question is no one has come to

19   offer them a 9 percent royalty to get a license to that

20   patent, right?

21   A.  Not that I'm aware of.

22   Q.  Now, in coming up with your 9 percent -- and I would

23   like to talk about that just a little while -- you talked

24   about a rule of thumb that is applied.  Do you remember that

25   in your report?

1    A.   Yes.

2    Q.   And you applied a 25 percent to 33 percent rule of

3    thumb, right?

4    A.   Right.

5    Q.   And first, just because it can be a little confusing,

6    this rule of thumb is not meant as the royalty amount

7    itself, right?

8    A.   That's right.

9    Q.   And instead you apply rule of thumb to the profits

10   derived from the product to figure out what the appropriate

11   royalty percentage is, correct?

12   A.   Right.

13   Q.   And I want to talk with you about specifically why you

14   started with this 25 to 33 percent rule of thumb.  All

15   right?

16   A.   Okay.

17   Q.   Now, do you start with a 25 to 33 percent rule of thumb

18   when you are retained as an expert for the defendant in a

19   patent lawsuit?

20   A.   I always start with 25 percent.

21   Q.   Okay.  So 25 percent is where we begin, right, and not

22   25 to 33 percent; is that right?

23   A.   Well, there are two different sources for the 25 percent

24   rule of thumb, but it's called the 25 percent rule of thumb

25   and typically 25 percent is the starting point and then you

 1    would go up or down from 25 percent depending on the

 2    strength of the bargaining position of each party in the

 3    hypothetical negotiation.

 4          In this situation I believe that August had a much

 5    stronger bargaining position than Camtek and so I went from

 6    25 up to 30 something percent.

 7    Q.  33, I believe it was.  Does that sound right?

 8    A.  Well, I would have to look at it and refresh my memory

 9    on it.

10    Q.  All right.  And sometimes when you look at the

11    25 percent rule, you also go down from 25 percent; isn't

12    that right?

13    A.  Yes, you can do that and I have done that in cases

14    before, both for plaintiffs and defendants, but you have to

15    look at all the facts and decide where the factors lie --

16    where the factors favor one party or another.

17    Q.  And so, for instance, in 2006 you testified in a patent

18    case in the Northern District of Illinois on behalf of the

19    defendant.  Do you remember that?

20    A.  Yes.  The Black & Decker vs. Robert Bosch Tool case,

21    yes.

22    Q.  That's right.  And it related something about radios for

23    construction sites that had a charging -- a battery charger

24    in them; is that right?

25    A.  That's right.

1   Q.  And in that case when you applied the 25 percent rule,

2   you started at just 25 percent, right?

3   A.  That's right.

4   Q.  And then looking at the facts you ended up applying a

5   range of 10 to 25 percent for your rule of thumb; is that

6   right?

7   A.  That's right.

8   Q.  All right.  Now, this rule of thumb that you apply to

9   profits, that's something that gets applied against

10  operating profits, right?

11  A.  Typically, yes.

12  Q.  And operating profits are a smaller amount than gross

13  profit, for those of us who are not accountants, correct?

14  A.  That's right.

15  Q.  All right.  And operating profit excludes selling

16  expenses, general and administrative expenses, and

17  manufacturing related expenses, right?

18  A.  When you say it excludes them, what do you mean?

19  Q.  Leave that out of your operating profits number.  To get

20  to operating profits you subtract selling expenses, general

21  and administrative expenses, and manufacturing related

22  expenses; is that right?

23  A.  Okay.  Yes.

24  Q.  And you're aware that oftentimes if you use a rule of

25  thumb greater than 25 percent, it's in a situation where the

1   licensee would typically get access to improvements,

2   research and development, or other information from the

3   patentee; isn't that right?

4   A.   That depends.  I mean, that's been written in an article

5   by Robert Goldscheider, but that isn't necessarily the case.

6   Q.   But it could be the case that in some of those

7   situations it's because these additional items are included;

8   is that right?

9   A.   That's right, and that's typically in a negotiation

10  that's not within the context of litigation.  In the context

11  of litigation you have a situation where there's already

12  been infringement and so you need to take into consideration

13  a variety of pieces of information, but in a negotiation

14  before litigation there might potentially be those types of

15  sharing of information available after the fact, but that

16  will never happen in the context of litigation.

17  Q.   Right.  And so what happens for us instead is what is

18  sometimes referred to by damages experts like yourself as a

19  naked patent license; is that right?

20  A.   Not necessarily.  I don't know that I would apply a

21  naked patent license term to this.

22  Q.   But this is a situation where all -- the license that

23  you're talking about, the 9 percent, is just for the right

24  to practice the alleged invention in the patent and nothing

25  else, right?

1    A.  That's right.

2    Q.  Okay.  Now, in your reasonable royalty analysis you

3    looked at royalty rates in the semiconductor industry.  Do

4    you remember that?

5    A.  Yes.

6    Q.  And you found that those were 3.5 to 4.5 percent royalty

7    rates typically; isn't that right?

8    A.  Right.  That's for manufacturers of semiconductors.

9    That's slightly different than optical inspection equipment

10   to inspect semiconductors.

11   Q.  Right.  But it was 3.5 to 4.5 percent, which is lower

12   than the 9 percent royalty rate that you advocate in this

13   case, correct?

14   A.  That's right.

15   Q.  And you also looked at a report on publicly disclosed

16   license agreements from *RoyaltySource*, right?

17   A.  Yes.

18   Q.  And the licenses that you found ranged in the royalty

19   rate from 3 to 7 percent.  Do you remember that?

20   A.  Yes.

21   Q.  And those were also below the royalty rate that you

22   argue should apply here, correct?

23   A.  That's right.

24   Q.  And then you also looked at some license agreements that

25   August Technologies had.  Do you recall that?

1    A.  Yes.

2    Q.  And there was just one license agreement that August

3    Technologies had that had a royalty rate above 9 percent.

4    Do you remember that?

5    A.  Yes.

6    Q.  And that was this UT-Battelle license?

7    A.  That's right.

8    Q.  Okay.  And that agreement had a 12.5 percent royalty

9    rate, correct?

10   A.  That's right.

11   Q.  But that agreement was for three -- for a license to

12   three patents, correct?

13   A.  I don't remember the specifics of it.

14   Q.  Okay.  But you do recall that August never paid actually

15   any royalty under that agreement, don't you?

16   A.  I think that's right.  They negotiated 12 or 12 and a

17   half percent.

18   Q.  And that was for a software development agreement,

19   right, not about an inspection device?

20   A.  I don't remember.

21   Q.  And do you recall, though, that no software was ever

22   actually developed under that agreement?

23   A.  I'm not sure.

24   Q.  And the other thing that you looked at in coming up with

25   your 9 percent reasonable royalty rate was you characterized

1   the patent in terms of its inventiveness, I guess I would

2   say, you called it a revolutionary patent, right?

3   A.  That was one of a variety of factors that I

4   considered --

5   Q.  Right.

6   A.  -- whether it was a minor improvement, a major

7   improvement, or a revolutionary improvement.

8   Q.  All right.  And on that scale you determined it was a

9   revolutionary improvement; isn't that right?

10  A.  Well, I considered the range for a revolutionary

11  improvement.  I don't know that I'm necessarily qualified to

12  decide what level of improvement it actually is.

13  Q.  Okay.  And in this analysis of revolutionary or major

14  improvement or minor improvement, you were relying on an

15  1997 article that I believe was written by Stephen Degnan

16  and Corwin Horton; is that right?

17  A.  Yes.

18  Q.  And in defining what they meant by revolutionary patent,

19  the article explains that the invention had to satisfy a

20  long-felt need or create a whole new industry; isn't that

21  right?

22  A.  Right.

23  Q.  And they give one example in that article of a

24  revolutionary patent and that one is the Gordon Gould laser

25  patent.  Do you remember that?

1    A.  Yes.

2    Q.  And Mr. Gordon Gould is widely regarded as the inventor

3    of the laser, right?

4    A.  Perhaps.

5    Q.  All right.  And the article in talking about the median

6    running royalty rate for licensing revolutionary patents

7    outside of the pharmaceutical context was 5 to 10 percent,

8    right?

9    A.  Okay.

10   Q.  And the article supplies a different range for a major

11   improvement patent, right?

12   A.  That's right.

13   Q.  And the article defined a major improvement as something

14   that significantly enhances quality for an existing product

15   or service, right?

16   A.  Yes.

17   Q.  And the article supplied the median running royalty rate

18   for a major improvement patent outside of the pharmaceutical

19   context as having a royalty rate of 3 to 7 percent; isn't

20   that right?

21   A.  Yes.

22   Q.  And so if this jury were to determine that this patent

23   is not a revolutionary patent, would you agree that your

24   9 percent rate is too high?

25   A.  No.

1   Q.  But you'd agree that a 9 percent royalty rate would be

2   off the scale for even a major improvement, according to

3   this source that you relied on; isn't that right?

4   A.  You know, that was just one indicator.  There were a

5   number of indicators that I considered for the royalty rate

6   and the primary one was the sharing of profits or the rule

7   of thumb, which we talked about earlier in our discussion

8   here, and the rule of thumb produces a royalty rate that is

9   consistent with my 9 percent rate.

10          And I gave the most weight to that as well as to

11  the Georgia-Pacific factors because what's required in a

12  royalty analysis is to apply the Georgia-Pacific factors in

13  a hypothetical negotiation, and that's what I did.  And my

14  opinion is that if there is a royalty that's appropriate in

15  this case, it's 9 percent.

16  Q.  All right.  But looking at the article that you relied

17  on, right, for this revolutionary, major improvement, minor

18  improvement, 9 percent is off the scale for even a major

19  improvement in that article, correct?

20  A.  Remember that those are royalty agreements that are a

21  result of a negotiation between two parties at arm's length

22  where there has been no infringement, but here we have a

23  situation where there's alleged infringement.  And assuming

24  that there's a finding of infringement, then there has to be

25  what's called adequate compensation for the infringement and

1    adequate compensation in my opinion would be 9 percent.

2    Whether that is consistent with that article or not, I think

3    you're misapplying the article.

4    Q.  But my question is:  In that article 9 percent falls

5    outside of the range for even a major improvement patent,

6    correct?

7    A.  Right, and that's why I explained that we're in a

8    different context than that article.

9    Q.  But you applied -- you talked about that article

10   specifically in your report, right?

11   A.  Yes, because it's one of the indicators of what a

12   potential royalty rate might be, but then you really have to

13   apply the Georgia-Pacific factors more specifically.

14   Q.  And in your Black & Decker case you also relied on that

15   article, right, finding that in that case you had a minor

16   improvement, correct?

17   A.  That's right.

18   Q.  So the article talks about the category of minor

19   improvement.  Do you recall that?

20   A.  Yes.

21   Q.  And it provides that the median running royalty rate for

22   a minor improvement ranged from 1 to 3 percent for

23   nonpharmaceutical organizations, correct?

24   A.  Yes.

25   Q.  And that article specifically notes that all patents are

1   not alike.  And you would agree with that, correct?

2   A.  Yes.

3   Q.  And do you recall that it also states, in fact, over

4   90 percent of the over 100,000 patents issued in the United

5   States each year have little or no value to anyone other

6   than the patent owner; do you remember that?

7   A.  Yes, I do.

8   Q.  And you came to the opinion that the '6,298 patent was

9   revolutionary based on your discussions with August's

10  employees, right?

11  A.  Like I said before, I applied the revolutionary range

12  here, but I'm not in a position to decide whether this is a,

13  quote, revolutionary patent or not.  I base that on my

14  discussions with the August management.

15  Q.  And so in your opinion, if the jury were to decide that

16  lost profits is inappropriate here, but that damages are

17  appropriate, then you would advocate that the 9 percent

18  royalty rate be applied for $2,117,561, right?

19  A.  Only if there was a finding that lost profits wasn't

20  available on any one of those 36 system sales.

21          MS. CHAPLIN:  Thank you.

22          THE COURT:  Anything further?

23                  **REDIRECT EXAMINATION**

24  BY MR. GRUMBLES:

25  Q.  Good afternoon, Ms. McCloskey.  Since the break opposing

1    counsel has been asking you about royalty calculation.  Just

2    to clarify, why did you include a royalty calculation in

3    your expert report?

4    A.  Because according to the patent statute, a party that

5    has suffered infringement of their patent is entitled to at

6    a minimum a reasonable royalty.  So I provided the

7    calculation, but it was my opinion that lost profits were

8    appropriate in this case because August would have been able

9    to make every one of those sales had Camtek not been selling

10   the infringing Falcon system.

11   Q.  And nothing that counsel has shown you or asked you

12   about during the cross examination would cause you to change

13   that opinion in any way?

14   A.  No.

15                MR. GRUMBLES:  Thank you.  No further questions.

16                THE COURT:  You may step down.

17                MR. GRUMBLES:  Your Honor, I'm sorry, one quick

18   thing.  By agreement with counsel, I erroneously identified

19   Plaintiffs' Exhibit 278 as Plaintiffs' Exhibit 270.  So I

20   would move for the admission of Plaintiffs' Exhibit 278.

21                MS. CHAPLIN:  That's correct, Your Honor.  No

22   objection.

23                THE COURT:  Be admitted.

24                Call your next witness, please.

25                MR. McDONALD:  Your Honor, the plaintiffs rest.

1    THE COURT:  All right.  Members of the Jury, we'll

2    take a 15-minute break, 15-minute recess.  All rise for the

3    jury.

4                    **IN OPEN COURT**

5                    **(JURY NOT PRESENT)**

6         THE COURT:  Counsel.

7         MR. BANNON:  Your Honor, would you like to take

8    Rule 50 motions?

9         THE COURT:  (Indicating.)

10        MR. BANNON:  Your Honor, Camtek would like to move

11   under Rule 50(a) on four grounds.  First, that there is no

12   literal infringement of the '6,298 patent; second, that

13   there has not been sufficient evidence for infringement

14   under the doctrine of equivalents of the '6,298 patent;

15   third, that there has not been sufficient evidence for a

16   finding of willful infringement; and fourth, on the issue of

17   lost profits.

18        With regard to the first matter, Camtek requests

19   judgment as a matter of law that the Falcon machines do not

20   literally infringe claims 1 or 3 of the '6,298 patent.

21   Infringement of a patent requires a finding that each and

22   every limitation of that claim is present in an accused

23   device.

24        Plaintiffs have failed to adduce evidence from

25   which a reasonable juror could conclude that the Falcon

1    machines contain at least three elements.  The Falcon does

2    not contain a visual inspection device for visual inputting

3    of a plurality of known good quality wafers during training;

4    second, the Falcon does not contain a microprocessor having

5    processing and memory capabilities for, quote, developing a

6    model of a good quality wafer and comparing unknown quality

7    wafers to the model; and third, that the Falcon does not

8    contain an illuminator that strobes to provide short pulses

9    of light during movement of a wafer under inspection based

10   on the velocity of the wafer, as the Court has construed

11   this claim.

12            For the same reasons Camtek does not practice the

13   method recited in claim 3 of the '6,298 patent.

14   Accordingly, judgment as a matter of law of no literal

15   infringement of claims 1 and 3 of the '6,298 patent is

16   proper.

17            Our second ground is the doctrine of equivalents

18   and infringement under the doctrine of equivalents requires

19   evidence that the accused device in the asserted claim

20   limitation perform substantially the same function in

21   substantially the same way to achieve substantially the same

22   result.  And plaintiffs have failed to adduce any evidence

23   that the Falcon infringes claims 1 or 3 under the doctrine

24   of equivalents on this basis.

25            Second, the law states that the doctrine of

1    equivalents cannot be applied to completely eviscerate the

2    limitations of a patent claim.  And since a die is not the

3    same as a wafer and since the Falcon machines train with

4    multiple die from a single wafer and create a model of a

5    single die for inspection purposes, the doctrine of

6    equivalents cannot be applied to find that Camtek

7    equivalently infringes claims 1 or 3.  Thus, Camtek believes

8    that judgment as a matter of law of no equivalent

9    infringement of claims 1 and 3 is proper.

10           On the third issue, willful infringement, willful

11   infringement requires proof that Camtek acted with reckless

12   disregard of the '6,298 patent.  That means that Camtek

13   acted despite an objectively high likelihood that its

14   actions constituted infringement of a valid and enforceable

15   patent or, two, actually knew or that it was so obvious that

16   Camtek should have known that its actions constituted

17   infringement of a valid and enforceable patent.  The leading

18   case on that, Your Honor, is In re Seagate Technology,

19   497 F.3d 1360 at 1371.  It's a Fed Circuit case from 2007.

20           Plaintiffs have failed to adduce sufficient

21   evidence that a reasonable person in Camtek's position could

22   have believed that the '6,298 patent was infringed, valid,

23   and enforceable.  Accordingly, judgment as a matter of law

24   on the issue of Camtek's alleged willful infringement is

25   proper.

1            Finally, on the issue of lost profits, Your Honor,

2     the plaintiffs must prove, as you just heard for the last

3     two days, that but for the alleged infringement there was a

4     reasonable probability that they would have made Camtek's

5     sales of the Falcon machines.  I would cite to the Court's

6     attention American Seating Company vs. USSC Group, 514 F.3d

7     1262.  Jump cite is 1269 to 70.  It's a Federal Circuit case

8     from 2008.

9            More specifically, plaintiffs must prove four

10    factors under the Panduit case, that there was demand, there

11    were no noninfringing substitutes, that plaintiffs had the

12    capacity to make all of Camtek's sales, and the amount of

13    the profit.

14           Camtek contends that plaintiffs have failed to

15    adduce sufficient evidence that but for Camtek's alleged

16    infringement there was a reasonable probability that they

17    would have made all of the sales that Camtek made of the

18    Falcon machines.

19           Camtek contends that the evidence adduced at trial

20    is clear that the relevant market during the relevant time

21    period consisted of additional suppliers such as RVSI and

22    ICOS.  In addition, plaintiffs have failed to adduce

23    sufficient evidence as to each of the four Panduit factors,

24    including demand for the patented feature of the '6,298

25    patent.  Accordingly, Camtek believes judgment as a matter

1    of law that plaintiffs are not entitled to lost profits is

2    proper.

3            THE COURT:  Thank you.

4            MS. HUGHEY:  Thank you, Your Honor.  August

5    opposes Camtek's motion for judgment as a matter of law on

6    infringement under the doctrine of equivalents and literal,

7    willful infringement, and lost profits.

8            With respect to literal infringement, August has

9    presented evidence from its expert, Dr. Mundy, that every

10   single claim element has been met, including the three

11   elements specifically raised by Camtek.

12           In addition, Elmer Gardiola and Roni Flieswasser

13   and David Barnard also testified regarding the operation of

14   Camtek's infringing product, providing evidence that those

15   elements have been met.  August provided a claim chart and

16   that was used by Dr. Mundy to prove every single one of

17   those was met.

18           With respect to claim 3 above, in addition to the

19   evidence of the testimony, we have the manuals that

20   demonstrate that claim has been met, including testimony by

21   Mr. Gardiola about how the product was used.  There also has

22   been evidence -- included in evidence was the demo software,

23   photos, manuals provided on the issue of infringement.

24           So with respect to literal infringement, all

25   elements have been met.

1    Under the doctrine of equivalents there is

2    evidence that the patented product -- that the infringing

3    products work in substantially the same function and way and

4    to get that same result.

5    With respect to willful infringement, again,

6    August has provided sufficient evidence to meet its burden.

7    It provided the evidence of the manuals.  It provided

8    evidence that Camtek was given knowledge of the patents and

9    it continued to sell, and it provided evidence of

10   Dr. Mundy's testimony on that point as well and Mayson

11   Brooks as well talked about the fact that what August was

12   doing was publicly available at trade shows starting in

13   2000, well before Camtek came on the market.

14   In addition, the parties agreed that certain

15   witnesses on the willfulness issue would not be raised

16   necessarily in August's main case and August has a right to

17   call DeRosa and Amit on the issue of willfulness at this

18   point.

19   With respect to the final issue of lost profits,

20   August has provided sufficient evidence that with a

21   reasonable probability it would have made those sales but

22   for Camtek's infringement.

23   We heard the evidence of Mayson Brooks and saw the

24   documents that he provided saying that but for Camtek's

25   infringement August would have made every single sale.  We

1   also heard testimony from Elmer Gardiola that the only two

2   competitors he considered as having a source would have been

3   August and Camtek.  We also heard testimony from Barnard.

4          In addition, we looked at Fran McCloskey's

5   testimony where she was able to look at both Camtek and

6   August documents and in her opinion August would have made

7   those sales but for Camtek's infringement.

8          We also saw evidence that RVSI and ICOS were not

9   competitors in the market and would not have been able to

10  make those sales and there was demand for the patented

11  features of the product, as demonstrated by the parties'

12  quotes to customers.

13         MR. BANNON:  May I respond briefly, Your Honor?

14         THE COURT:  Very briefly.

15         MR. BANNON:  It appears that counsel has stated

16  that they have not presented any evidence on willful

17  infringement and that there was some sort of order that they

18  did not have to in their main case.  Plaintiffs have to

19  prove willful infringement by clear and convincing evidence

20  and I think they plan on presenting that issue to the jury.

21  I think counsel is confusing the issue of inequitable

22  conduct, which the Court has bifurcated.  And I agree that

23  basically no evidence of reckless disregard has been

24  presented to this Court on the issue of willful

25  infringement.

1     On the issue of literal infringement and doctrine

2     of equivalents, certainly there has been no evidence that

3     the Falcon develops a model of a good quality wafer and

4     compares unknown quality wafers to that model.  Instead the

5     issue or what has been presented to the Court is that the

6     Falcon creates a model of a die and that die is checked

7     against the die on the wafer.

8          Thank you.

9          THE COURT:  All four motions are denied.

10          Are you ready to proceed with your case?

11          MR. BANNON:  Yes, Your Honor.

12          THE COURT:  We'll take ten more minutes.

13     (Recess taken at 2:55 p.m.)

14                    *    *    *    *    *

15

16

17

18

19

20

21

22

23

24

25

```
1           (3:15 p.m.)

2                          IN OPEN COURT

3       (Without the jury)

4           THE COURT:  Okay.  We're out of the hearing of the

5       jury.  The motion has been filed.  Let's hear argument on it,

6       brief argument.

7           MS. HUGHEY:  Thank you, your Honor.

8           I believe August's brief has adequately laid out

9       the issue that as a general rule the defendant's patent is

10      irrelevant to the issues in the case and should not be

11      admitted to the jury because it's prejudicial, it's

12      confusing, and it's unnecessary.

13          Now, Camtek correctly cites to several cases that

14      have allowed such evidence, but it's only in a very limited

15      circumstance which does not apply in this case.  In this case

16      we have an earlier issued patent that Camtek looks to rely on

17      to argue that it does not willfully infringe a later patent

18      or that there is not infringement under the doctrine of

19      equivalents.

20          With respect to willfulness, the only time a

21      defendant's patent is permitted is if defendant is offering a

22      later-issued patent as evidence of its attempts to design

23      around the patent-in-suit, and specifically, the cases that

24      allow that are ones where the patent-in-suit was actually

25      cited during the prosecution of the later-issued patent.  In
```

1    this case we don't have that.

2              First of all, Camtek is not arguing that it

3    attempted to design around the August patent.  Instead it's

4    arguing independent design, independent invention.

5              Second, its patent is not one that was cited

6    during -- that cited the patent-in-suit during prosecution.

7    The patent-in-suit issued after the InspecTech patent.

8              As a second issue with respect to the doctrine of

9    equivalents, the doctrine of equivalents cases are along the

10   same lines.  If a later-issued patent issued, arguably it has

11   some kind of boundaries that maybe don't apply for the

12   doctrine of equivalents.  Here again we have an earlier

13   patent they're trying to rely on that has no relevance to the

14   doctrine of equivalents.

15             Additionally, even if those applied, the fact of

16   the matter is Camtek has made up this argument that it's

17   going to help its willfulness case and its infringement case

18   probably sometime last night.  This is not something that

19   Camtek has identified to August as a contention.

20             With respect to its interrogatories, when it was

21   asked to identify why it did not willfully infringe the

22   patent, it never pointed to InspecTech patent as evidence of

23   that.

24             And likewise, with respect to the doctrine of

25   equivalents, this is the first time I've heard that Camtek

1    was planning to rely on that patent.  It was not identified

2    during discovery as an issue, and in fact if it were, then

3    August would have had the ability to do discovery on that

4    patent to determine whether or not the infringing device was

5    also covered by that patent and that would be the only reason

6    it would be relevant.

7            So, to summarize, as a general rule, patents of

8    defendants not admissible because prejudicial, suggesting

9    that a patentee has a right to practice its patent even if

10   it's infringing someone else's, which is not the law and I

11   don't think they're going to disagree that's not the law.

12   Very, very narrow, limited circumstances to be allowed, not

13   relevant in this case.

14           Thank you, your Honor.

15           THE COURT:  All right.  Convince me that Plaintiff

16   is wrong.  Tall order.

17           MR. LIANG:  May it please the Court.

18           Counsel started off with timing.  I'll address

19   that -- oh, I'm sorry.  Counsel ended with timing and I'll

20   address that first in terms of notice.

21           The Court's September 29th, 2008 order required

22   Plaintiffs to disclose its objections.

23           THE COURT:  Let's move on past that.  That's not

24   the issue.  You've got to convince me that they're wrong and

25   procedurally we're not going to deal with that issue right

1    now.

2           MR. LIANG:  Okay.  Well, with respect to willful

3    infringement, Camtek's state of mind is a key factor in

4    determining whether it willfully infringed the '6,298 patent,

5    and in the words of the Federal Circuit, reckless disregard

6    is the standard.

7           And Camtek's patents are relevant to its

8    independent development -- and Counsel mentioned that in her

9    argument -- and whether Camtek copied Plaintiffs' patents.

10   And Plaintiffs allege that Camtek willfully infringed by

11   copying its patented technology and Camtek's patents are

12   relevant to show that it did not act willfully and it

13   independently developed these technologies.  This particular

14   patent that is raised was filed 15 months before Plaintiffs'

15   patent.

16          Regarding the doctrine of equivalents, under the

17   doctrine of equivalents Plaintiffs have to show that the

18   Falcon machines were insubstantially different from the

19   claims of the asserted patent, the '6,298 patent, and

20   Camtek's patent is relevant to show the differences between

21   the Camtek machine and the Plaintiffs' patent, that it was

22   substantial and therefore was awarded a patent from the

23   USPTO.

24          That's all I have, your Honor.

25          THE COURT:  All right.  Thank you.

1            Nothing further?  Plaintiff's motion is granted.

2            All right.  Let's get the jury.

3            MR. BANNON:  Your Honor, very quickly, there are

4     two other patents Camtek has -- well, two or three patents.

5     Two of them -- or at least one of them is a later-filed

6     patent and I'm just wondering whether your ruling would apply

7     to that one as well.  Two of the patents go towards the 3D

8     capability that you've heard a lot of testimony about.  One

9     is issued and one is pending.  I think you heard earlier

10    about CCS, LTS, and those patents deal with bump inspection,

11    which I think you've heard a lot of testimony that customers

12    liked Camtek's machine a lot I think because of this

13    technology and 3Di wasn't very popular.  I think they only

14    sold three or five machines.

15           THE COURT:  Counsel?  It's your motion.  Go ahead.

16           MS. HUGHEY:  August would make the same motion with

17    respect to those patents as well, the same issues.

18           THE COURT:  You did not address those.

19           MS. HUGHEY:  They weren't on the list of exhibits

20    for today, so we can brief those as well if you would like.

21           THE COURT:  No, since it would be the same cases.

22    You don't know?

23           MR. McDONALD:  We have to take a look at those

24    patents.  Last night we were focusing on the patent that was

25    brought up -- he's saying there are differences.  We haven't

1    had a chance to look at them from that perspective.

2              MR. BANNON:  These patents were cited in the very

3    beginning of the case.  I think they were in the first

4    document production.

5              THE COURT:  Okay.  Let's do it right.  Let's brief

6    it.

7              MS. HUGHEY:  Yes, your Honor.  Thank you.

8              THE COURT:  All right.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Discussion off the record between the

2         Court and the court reporter)

3                          IN OPEN COURT

4        THE COURT:  We're having a realtime problem --

5        (Laughter)

6        THE COURT:  -- so it'll take a few minutes.

7        (Brief recess)

8                          *  *  *  *  *

9        (3:35 p.m.)

10                         IN OPEN COURT

11       (Jury enters)

12       THE COURT:  Please be seated.  Call your first

13  witness, please.

14       MR. BANNON:  Your Honor, Camtek calls as its first

15  witness, Moshe Amit.

16       **MOSHE AMIT, DEFENDANT'S WITNESS, SWORN**

17       THE COURT:  Good afternoon.

18       THE WITNESS:  Good afternoon, sir.

19       THE COURT:  Would you state your true and correct

20  name for the record, please, spelling it for the record.

21       THE WITNESS:  My name is Moshe Amit.

22       THE COURT:  Would you spell your first --

23       THE WITNESS:  Yes.  M-O-S-H-E, and then A-M-I-T.

24       THE COURT:  You may inquire.

25       MR. BANNON:  Thank you, your Honor.

1      **DIRECT EXAMINATION**

2   BY MR. BANNON:

3   Q.    Mr. Amit, are you presently employed?

4   A.    No, I retired last January from Camtek.

5   Q.    Okay.  And prior to your retirement, what was your

6   position at Camtek?

7   A.    I was -- between 2001 and March of 2006, I was the

8   former CFO of Camtek, and between March 2006 until my

9   retirement in January 2008, I did some special assignment and

10  special projects for Camtek as senior management member.

11  Q.    You said you were the CFO of Camtek, is that right?

12  A.    Yes.

13  Q.    Okay.  Are you a U.S. citizen, sir?

14  A.    Yes, I am a U.S. citizen.

15  Q.    Since when?

16  A.    Since 1992.

17  Q.    How long had you lived in the United States before

18  becoming a citizen?

19  A.    This was for seven years.  I came over to the United

20  States in 1985, and in 1992 I became a U.S. citizen.

21  Q.    Do you have a family, sir?

22  A.    Yes.  I have two children and one grandchild.

23  Q.    How old are your children?

24  A.    My eldest son is 36 year old.  He live here in Pasadena,

25  California.  He's doing his research fellowship in synthetic

1    biology in Cal Tech Research Institution.

2    Q.   Do you have a younger son as well?

3    A.   Yes.  The younger son, he's in Tel Aviv.  He's working

4    for a robotics company in the business management area.

5    Q.   And how old is he?

6    A.   He's 34 years old.

7    Q.   And how old is your grandchild?

8    A.   Two years.

9    Q.   Does your grandchild live here in the United States?

10   A.   Yes.

11   Q.   Now, where did your children go to school, sir?

12   A.   Well, the older one graduated from Cornell University in

13   New York, then did his master degree and Ph.D. degree in

14   Weitzman Institution in Israel.  The younger son graduated

15   from Lehigh University in Pennsylvania and then did his MBA

16   degree at Sloan, which is the business school of MIT in

17   Massachusetts.

18   Q.   Would you explain to the jury, sir, what your

19   educational background is?

20   A.   Yes.  I graduated from Technion in Israel.  I have a

21   degree in industrial engineering and management.  I have also

22   did all the classes for my master degree, but I did not

23   completed the thesis.

24   Q.   What is the Technion?

25   A.   Technion is like, you know, the best engineering school

1    in Israel.  It's like the MIT of Israel, if I may define it

2    this way.

3    Q.   Okay.  I'd like to talk a little bit about your work

4    history, sir.

5    A.   Okay.

6    Q.   Can you describe or briefly describe your work history

7    after graduating from Technion?

8    A.   Yes.  I graduated in 1969 and then I work for four years

9    for a consulting company.  Then for 11 years I manage a

10   construction company.  This was between 1973 and 1984.

11            In 1985 I came over to United States.  I set up an

12   engineering company for engineering services called PCE,

13   which stands for Precision Circuits Engineering, and provided

14   some services to the printed circuit board industry.

15            Later on in -- later on in 1988, some of the

16   services were also the coordination of Camtek in United

17   States.

18            In 1994, I returned back to Israel.

19   Q.   Now, I'd like to talk a little bit about the history of

20   Camtek.  Can you tell the jury when Camtek was started?

21   A.   Camtek was started in 1987 in Israel.

22   Q.   And what was the business of Camtek in 1987?

23   A.   At that time Camtek developed, manufactured and sold

24   semi-automated optical inspection machine which was called

25   V-Scan, V like Victor, S, Scan.

1    Q.    Okay.  And what was V-Scan used for?

2    A.    The V-Scan inspected printed circuit board in the

3    following way:

4            The first step was to generate good reference, or

5    as we call it, golden image, and typically we did it by

6    scanning artwork, which is the film that's being used to

7    print the board itself.  This is how we create the golden

8    image.

9            Then the board itself was scanned and a comparison

10   was done more like -- the board was scanned.  It was in a

11   frame, on a frame to frame, frame after frame, and then there

12   was a comparison of the scan frame over the reference frame,

13   and the deviation would display in different color and the

14   operator could identify what is a defect and what is not a

15   defect, what is a real defect and what is a false defect,

16   et cetera.

17   Q.    Now, you used the term "golden image."

18   A.    Yes.

19   Q.    What did you make a golden image of?

20   A.    As I mentioned, the golden image was done from the

21   artwork, the film that used to print the board itself.  So

22   when the film was scanned, the machine memorize the image of

23   the film and use it as a good reference.  We -- you know the

24   terminology in the industry.  It was a golden image or golden

25   board.

1   Q.   So was it a golden image of a PCB?

2   A.   Yes.  This was a golden image of a printed circuit

3   board, of a specific layer that we wanted to inspect in a

4   later stage.

5   Q.   Okay.  And I believe you said the V-Scan was a

6   semiautomatic inspection device, is that right?

7   A.   Yes.  Yes.

8   Q.   Okay.  When did Camtek first introduce a fully automatic

9   optical inspection device?

10  A.   This was in 1994 and it was a kind of an upgrade of the

11  V-Scan to fully automated machine.  We call it AOI, automated

12  optical inspection.

13          This structure was very similar like the V-Scan.

14  It was like a work bench that the operator could see and scan

15  the board itself.  The generation of the reference was quite

16  the same, but using a film or artwork typically.  The

17  scanning of the board itself this time on the V-Scan was done

18  in a continuous mode, not frame by frame, and the automation

19  process was in a way that the machine at the end of the

20  scanning process, the machine just moved to the location

21  where the deviation were found, just to the location.  In

22  other words, if there was a single defect found on the board,

23  the machine just moved right to the spot where the deviation

24  was found and then it was displayed on a monitor and the

25  operator can verify whether it is a real defect or a false

1    defect.

2    Q.    So did you say the name of that device was the 2V-20?

3    A.    2V-20, 2V dash 20.

4    Q.    And did you also say that that was introduced in early

5    1994, right?

6    A.    Yes.  Yeah, I think it was February 1994.

7    Q.    Now, how did the Camtek 2V-20 compare to other optical

8    inspection devices from that 1994 time period?

9    A.    Yeah.  Well, we tried to address the 2V-20 to the niche

10   of the small PCB manufacturer, which we call low-volume, high

11   end.

12           You have to remember -- I'd like to tell to the

13   jury that there was a few giants, AOI manufacturers, like

14   Opritech and Orbot and KLA that used to sell AOI machine to

15   the high-volume PCB manufacturer with a tack price of half a

16   million dollar or so.  This price, a small PCB shop, you

17   know, cannot afford, so we address our equipment with a tack

18   price of $120,000 only to the market of the small user.  I

19   say high end because the level of complexity of the board was

20   such that they really need AOI machine to process a board.

21           Now, what was typical about this V-Scan machine

22   was, first of all, the light construction and then, you know,

23   the tack price, and yet it was operated by very powerful

24   software, our operating software, that created altogether a

25   big competitive advantage for Camtek.

1    Q.   Now, can you explain to the jury what the main

2    components other than software were for the 2V-20 machine?

3    A.   Yes.  We had their vacuum table which the board would

4    held.  Then there was a camera, an optical device, a monitor

5    to display the defects and small electronic cabinet.

6    Q.   And in 1995, how large of a company -- or 1994, 1995,

7    how large of a company was Camtek?

8    A.   When I started with Camtek, this was late 1994, early

9    1995.  We were about 15 employees.

10   Q.   And what was your position at Camtek at that time?

11   A.   I was in charge of Camtek worldwide operations,

12   including sales, marketing and customer support.

13   Q.   Did there come a time at Camtek when you began focusing

14   on marketing your products to large manufacturers?

15   A.   Yes.  This was only 1995 after I believe we were kind of

16   well recognized in the PCB market, and with the introduction

17   of advanced electronic components, we felt that this is about

18   the time that we will go head on with the larger

19   manufacturer.

20          And again, on the same platform of the 2V-20, we

21   develop the -- a machine model which we call it Orion, and

22   the Orion was able to process, to do the inspection much

23   faster speed, much more accurately, and for us it was really

24   success.

25          In 1999 we had some I believe 23 million in revenue

1  and in year 2000 we had $53 million of revenue.  This was

2  more than double and this was more or less what enabled us to

3  do our IPO in NASDAQ in July of year 2000.

4  Q.   So 2000 was a big year for Camtek.

5  A.   Yes.

6  Q.   Okay.  I'd like to switch now to a company called

7  InspecTech.

8          Did there come a time when Camtek got involved in

9  the automatic optical inspection business for semiconductor

10  wafers?

11  A.   Yes.  With the money that we raised, you know, during

12  our IPO and becoming public company, we were seeking an

13  opportunity to grow and, you know, searching for a new growth

14  engine, and we acquire InspecTech, which was like 33

15  employees, in the northern part of Israel.  They were

16  involved in, again, AOI machine of the semiconductor, or I

17  would say the backend sector of the semiconductor industry.

18  And for us this was quite natural, you know, to try to find a

19  growth engine in this niche.

20  Q.   Now, you said that InspecTech had 32 or 33 employees.

21  Did it have any products at that time?

22  A.   Yes.  InspecTech has three products, two of them already

23  in the market, the first one called KIS.  This was for kerf

24  inspection.  The second was called BIS.  This machine did

25  wafer inspection and bump inspection, 3D.  And the third one

1    which was under development was called the WIS, W-I-S, and

2    this machine was planned to do all the three operations:  the

3    kerf inspection, the wafer inspection, and the bump

4    inspection.

5    Q.   Now, can you explain to the jury what some of the

6    reasons were for Camtek's acquisition of InspecTech?

7    A.   Yes.  We believed that we got some good and valuable

8    assets, you know, together with the acquisition of

9    InspecTech.

10         Number one that I mentioned before, we got an

11   access to a new market, an opportunity to develop a new

12   growth engine.

13         Number two, we acquire with the company 32

14   employees.  Most of them are R&D employees, which also are,

15   you know, an asset.

16         InspecTech also had 22 field installation, most of

17   them of the KIS and the BIS, which again, this is an access

18   to the market.

19         PCB had proven 3D technology which we were very

20   interested to have --

21   Q.   Do you mean InspecTech, sir?

22   A.   InspecTech.

23   Q.   You said PCB.

24   A.   Oh, sor -- yeah.  No.  InspecTech had -- I repeat.

25   InspecTech had 3D technology which we were very interested to

1    have for our machines in the HDI, the high-density

2    interconnect market, which is the highest end of the PCB

3    market.  They have there also a 3D requirement on bumps,

4    which is on the substrate.

5          And finally, we acquired with InspecTech some

6    patents that belonged to InspecTech.

7    Q.   Now, was Camtek satisfied with the InspecTech

8    acquisition?

9    A.   I believe overall, I think that we were very satisfied

10   with the acquisition and there are records, you know, in the

11   years 2004, '5 and '6 that kind of showed that.

12   Q.   Now, were you selling the KIS and the BIS or the WIS in

13   2004, '5 and '6?

14   A.   No.  No.  When we acquire InspecTech, we realized that

15   the current product -- perhaps they were good enough for R&D

16   purposes, prototyping, but they were not stable enough to

17   meet the tough up-time requirements of the semiconductor

18   industry, so we knew that here we need to create a synergism

19   and to combine the accumulated know-how and knowledge of

20   Camtek together with all the knowledge that we acquired with

21   InspecTech.

22          So, what we did is, we set it as a first priority

23   and we enter into very extensive mode of R&D work, and we did

24   it by assigning the best of our R&D people to InspecTech

25   group in order to contribute from their knowledge to the

1    InspecTech product.

2    Q.   Now, I know you were the CFO and you weren't acting as

3    an engineer, but other than taking the PCB R&D engineers and

4    putting them on this project, did you do anything else to

5    improve the InspecTech products?

6    A.   Well, at that time, yes, I was already the CFO, so I'm

7    really not familiar with all the technical people, but what I

8    know from the standpoint at least of the PCO, that the

9    first -- the initial focus was to -- to make a new machine, a

10   new model with new artwork from scratch, I mean, not to rely

11   on anything that we got with InspecTech as far as the

12   operating artwork.  We also, as I mentioned before, thought

13   that the power of the artwork was always a unique -- one of

14   Camtek's uniquenesses and a competitive edge.

15   Q.   Just to help the jury, when you say "artwork," are you

16   referring to software?

17   A.   Software.  Sorry.  I'm sorry.  I'm a little bit confused

18   with the vocabulary.  I mean the software.  The operating

19   software is one of Camtek's uniquenesses.

20           To the best of my knowledge, on the first model of

21   the Falcon, which we introduce in July of 2003 at SEMICON

22   West -- this was the first introduction of the Falcon -- most

23   of the hardware remained the same hardware.  This came from

24   InspecTech, but as I mentioned, the software was totally new,

25   totally Camtek's software, which we did it from scratch.

1    Q.    Okay.  You don't mean to say that there were no changes

2    to any of the components, the hardware components --

3    A.    No, I believe -- I know at least, you know, the covers

4    was changed perhaps, you know, something which was to do with

5    the illumination was different than the one that we acquire

6    for InspecTech, but I would say the mechanics, the mechanical

7    assembly, vacuum devices or whatever, everything were more or

8    less the same as we acquired from InspecTech.

9    Q.    And that was specifically with respect to the BIS, or

10   both the BIS and the KIS?

11   A.    It was specifically for the -- for the BIS.  We didn't

12   see a real potential to continue to develop at that time --

13   we set a first priority on the development of the BIS, which

14   we called the Falcon later on, and not the kerf inspection.

15   Q.    Now, did you subsequently come out with a Falcon model

16   that did kerf inspection in addition to --

17   A.    Yes.  Yes.  Yeah, this was in the later stage that we

18   did also the kerf inspection with the Falcon.

19   Q.    And what was the name of that product?

20   A.    I think it was the Falcon PD, if I remember it well.

21   Q.    What does PD stand for?

22   A.    This is post dicing.

23   Q.    Now, how much did Camtek invest in research and

24   development to bring the Falcon to market?

25   A.    I believe from the time we acquire InspecTech till the

1    first introduction of the Falcon at SEMICON West in July of

2    2003, we invested about $11 million in R&D.

3    Q.   Now, I'd like to switch topics again to when Camtek

4    first learned about the '6,298 patent, okay, and that'll be

5    my first question.  When did Camtek first learn about the

6    '6,298 patent?

7    A.   This was I believe in -- sometimes in February of 2005

8    when we receive a letter from August, from lawyers of August,

9    I believe, Mr. John Vasuta.

10             MR. BANNON:  Okay.  Can we pull up Defendant's

11   Trial Exhibit Number 37?

12             And, your Honor, I don't believe there's any

13   objection.  This is just Defendant's counterpart to  the

14   plaintiff's exhibit that was already admitted.

15             THE COURT:  Any objection?

16             MR. McDONALD:  No objection, your Honor.

17             THE COURT:  Be admitted.

18   BY MR. BANNON:

19   Q.   Let me see if I can help you out, Mr. Amit.  In the

20   event you'd rather look at the physical paper documents --

21   A.   I prefer physical, because this is too small for me.

22   Q.   Fair enough.

23   A.   Okay.  Now I can see it.

24        (Pause)

25             MR. BANNON:  Your Honor --

1       THE COURT:  You have to keep your voice up.

2       MR. BANNON:  Your Honor, I will not be using 717.

3       THE COURT:  All right.  Thank you.

4  BY MR. BANNON:

5  Q.   Now, Mr. Amit, you referred to a letter from Mr. Vasuta.

6  Do you have Defendant's Trial Exhibit number 37 before you?

7  A.   Yes.  This is Number 37.

8  Q.   Okay.  And do you see that letter dated February 1st,

9  2005?

10  A.   Yes.

11  Q.   And it's to Mr. Rafi Amit?

12  A.   This was addressed to Mr. Rafi Amit, our chairman.

13  Q.   Okay.  Any relation to you, sir?

14  A.   Yes.  He is my brother.

15  Q.   Now, is this the letter that you just referred to that

16  you received from Mr. Vasuta?

17  A.   Yes.

18  Q.   And this was Camtek's first notice of the '6,298 patent,

19  is that right?

20  A.   Yes.

21  Q.   Okay.  Was that the first letter that you received from

22  August about their patents?

23  A.   No.  We -- about the patent in general?

24  Q.   About any of their patents.

25  A.   Yes.  Some four months earlier we receive a letter --

1    this was in November, I believe, of 2004 -- received a letter

2    from Mr. Stan Piekos, which is the CFO of August at that

3    time, and the letter was related to August's patent number

4    '666.

5            MR. BANNON:  Okay.  Can we pull up Defendant's

6    Trial Exhibit Number 72, please?

7            And, your Honor, I don't believe there's any

8    objection to this document --

9            THE COURT:  Well, Counsel, don't --

10           MR. BANNON:  Okay.

11           THE COURT:  Let's find out.

12           MR. McDONALD:  He's correct.  No objection.

13           THE COURT:  Be admitted.

14           MR. BANNON:  Thank you, your Honor.

15   BY MR. BANNON:

16   Q.   Now, is this the letter that you just referred to, sir?

17   A.   Yes.  This is Exhibit 72.

18   Q.   Okay.  And it's dated October 6th, 2004 --

19   A.   Yes.

20   Q.   -- correct?  Now, this letter was not about the

21   patent-in-suit that we're here about today, right?

22   A.   No, this is about another patent, '666.

23   Q.   And what did Camtek do when they got this letter from

24   Mr. Vasuta?

25   A.   Well, in the letter, Mr. Piekos claimed that he believed

1    that Camtek infringed this patent and this is based on some

2    information that they have, and he ask us to respond to this

3    claim.

4    Q.   And what did you do?

5    A.   Well, first of all, you know, I show this letter to our

6    team in the microelectronic division to review it, and then

7    they also met with our patent lawyer in Tel Aviv, Adi Levit,

8    and they reach the conclusion -- first internally at Camtek

9    and then it was supported by Adi Levit -- that we do not

10   infringe this patent.

11        So, we draft our answer, our reply to August, at

12   least according to my view in a very, very good face, in a

13   very open way, almost in a friendly way in the way that we

14   give them a very detailed explanation as to how our

15   machine -- how our machine works and why we do not infringe

16   their patent, and we mailed this letter to Mr. Piekos.

17   Q.   Now, sir, we're not going to put it up on the screen,

18   but can you refer to Defendant's Trial Exhibit number 74,

19   please?

20        THE COURT:  You know, we can move past -- I haven't

21   gotten involved in this, but my understanding is most of

22   these exhibits are not objected to.  You already know which

23   ones they're objecting to.

24        MR. BANNON:  That's correct.

25        THE COURT:  Put it up on the screen.  Let's move --

1           MR. BANNON:  Okay.  Thank you, your Honor.

2           THE COURT:  It stops -- it's herky-jerky direct

3   examination.

4           MR. BANNON:  Fair enough.

5           THE COURT:  Let's get it up.

6           MR. BANNON:  Let's put Defendant's Trial Exhibit

7   Number 74 on the screen, please.

8           THE WITNESS:  Yes.

9   BY MR. BANNON:

10  Q.   Do you recognize Exhibit 74, sir?

11  A.   Yes.  This is our reply dated November 4 (sic), 2004.

12  Q.   Who prepared that response?

13  A.   The reply was prepared by our division team, the

14  microelectronic division.  This is the division that produce

15  the Falcon.  And we had the chairman, Rafi Amit, sign on this

16  letter.

17  Q.   Now, did Mr. Piekos ever respond to this letter from

18  your chairman?

19  A.   No, Mr. Piekos never respond.  The next response that we

20  got from August was the letter that I mentioned earlier that

21  came from Mr. John Vasuta, the lawyer of August, which,

22  again, he thank us for the detailed answer.  Apparently it

23  was not satisfactory.  He requested more information and on

24  the second page he indicated another patent.  This is the

25  patent which we are here, the '6,298, which again, also in

1    this patent, they believe that we infringe this patent.

2    Q.   So that was Trial Exhibit Number 37 that we looked at

3    earlier?

4    A.   Yes.

5    Q.   Okay.  And did August ever pursue the '666 patent any

6    further?

7    A.   Not that I know.

8    Q.   When August identified the second patent, the

9    patent-in-suit here, what did you do about that?

10   A.   Well, what can I tell you?  My first impression -- I had

11   a very bad impression, you know, from this letter, you know,

12   after the good faith and the openness that we did in our

13   reply.  It's like, you know, I felt that there was some

14   perhaps hidden intention or hidden motivation on August's

15   side, you know, to draft this series of letters.

16          Regardless my feeling, we did more or less the same

17   process.  We call our -- first of all our microelectronics

18   team to review the patent, to review the '6,298 patent, to

19   compare it with the way -- how we operate with the Falcon.

20          Again, we seek the advice of our patent law firm in

21   Tel Aviv, Mr. Adi Levit, and once again we came with a

22   crystal clear conclusion that we do not infringe also the

23   '6,298 patent.

24          The only change at this time, we preferred to send

25   August a very short answer.  We say thank you for the letter,

1    we check it thoroughly.  We think -- our conclusion is that

2    we do not infringe.  However, if you believe that we do, by

3    all means provide us with detailed information as to what are

4    the specific, what is it exactly that we infringe, how do you

5    believe our machine works and what exactly does it infringe

6    your patent, and then we will be glad to discuss it with you,

7    to meet with you, whatever is required to do it in an open

8    way.

9    Q.    Did Mr. Vasuta ever respond to that letter with the

10   basis for their claims?

11   A.    No.  But we did additional move, additional step on our

12   side.  At the same time -- and this was the initiative of our

13   CEO --

14   Q.    What did you do?

15   A.    Yeah.  We decided not to take any risk.  And since, you

16   know, a legal opinion from lawyers in Tel Aviv will not be

17   applicable in the U.S. court, so we decided to seek for

18   independent legal opinion from a reputable U.S. law firm.

19   And I clearly remember the language that our CEO used, and he

20   said:  We don't want to take any risk.  I want to obtain a

21   legal opinion.  If the legal opinion, independent legal

22   opinion, will find that we infringe this patent, then we have

23   to stop the production and the selling of the Falcon.

24            So, first of all, I want to do it and I want to

25   play it safe, so we approach our corporate lawyer -- his name

1   is Lior Aviram -- using his network and to recommend on a

2   U.S. patent firm that will be able to prepare an independent

3   legal opinion.

4   Q.   And did you retain such a firm?

5   A.   Yes.  The recommendation was on Brown Raysman firm in

6   New York.

7   Q.   All right.

8        MR. BANNON:  Okay.  Can we pull up Defendant's

9   Trial Exhibit Number 283, please?

10  Q.   Have you seen Exhibit 283 before, sir?

11  A.   Yes.  I see it only on the screen.  I cannot find it in

12  the binder.  283?

13  Q.   Defendant's Trial Exhibit 283.  Have you seen that

14  document before, sir?

15  A.   Yes.  Yes.  This document is an e-mail that's send by

16  our -- Michael Lev, which was in charge of our -- at that

17  time our IP in Camtek, and this was most like a summary of

18  the meeting from -- dated May 25 of 2005 which took place in

19  Tel Aviv together with Brown Raysman lawyer there.

20  Q.   So was that the first meeting with Brown Raysman?

21  A.   This was the first meeting -- this is what you would say

22  the kickoff meeting to prepare the independent legal opinion.

23  Q.   And that was about two months before the lawsuit was

24  filed?

25  A.   Yeah.  I believe the lawsuit was filed in July.  This

1    was during SEMICON West.

2    Q.   Now, did Brown Raysman tell you how long it would take

3    to do their analysis?

4    A.   Yes.  They say that they believe that it will take them

5    at least six to eight weeks after they will receive all the

6    necessary documentation and information from our side.

7    Q.   Now, who from Brown Raysman performed the analysis?

8    A.   They nominated a team, which was I believe Frank DeRosa.

9    He was the co-chairman in Brown Raysman, and he was assisted

10   by another lawyer named Robert Schaefer.

11   Q.   Now, what kind of information was made available to

12   Mr. DeRosa and Mr. Schafer by Camtek to allow them to do

13   their analysis?

14   A.   Okay.  There was some information that they will be able

15   to, you know, obtain themselves, like all the prosecution

16   history and prior art, research or whatever.  They had done

17   it by themself.  What we has to come up with, all the

18   documentation, all the manual, all the explanation as far as

19   how the machine works, how the machine operates, how we

20   instruct, you know, the operator in the field, et cetera,

21   et cetera.  This is all the information that we put together

22   and we send it to them.

23        On the top of it, we thought that it will be much

24   better if this team or one of these team will come over to

25   Israel to see the machine, to inspect the machine, to get a

1    firsthand impression of how the machine works, and of course,

2    you know, to discuss in a very open way with each and every

3    R&D engineer that was involved in whatever, the software

4    code, the algorithm, the physics, the electronics of the

5    machine.

6    Q.    Now, was it Mr. Schafer that came over to Israel?

7    A.    Yeah.  It was sometime in August Mr. Schafer came over.

8    He spent like I believe two or three days altogether.  I

9    don't recall right now exactly.  And I instruct our people to

10   cooperate with him like, you know, in a very open way, just

11   to open everything for him.

12   Q.    Did he speak to any of your engineers?

13   A.    Yes, he spoke to all of our leaders in the R&D team.

14   Q.    Did he see the Falcon in operation?

15   A.    Yes.  Yes.  Yes.  We demo'd the Falcon for him.

16   Assigned a special machine just for the demo purposes for

17   him.

18   Q.    Did he ask to see anything that you did not provide to

19   him?

20   A.    No.  I mean, you know, everything was open.  There was

21   no question about, you know, to provide or not provide.  You

22   know, everything was open to him.

23   Q.    You wanted him to see everything, right?

24   A.    Yes, absolutely.

25   Q.    Now, did Mr. Schafer express any opinions at that time

1    on whether or not Camtek might have an infringement problem?

2    A.   Well, in the end of his visit just before, you know, the

3    taxi came to take him back to the airport, I just met with

4    him for a courtesy, whatever, and asked him what was his

5    first impression from the study, and he told me that he

6    believed that we have some very good points to claim that we

7    do not infringe the patent.

8    Q.   Now, did you ever get an oral opinion from Mr. DeRosa?

9    A.   Yeah.  A few days after that, I believe, after the --

10   did all the summaries in New York, they initiated a

11   conference room -- a conference call, and during this

12   conference call we got notified by DeRosa that they think or

13   they believe or their opinion is going to be that we do not

14   infringe this patent.

15   Q.   Did you ever get a written opinion from Brown Raysman?

16   A.   Yes.  This was in September.  We got a 25-page written

17   opinion explaining that we do not infringe.

18            MR. BANNON:  Let's pull up Defendant's Trial

19   Exhibit 269, please.

20   Q.   I have Defendant's Trial Exhibit 269 before you, sir?

21   A.   Yes.  This is a written opinion that we got from Brown

22   Raysman.

23   Q.   And that's the opinion you just referred to, correct?

24   A.   Yes.

25   Q.   Did you read the opinion when you got it?

1   A.   Yes, I read the opinion and immediately after that I

2   forward it to our team in the microelectronics division,

3   first of all to review that all the technicality, all the

4   technical descriptions that are being written in the opinion

5   are true and correct and comply with the way the Falcon is

6   being operated.

7        I also forward this opinion to our lawyers in

8   Tel Aviv, the patent lawyer, Adi Levit, and the corporate

9   lawyer, Lior Aviram, to review it for all this kind of -- I

10  don't know, legal language that's in it.

11  Q.   Well, were there any conclusions in the opinion that

12  either you or your lawyers or anyone else from Camtek

13  believed were incorrect?

14  A.   No.

15  Q.   Did anyone disagree with any of the opinions or

16  conclusions that were reached by Mr. DeRosa?

17  A.   No.

18  Q.   Did Camtek rely on Mr. DeRosa's opinion in deciding to

19  go forward with sales of the Falcon in the United States?

20  A.   Yes.  Based on this opinion, we decided to continue with

21  the production and the selling of the Falcon.

22  Q.   Now, if Mr. DeRosa had concluded that there was

23  infringement of the '6,298 patent, would Camtek have

24  continued selling the Falcon in the United States?

25  A.   No way.  As I mentioned before, this was a clear

1    instruction of Rafi Amit, the chairman, and probably we have

2    to find a different way, you know, to do it in a way that we

3    do not infringe.

4         MR. BANNON:  Your Honor, I'd like to move in

5    Defendant's Exhibits 74, 269 and 283 that were used in the

6    witness's testimony.

7         MR. McDONALD:  No objection, your Honor.

8         THE COURT:  Be admitted.

9         MR. BANNON:  Thank you.

10        Mr. McDonald will ask you some questions now, okay,

11   Mr. Amit?

12        THE WITNESS:  Okay.

13                    **CROSS-EXAMINATION**

14   BY MR. McDONALD:

15   Q.   Good afternoon, Mr. Amit.

16   A.   Good afternoon.

17   Q.   It was your responsibility for getting this opinion

18   done, is that right?

19   A.   Yes.

20   Q.   And why wasn't that duty handled by the CEO?  Why were

21   you as the chief financial officer in charge of it?

22   A.   Well, you know, most of the other vice president were

23   quite busy in the day-to-day work and it was the chairman

24   opinion to assign the job to me in a way that I just need to

25   manage the process to make sure the Brown Raysman people will

1    get all the support and all the necessary information and

2    everything will be -- you have to put it as the first

3    priority; in other words, just to manage the process.

4    Q.   So you were in charge of making sure they got all the

5    information that might be relevant to this opinion, right?

6    A.   Yes.

7    Q.   Because you wanted an opinion you could completely rely

8    on, right?

9    A.   Can you repeat?

10   Q.   You wanted an opinion that you could completely rely

11   upon.

12   A.   Yes.

13   Q.   And if this opinion said there's infringement risk, you

14   would have stopped selling the Falcon in the U.S., is that

15   right?

16   A.   This is correct.

17   Q.   And you were really looking, if I understood you right,

18   no risk.  That was the message you got loud and clear from

19   the CEO, that you wanted no risk at all of infringement in

20   the U.S.

21   A.   I wouldn't say no risk at all.  I said we don't want --

22   we cannot afford to take a risk and therefore we need to

23   obtain independent legal opinion.

24   Q.   And you understood now that this opinion was based upon

25   that information that your folks at Camtek provided to that

1    U.S. lawyer in New York, right?

2    A.   This opinion was based on the information that we

3    provided and the free access that they get them, you know, to

4    open -- to have an open discussion with our R&D people.

5    Q.   And you would agree that the opinion is only going to be

6    as good as the information provided to the lawyer who gave

7    the opinion, right?

8    A.   The general statement I believe it is, but again, you

9    know, we -- you know, in order even to minimize this kind of

10   risk, we took an approach with, hey, everything is open for

11   you.

12   Q.   And did you personally determine whether or not the

13   Camtek people provided accurate information to the opinion

14   counsel?

15   A.   No.  The only thing, I was just going there to the

16   meeting to make sure -- and observing that Mr. Schafer met

17   with the head of the physics department and the software

18   electronic, with all, really, the key people in the R&D.

19   Q.   Was anyone in particular responsible for personally

20   verifying that the New York opinion lawyer got accurate

21   information for his opinion?

22   A.   I believe there was one person which basically

23   internally, the division, which I would say coordinate and

24   reported to me in this sense, or two person.  One was

25   Mr. Amir Gilead, which was the division manager, and the

1    second person is Michael Lev, which was basically an IP

2    manager and the marketing manager of the division at that

3    time.

4    Q.    So it was two people, a Mr. Amir Gilead --

5    A.    And Michael Lev, Michael Lev.

6    Q.    Okay.  So from your standpoint, you didn't personally

7    take responsibility for ensuring the information the New York

8    lawyers got was accurate, you assumed the other people took

9    care of that?

10   A.    Yes.

11   Q.    Can we turn to Exhibit D 234, please, the opinion

12   itself?

13   A.    D 234.

14   Q.    Excuse me.  Actually, that's 269?

15   A.    269.  Okay.

16          MR. McDONALD:  Judge, can we flip over to Todd's

17   machine there?  Thank you.  And put the first page up to

18   start with.

19   Q.    So this is the first page of the opinion letter from the

20   law firm Brown Raysman, right?

21   A.    Yes.

22   Q.    And that's the firm in New York that you hired to do

23   this analysis, right?

24   A.    Mm-hm.

25   Q.    You knew you couldn't rely on your Israel attorney to

1    figure out the U.S. patent law, right?

2    A.    Yeah.

3    Q.    And this letter was addressed specifically to you,

4    correct?

5    A.    Right.

6    Q.    Could you turn then to page 15 of this opinion.

7    A.    Page 15.

8    Q.    And you see near the bottom there's --

9    A.    Okay.

10   Q.    Near the bottom of the page there's a little heading

11   here that the lawyer wrote about meetings with Camtek.

12   A.    Yeah.

13          MR. McDONALD:  And can we just blow up the last

14   part of the page there.

15   A.    Okay.

16   Q.    So there it says:  "Meetings with Camtek.  The foregoing

17   description is based on the referenced documents and meetings

18   with Camtek."

19   A.    Mm-hm.

20   Q.    And then there's a paragraph that will continue on the

21   next page.  Do you see that here?

22   A.    Yeah.

23   Q.    It says:  "With respect to the documents and meetings,

24   the Falcon User Guide (Exhibit 3) contains the following

25   statement on page 5-9:  "Preferably, you will select dice

1   that are defect-free."

2   A.   Mm-hm.

3        MR. McDONALD:  Now if we can put on page 16 and up

4   at the top there.

5   Q.   And it continues to say:  "From meetings with Camtek, we

6   understand that the dice are selected at random and are of

7   unknown quality."

8        Do you see that?

9   A.   Yes.

10  Q.   "Thus, the above statement in the User Guide is

11  inaccurate and apparently the result of miscommunication to

12  or misunderstanding of the technical writer of the User

13  Guide."

14       Do you see that language?

15  A.   Yes.

16  Q.   Now, you understand that this opinion was relying on the

17  information I just quoted as being accurate, right?

18  A.   Mm-hm.

19  Q.   Can you say yes or no so they can type a word?

20  A.   Yes.

21  Q.   You said, "Mm-hm."  I just want to make sure we get a

22  clear record.

23  A.   Yes.

24  Q.   Thank you.  And so you understood that if this

25  information was incorrect, what the lawyer was stating here,

1   that you could not have that assurance that you could rely on

2   this opinion, right?

3   A.   No, sir.  This is not my understanding.  This is not my

4   understanding.  Part of the information that was given to the

5   -- Brown Raysman was, yes, here is our manual and please note

6   that we have a mistake here.  This is not the way how we do

7   the process with the Falcon.  There is a mistake in the

8   manual.  This is information that we gave him.  It is our

9   information.

10  Q.   Okay.  And I didn't mean to dispute that, so let's just

11  make sure we understand each other here.

12          The lawyer was saying there's this language in the

13  manual that says preferably select dice that are defect-free,

14  right?

15  A.   Yes.

16  Q.   But he says:  But your people at Camtek told me that

17  language is wrong, right?

18  A.   Right.

19  Q.   And you understand that his opinion, the lawyer, the

20  New York lawyer, opinion lawyer, his opinion is based on that

21  understanding that the manual is wrong.

22  A.   Yes.

23  Q.   Okay.  So if the manual is actually an accurate

24  description of what customers using the Falcon would do, you

25  can't rely on this opinion, can you?

1   A.   No, I don't under -- I don't agree with you.  You know,

2   I don't -- it's not I disagree with you per se.  I don't

3   understand you.

4   Q.   Well, you do understand that the lawyer is saying:  Here

5   are the facts as I understand them that relate to the Falcon.

6   A.   Yeah.

7   Q.   And based on the facts as I understand them as the

8   lawyer, here's my opinion, right?

9   A.   Okay.

10  Q.   Would you at least agree with me that if his

11  understanding of the facts is wrong, if, if his understanding

12  of the facts is wrong, you cannot rely on the opinion?

13  A.   No.  His understanding was based on what he saw in the

14  Falcon and how the Falcon was demo'd to him, and how we -- we

15  pick, you know, the dice in order to create the reference,

16  and we told him this is the way how the Falcon is operated

17  regardless the mistake that we have in the manual.

18  Q.   All right.  Well, I'm going to try to move on and see if

19  we can communicate in a different way here on that issue.

20        You do understand, though, that that language was

21  what he was relying on at least in part to reach his opinion,

22  right, the language in his opinion that says:  The manual

23  says use defect-free, but the Camtek people told me the

24  manual was wrong.  We all agree that he's relying on that in

25  his opinion, right?

1   A.   Yes.

2   Q.   Okay.  Now, did you personally do anything to verify

3   yourself that that manual is wrong?

4   A.   Well, I ask, you know, the technical people, you know,

5   about this comment and I believe the explanation -- I thought

6   the explanation that I got from the technical people as to

7   the source or the reason for this mistake was satisfactory in

8   my eye.

9   Q.   Did you talk to the person who wrote the wrong language?

10  A.   No, I just talked to the division manager and perhaps to

11  Mr. Michael Lev, to Amir Gilead and Michael Lev.

12  Q.   Do you know the name of the person who wrote the wrong

13  language?

14  A.   Yes.  I believe these are the technical writer.  Her

15  name was Tory -- I forgot his last name.  Tory was the first

16  name.

17  Q.   Okay.  And this person Tory who wrote this, does he or

18  she still work for Camtek?

19  A.   No.

20  Q.   When did this person -- is it a he or she?

21  A.   She.

22  Q.   Okay.  When did she stop working for Camtek?

23  A.   I don't remember.  It was probably few months before my

24  retirement, in other words, sometimes in 2007 or something

25  like that.

1    Q.    So do I understand you right you did not talk to Tory

2    about why she made this mistake?

3    A.    No, not to Tory herself.

4    Q.    So did someone tell you that they had given Tory the

5    wrong information?

6    A.    The explanation was on a level of a misunderstanding.

7    This is exactly the language used and the explanation that I

8    got is, defect-free die, they probably meant to -- to -- do

9    not pick up dice which you say on the edge of the wafer,

10   which is just a partial area of the die, or do not pick die

11   which has a ink stamp on it, you know, from a previous

12   process.

13          But, you know, my common sense told me that how can

14   somebody pick a defect die from a wafer production lot which

15   need to be inspected and nobody know what is the quality of

16   this die.  You know, it is impossible, as a matter of fact.

17   Q.    Help me.  Let's take this in some steps here.  You had a

18   lot of information there.  I want to make sure I understand

19   what you're saying here.

20          Are you saying that it's impossible to properly

21   train the system under certain circumstances; is that what

22   you're talking about?

23   A.    No.  No.

24   Q.    Okay.  When you say something is impossible --

25   A.    Impossible to pick up a defect-free die when you don't

1    know the quality of the die or the wafer because you did not

2    inspect them yet.  This is the lot that you want to inspect.

3    Q.   All right.  Well, but you did mention, though, what was

4    miscommunicated, if I understand you right --

5    A.   Misunderstanding as far as what's the definition of

6    defect-free.  They call it here -- what is the language that

7    they use?  "Select dice which are defect-free."

8    Q.   So you're saying how would you know they're defect-free.

9    A.   Yes, unless it is clear -- and I mentioned like two

10   samples, like a die on the edge of a wafer or a die which had

11   an ink stamp on it, which is, you know, big and clear and you

12   don't want to pick this die.  But other than that you have no

13   clue what is a good die and what is a bad die.

14   Q.   Well, for purposes of using the Falcon.

15   A.   And --

16   Q.   Let me ask you a question.  Let's stick with questions

17   and answers here, if we could.

18   A.   Okay.

19   Q.   Is it your understanding that the Falcon can be used by

20   customers with a wafer that has gone through an electrical

21   inspection process already?

22   A.   Can you repeat, please?

23   Q.   Sure.  Is it your understanding that the Falcon can be

24   used on a wafer that has already gone through an electrical

25   inspection process?

1    A.    Yes, okay.  I mean, this is what you say, understand it.

2    Q.    Okay.  And so that wafer could have die on it that

3    passed the electrical test, right?

4    A.    Okay.

5    Q.    And die that did not pass the electrical test, right?

6    A.    Well, if you say so.  I mean, I'm not familiar with the

7    process.  I'm not familiar with the process, so, you know --

8    I'm not familiar with the process.

9    Q.    You're not familiar with what process?

10   A.    With the -- with the process in the semiconductor

11   industry as far as, you know, before electrical test or after

12   electrical test.  I'm not familiar with the process, so I

13   cannot comment on it.

14   Q.    Well, let me stick with what you talked about then.  If

15   I understood you right, you're saying there's die around the

16   edge of the wafer that obviously would be bad die, is that

17   right?

18   A.    Because they're partially.  They don't have the full

19   geometry of the die.

20   Q.    And then some die would have an ink dot on them, right?

21   A.    Yes.

22   Q.    How do they get the ink dot?

23   A.    Probably a previous inspection process.

24   Q.    Such as electrical testing, right?

25   A.    Maybe yes and maybe no.  I don't know.  I'm not familiar

1    with the process.

2    Q.   Could be electrical testing, it could be some other

3    testing, but whatever testing it is, the ink dot means it

4    didn't pass the test, right?

5    A.   Yes.

6    Q.   And if it doesn't have an ink dot, that means it did

7    pass whatever the test was, right?

8    A.   Perhaps just some of the inspection, you know, which

9    doesn't mean that this is a good die.

10   Q.   But you just mentioned ink dots.

11   A.   Yes.

12   Q.   And if I understand you right, an ink dot can come into

13   the Falcon system, a wafer has die with some of the die

14   having ink dots on them before it even gets into the Falcon

15   system, right?

16   A.   Mm-hm.

17   Q.   Can you say yes or no to that, please, just so we can

18   get a clear record?

19   A.   Yes.

20   Q.   I appreciate that.  I know it's hard to remember --

21   A.   Sorry about that.  Okay.

22   Q.   We'll get through this.  Don't worry.

23          So coming into the Falcon, some of those die can

24   have an ink dot which can indicate they are not good die,

25   right?

1    A.    Okay.

2    Q.    Do you agree with that?

3    A.    Yes.

4    Q.    And is it your understanding that the way the users use

5    the Falcon machine is, when they're setting up that reference

6    die, the model, they'll avoid using the die with the ink

7    dots?

8    A.    Yes.

9    Q.    So the user will use die that are known to be good

10   enough to have passed some prior testing in that case,

11   correct?

12   A.    Or you can say they should use a randomly picked die

13   with an exception that they don't have an ink spot on them,

14   okay?  What can I tell you?  I mean, you know, I'm really not

15   familiar with the process.  I said in my eyes from the view

16   of, let's say, a CFO, this was a satisfactory explanation for

17   me.

18        (Pause)

19   Q.    All right.  I just did a little sketch here and see if

20   we can put in a picture here what we've been saying in words,

21   all right?

22   A.    Okay.

23        MR. McDONALD:  Your Honor, may I use the ELMO here?

24   Q.    All right.  You might have a little trouble reading my

25   handwriting here, this was kind of on the fly, so I'm going

1    to walk you through this.

2    A.   Okay.

3    Q.   I tried to draw something round here, at least my

4    version of round, representing a wafer, okay?  Do you see

5    that, a round circle?

6    A.   Okay.

7    Q.   Then up at the top you see there's something that's not

8    really a square, but kind of close to a square, with a big

9    dot in it?

10   A.   Mm-hm.

11   Q.   All right.  Then I've got something that I wrote there

12   that says "Die with dot:  Do not use," right?

13   A.   This is what you wrote.

14   Q.   Okay.  And then the other thing I wrote is another

15   square with no dot on it, right?

16   A.   Yeah.

17   Q.   With a little line:  "Die with no dot:  Okay to use."

18   Do you see that?

19   A.   Okay.

20   Q.   All right.  So I'm hoping I've depicted accurately what

21   we've just been talking about here, that coming into the

22   Falcon before it creates that training, there'll be die that

23   have an ink dot that you don't use to create the model,

24   another die with no dot that may be used to create the model,

25   right?

1    A.    Okay.

2    Q.    Now, is it your understanding and was it your

3    understanding at the time of this opinion that the operator

4    would be involved in selecting the die that don't have ink

5    dots on them to create the model?

6    A.    Possible, yeah.

7    Q.    Isn't that probable?  Would you go with me that that's

8    probable?

9    A.    Probable.  Probable.

10   Q.    All right.  So, is it true that in the system as you

11   understood it at the time you got this opinion from the

12   New York attorney, that in fact customers creating the model

13   would know that the die may not be defect-free, but they'd be

14   good enough to have passed that ink-dot test and good enough

15   to make a good model?

16   A.    I -- I don't feel really that I can, you know, discuss

17   all these kind of technical details with you.  If you allow

18   me, please, to go back to why I was satisfied.

19           I say that with the explanation that I got, that

20   maybe Tory intended to write when she said defect-free to be

21   specific.  For me as the CFO of the company -- I have just a

22   very general understanding -- this seems to be satisfactory

23   explanation.  That's it.  I mean, now you try to ask me about

24   all the detail, the technical and what we do and whether it

25   was after electrical test or -- I don't think that I'm the

1  right person to discuss it.  You know, I don't have the

2  knowledge to discuss it with you.

3  Q.  So in terms of the information given to the lawyer, you

4  don't really feel like you're the right person to speak as

5  the corporate representative of Camtek here today?

6  A.  No, no, I do, but this is as I was asking -- the aid

7  first of all, the aid of our people in the division.  They're

8  the technical people and I ask them to comment on any

9  technical information that's in the opinion and to make sure

10  that everything in the opinion is in line with the way how

11  we're working.  And the same I approach it, you know, with

12  our lawyer, and I believe this is what I had to do.

13  Q.  And isn't it true that during the process of this

14  lawsuit before it came to this trial this last couple of

15  weeks, you in fact were designated as the person to speak on

16  behalf of Camtek about the opinion you got from the New York

17  lawyer and the information provided to that lawyer that led

18  to the opinion, right?

19  A.  Yes, but more in the general terms, not in the

20  technical.  I explain to your lawyer during the deposition,

21  you know, I made it clearly.  My role was to manage the

22  process, to make sure that Brown Raysman will get all the

23  necessary information in the most open way in order for them

24  to prepare an independent legal opinion.

25  Q.  But I do understand that you had indicated that as part

1    of your responsibilities here you at least did some checking

2    on why is it that that technical writer got this wrong, is

3    that fair?

4    A.   Look --

5    Q.   Is that fair or not?

6    A.   Yeah.  Yeah.  Yeah.

7    Q.   I didn't think I was going too far out on a limb there,

8    right?

9    A.   And I still can understand something and ask some

10   questions, okay, and this is what I did.

11   Q.   All right.  That sounds good.

12   A.   Thank you.

13   Q.   And so your understanding is that writer got it wrong

14   when they said use, in effect, perfect or defect-free die to

15   create this model, because they didn't have to be perfect to

16   use the model --

17   A.   Okay.

18   Q.   -- is that fair?

19   A.   Okay.

20        MR. McDONALD:  Todd, I don't know if you can do

21   this very quickly, but -- we'll get it switched in a second

22   here.  You have to tell me you can do this first.

23        Can you pull up the definition of a known good

24   quality die?  Can you nod yes or no?  All right.

25        Judge, I'm going to turn off the ELMO here.

1    The one that has previously been used.  Yes.

2  BY MR. McDONALD:

3  Q.   Do you see up on the screen, Mr. Amit, there's the

4  definition of a term here:  "Plurality of known good quality

5  wafers or multiple known good wafers" that says:  "Multiple

6  wafers that are recognized individually or as a whole to be

7  sufficiently free of defects for training purposes (e.g.," --

8  or for example -- "die that have been inspected, tested or

9  otherwise reviewed prior to or during training)."

10    Do you see that definition here?

11  A.   Yeah, I can see that.

12  Q.   Okay.  If I understand you right, the Falcon, to create

13  a training model, uses die that may have been inspected

14  through that ink-dot process and known to at least be

15  sufficiently free of defects for training purposes even if

16  they're not totally defect-free, is that fair?

17  A.   Again, I feel that I'm losing you.  I feel that I'm

18  losing you because this is really not the area of my

19  expertise or my responsibility.  I tell you, my role in the

20  preparation of this opinion was to manage the process.  I

21  really cannot discuss it with you.

22  Q.   Okay.  So you're going to say, "I can't answer that

23  question"; have I got you right?

24  A.   I cannot answer the question.

25  Q.   And you showed up today to speak about that process that

1    Camtek went through to meticulously get this U.S. lawyer to

2    do this opinion to make sure you were doing everything right,

3    but despite that you're saying, "I can't answer that

4    question"; have I got you right?

5    A.    There are other people from the company that can answer.

6    I cannot answer questions which has to do with technicality,

7    with technical details, because I'm not qualified.

8    Q.    So you think these are technicalities?

9    A.    I believe so.  I believe so.

10   Q.    Isn't it true that that language about using defect-free

11   die was actually in several versions of Camtek user guides

12   that had been in existence in September of '05 at the time

13   you got this opinion?

14   A.    Again, this is something that I'm not aware of.  The

15   only thing -- you know, if I didn't read the opinion, I

16   wouldn't even know about, you know, this mistake, this

17   specific mistake.  This typically will not come -- a manual

18   or a version of a manual, if there is a mistake on the

19   manual, it will never come to the desk of a CFO.

20   Q.    But what if it's a mistake that is a mistake that your

21   New York opinion counsel relied on to give your company an

22   opinion that said they did not infringe the August patent

23   involved in this lawsuit?  Wouldn't that be something that

24   would come across your desk in that situation?

25   A.    No, I didn't understand your last question, please.  Can

1    you repeat, please, in simple language.

2    Q.   Well, sure.  I'll try.  I'm a lawyer, so that's going to

3    be a little tough, but we'll see if we can get there.

4         I think you said this is the sort of issue -- an

5    error in a manual is typically not the sort of issue that

6    would come across your desk as a CFO.

7    A.   No.  What I said, if there are errors in the manual, in

8    any other literature, typically it will not come to my desk

9    as the CFO.  This is what I say.

10   Q.   And I can appreciate that typically you may not see

11   what's on a certain page of a manual, but in the situation we

12   have here, that very error in that manual is something that

13   your lawyer said he was told about and that he relied upon to

14   tell you that you wouldn't infringe the August patent, right?

15   A.   No.  It is not the language of the error.  As I mention

16   again, one of the most important here is the way how we

17   operate the machine, and the way how we operate the machine

18   is contradiction to this statement.  And this is what we came

19   and we said:  "Listen, regardless what is written in the

20   manual, this is not the way how we operate the machine.  This

21   was a mistake."

22   Q.   Okay.  So you're saying -- your understanding as the

23   witness speaking on behalf of Camtek, you're comfortable

24   telling me today that that manual is inconsistent with how

25   the Falcon was actually operated at the time of the opinion,

1    correct?

2    A.   These specific two words of defect-free.  This is the

3    part which is not like the way we work on the Falcon.

4    Q.   How about the language that the attorney was relying on,

5    that in fact unknown quality die were used for training?  Was

6    the Falcon in fact used that way?

7    A.   To the best of my knowledge, yes and no.  They're using

8    an unknown quality dice because this was before the

9    inspection, so nobody know what is the quality.  This is my

10   common sense.

11   Q.   Well, didn't your common sense tell you, though, that if

12   by the time the wafer got to the Falcon machine, if it had

13   already been tested and had some die that were marked with

14   that ink dot, meaning they were bad, you wouldn't use those

15   for a model?

16   A.   You take me back to the process of the semiconductor

17   industry which I'm not familiar with and don't feel

18   comfortable to discuss it with you.  I mean, you have many of

19   our technical people.  You can discuss it with them.  I'm not

20   the right person.

21   Q.   Isn't it true, Mr. Amit, that at the same time your

22   company was giving information to your New York opinion

23   counsel in the fall of '05, Camtek was training customers to

24   use good die to create the model?

25   A.   This is not that I'm aware or know about it.

1    Q.   You don't know one way or the other?

2    A.   No.

3    Q.   Well, how long have you been here for the trial these

4    last few days?

5    A.   I'm here since Monday.  This was the first day.

6    Q.   Okay.

7    A.   And believe it or not, I could hardly hear most of the

8    questions, because, you know, I have some hearing problem and

9    you guys were talking with your back to me and, you know, I

10   could not hear all the questions.

11   Q.   Okay.  Were you here for Elmer Gardiola?

12   A.   No.

13   Q.   Okay.  Were you here for the testimony we had read in of

14   Mr. Bernard?

15   A.   No.

16   Q.   Okay.  Well, let's -- so is it your testimony you don't

17   know one way or the other whether or not Mr. Gardiola

18   testified in court in the last few days right here in this

19   trial that in September or October of 2005, he was trained by

20   Camtek people to use good die to make models?

21   A.   No, I don't know.

22   Q.   Are you aware of any efforts Camtek went through before,

23   during or after it got that opinion, to tell any customers

24   who got that user guide that the guide was wrong?

25   A.   I'm not aware that any action was --

1    Q.   Okay.  Do you know whether or not any customers got the

2    user guide that had the same language that your people told

3    the lawyer was wrong?

4    A.   Probably, yes.  You know, if this language was in the

5    manual, I believe that some of the customer, perhaps most of

6    the customer had this manual.  I mean, this is again common

7    sense.  This makes sense to me, not that I know that this

8    specific manual went to a specific customer.  It simply makes

9    sense to me.

10   Q.   Well, we can put a specific example of one up there.

11           MR. McDONALD:  If we could pull up Plaintiff's

12   Exhibit 88, please.

13   Q.   Do you see the first page of the exhibit up on the

14   screen, Mr. Amit?

15   A.   Yeah.

16   Q.   That's some version of a Falcon user guide on the first

17   page.  Does that look familiar?

18   A.   I see it right now.  It's not a document that I ever

19   read.

20   Q.   Okay.  You haven't read any of the user guides?

21   A.   No.

22           MR. McDONALD:  At least if we can blow up in the

23   lower left corner the little print that indicates the date.

24   A.   Okay.

25           MR. McDONALD:  That's just the document number.

1    I'm sorry.  I think it's the second page that has the

2    copyright date on it.

3    Q.   This looks like it's got a copyright date of 2004 there.

4    Do you see that on page 2?

5    A.   Mm-hm.

6    Q.   So you would agree that if this in fact existed in 2004,

7    this would predate when you got the opinion?

8    A.   Most likely.

9    Q.   Now, if we turn to page 56 of this document --

10        MR. McDONALD:  Can we blow up in the lower right

11   corner the number of the page, lower right corner.

12   Q.   This is a Delphi document.  Do you know who Delphi is?

13   A.   I think it's -- I think it's one of our customers in

14   United States, yeah.

15   Q.   Is that in Kokomo?  Does that ring a bell?

16   A.   No, no, no, no.  I heard this name.  You know, for me,

17   the CFO, this is a row on the revenue list.

18   Q.   All right.  No zip codes with that.

19   A.   No zip code, right.

20        MR. McDONALD:  So could we blow up the first

21   paragraph with the heading "Cleaning the Reference Die."

22   A.   Okay.

23   Q.   Now, this has that sentence that we've been talking

24   about, right, in the middle of the paragraph where it says

25   "Preferably"?

1    MR. McDONALD:  If we could highlight that.

2    Q.   "Preferably, you will select dice that are defect-free."

3    A.   Okay.

4    Q.   So it does look here like Delphi, anyway, was a customer

5    that got a copy of this wrong manual, right?  You agree with

6    that, that it appears to be the case?

7    A.   Well, what I have to agree or not agree here, you know

8    what I mean?  You show me documents with the same statement

9    and you say that this document went to Delphi.  Fine.  Okay.

10   Q.   If I understand you right, these customers are paying

11   you hundreds of thousands of dollars if not a million to buy

12   these machines, right?  You're the finance guy, so I think

13   you know that one, right?

14   A.   Okay.  Okay.  Okay.  I don't remember exactly what was

15   the selling price, but, you know --

16   Q.   Well, can you give me a ballpark idea?

17   A.   Pardon.

18   Q.   As the chief financial officer, do you have a --

19   A.   It could be anywhere between a 500,000 to $700,000

20   machine.

21   Q.   And is it your understanding that Camtek is under a

22   contractual obligation to these customers who pay them all

23   that money to train them and give them training materials?

24   A.   Yes.

25   Q.   But yet you have no information as you sit here today

1    that any of the customers were told that those guides were

2    wrong.  Have I got that right?

3    A.   No.  Can you repeat, please?

4    Q.   Yes.  As you sit here today, are you aware of a single

5    customer who got a manual like the one up on your screen here

6    with this supposedly wrong information, are you aware of a

7    single customer who got that wrong information in their guide

8    that was told this is wrong, this is a mistake, this is an

9    error?

10   A.   I'm not aware if someone told me that this was a mistake

11   or not.

12   Q.   So you told the lawyer it was a mistake, but you didn't

13   tell those customers that had paid you hundreds of thousands

14   of dollars and asked to get training materials from you --

15   A.   You ask --

16   Q.   Please let me finish the question.  I guess I'll have to

17   start over.

18            So if I've got this right, you told the lawyers,

19   the lawyer in New York in September of '05, that that book is

20   wrong, but you didn't tell a single customer that you know of

21   that the manual is wrong.

22   A.   You ask me personally?

23   Q.   I'm asking about your personal knowledge?

24   A.   Okay.  No.  It's not -- I personally did not tell the

25   lawyer that there is a mistake.  This is our team.  Our

1   people made the statement.  And I personally didn't met

2   Delphi or any other customer to tell them that this is wrong

3   or bad.  So I don't know.  It could be.  You have to address

4   this question to our field people and ask them whether they

5   told or whether they notified the customer about this mistake

6   or not.  I'm not the person to answer it.

7   Q.   You were in charge of making sure the lawyers got all

8   the information they needed, though, right?

9   A.   Right.

10  Q.   Have you ever heard the expression "garbage in, garbage

11  out"?

12  A.   No.  Yeah.  In general like a slogan or like, you know,

13  kind of a -- yeah.

14  Q.   What is your understanding as to what that means?

15  A.   Something which if your input is not good, then the

16  output is also not good, okay?

17  Q.   Okay.

18          MR. McDONALD:  Your Honor, I'm at a good break

19  point.

20          THE COURT:  Yeah, let's stop here.

21          Kristine, what time are we starting up tomorrow?

22          THE COURT:  Nine o'clock.  We're starting up at

23  9 o'clock tomorrow.

24          All rise.  Have a good evening.

25      (Jury excused)

1    THE COURT:  I'll see you tomorrow about 8:45 --

2    MR. BANNON:  Thirteenth floor.

3    THE COURT:  -- to argue the issues.

4    MR. McDONALD:  Have a good evening.

5    (Proceedings concluded for the day at 4:50 p.m.)

6    * * * * *

**I N D E X**

**W I T N E S S E S:**                                          PAGE

**DAVID MAYSON BROOKS**
      Redirect Examination (continued)
           by Mr. Grumbles . . . . . . . . . . . . . .   1164
      Recross-Examination by Ms. Chaplin . . . . . . .   1168
      Further Redirect Examination by Mr. Grumbles . .   1174

**FRANCES McCLOSKEY**
      Direct Examination by Mr. Grumbles . . . . . . .   1176
      Cross-Examination by Ms. Chaplin . . . . . . . .   1205
      Redirect Examination by Mr. Grumbles . . . . . .   1277

**PLAINTIFFS REST** . . . . . . . . . . . . . . . . .   1278

**MOSHE AMIT**
      Direct Examination by Mr. Bannon . . . . . . . .   1294
      Cross-Examination by Mr. McDonald  . . . . . . .   1318


* * * * *

**E X H I B I T S**

**PLAINTIFFS'**              FOR ID   IN EVIDENCE

107, 110, 123, 126-129,
131-132, 134-136, 168, 180,
194, 240, 245-248, 260, 278,
272, 275, 285, 290-293, 469,
471, 475-476, 586-588, 619-637     1188

278                                            1278


**DEFENDANT'S**              FOR ID   IN EVIDENCE

1035                                           1170
1028                                           1173
1025                                           1226
930                                            1246
1009                                           1252
1036                                           1258
1024                                           1263
37                                             1306
72                                             1308
74, 269, 283                                   1318

**C E R T I F I C A T E**


We, **TIMOTHY J. WILLETTE** and

**LORI A. SIMPSON**, Official Court Reporters for

the United States District Court, do hereby

certify that the foregoing pages are a true

and accurate transcription of our shorthand

notes, taken in the aforementioned matter, to

the best of our skill and ability.


/s/ Timothy J. Willette          /s/ Lori A. Simpson
_____  _____
**TIMOTHY J. WILLETTE, RDR, CRR   LORI A. SIMPSON, RMR, CRR**


Official Court Reporters – U.S. District Court
1005 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota  55415–2247
612.664.5108