# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---------------------------------------------------------------
                                  )
August Technology Corporation,    )  File No. CV-05-1396
a Delaware corporation, and       )          (MJD/AJB)
Rudolph Technologies, Inc., a     )
Delaware corporation,             )
                                  )
            Plaintiffs,           )
                                  )
vs.                               )
                                  )
Camtek, Ltd., a foreign          )  Minneapolis, Minnesota
corporation,                      )  February 6, 2009
                                  )  10:55 a.m.
            Defendant.            )
                                  )
---------------------------------------------------------------


BEFORE THE HONORABLE MICHAEL J. DAVIS
CHIEF UNITED STATES DISTRICT JUDGE
AND A JURY


**(TRIAL - VOLUME V)**


Proceedings recorded by mechanical stenography;
transcript produced by computer.

1    A.   Yes.

2    Q.   More specifically, does it refer to the Falcon 200?

3    A.   Yes.

4    Q.   Which RVSI product does the RVSI column refer to?

5    A.   RVSI -- RVSI's 3-D machine that also had a 2-D option on

6    it.

7    Q.   At the time this was prepared, was Delphi looking for a

8    2-D inspection system or a 3-D inspection system?

9    A.   At the time this was prepared, Delphi was looking for a

10   3-D inspection system.

11   Q.   Did the NSX 105 system indicated here have a 3-D option?

12   A.   I don't -- I don't know.  The -- the focus was on to --

13   another group of engineers were evaluating the 3-D and

14   Mr. Amos and myself were evaluating the 2-D.

15   Q.   Which engineers were evaluating the 3-D?

16   A.   Shimika Jenkins.

17   Q.   Anyone else?

18   A.   Jay Griffith.

19   Q.   What inspection system did Ms. Jenkins and Mr. Griffith

20   decide Delphi should purchase?

21   A.   Well, they had focused their efforts on the Camtek and

22   the RVSI for the 3-D application.  And since we were also

23   interested in the 2-D performance of the equipment is how

24   this spreadsheet came to life.

25   Q.   Did they ultimately decide to purchase a Falcon for

1     (2:10 p.m.)

2                   **IN OPEN COURT**

3                   **(JURY PRESENT)**

4          THE COURT:  Let's continue with the reading of the

5     deposition.

6     BY MR. GARRETSON:

7     Q.  And there are a list of companies and machines across

8     the top of the first page of this document.  Do you see

9     that?

10    A.  Yes.

11    Q.  And the list includes the August NSX-105, August NSX-90,

12    Camtek, and RVSI, correct?

13    A.  Correct.

14    Q.  I believe you testified earlier that two out of the

15    three Falcon machines owned by Delphi are used for 3-D

16    applications; isn't that correct?

17    A.  That's correct.

18    Q.  Of the list of products I had just read, the August

19    NSX-105, the August NSX-90, the Camtek Falcon, and the RVSI

20    machine that you were evaluating in Exhibit 20, which of

21    those machines had the capability to perform 3-D

22    applications?

23    A.  The Camtek and the RVSI.

24    Q.  Specific to the time that this document was created, to

25    your knowledge, which of those systems had the capability to

1    perform the 3-D applications?

2    A.   Camtek and RVSI.

3    Q.   As of this date, are you aware which, if any, of those

4    systems has the capability of performing 3-D applications?

5    A.   I believe that you could configure an NSX-90 to do a

6    3-D, but we did not do that.

7    Q.   At what time, if at all, did the capability become

8    available for the NSX-90?

9    A.   That capability was on one machine, the last one that

10   was purchased from August Technology, but we did not

11   evaluate it due to a previous evaluation.

12   Q.   Why did you not evaluate it?

13   A.   Because it was slow.

14   Q.   So is it fair to say that it did not meet Delphi's

15   performance criteria for 3-D applications?

16   A.   It was nowhere near close.

17   Q.   Have you ever seen the patent that's at issue in this

18   lawsuit, the '6 -- we'll call it the '6,298 patent.  Have

19   you ever seen any patent associated with this lawsuit?

20   A.   No, I have not.

21   Q.   Do you have any idea what the claims of the patent in

22   suit purport to cover?

23   A.   The only thing I've heard is there is a patent

24   infringement possibility and that was it.

25   Q.   Do you have any knowledge regarding the claim terms that

928

# I N D E X

**W I T N E S S E S:**                                                    **PAGE**

DAVID THOMAS BARNARD
        (BY DEPOSITION DESIGNATIONS) . . . . . . . . . .   776

DEBRA L. SPEED
        (BY DEPOSITION DESIGNATIONS) . . . . . . . . . .   830

TOMMY WEISS
        (BY DEPOSITION DESIGNATIONS) . . . . . . . . . .   913

* * * * *

# E X H I B I T S

| PLAINTIFFS' | FOR ID | IN EVIDENCE |
|---|---|---|
| 664, 665, 667 | | 775 |
| 44, 66, 68, 312, 315, 319, 320, 324-327, 329 | | 829 |
| 121, 353 | | 913 |
| 177, 179 | | 926 |

| DEFENDANT'S | FOR ID | IN EVIDENCE |
|---|---|---|
| 336 | | 775 |
| 139, 140 | | 913 |

1         UNITED STATES DISTRICT COURT
2             DISTRICT OF MINNESOTA

3    -------------------------------------------------
                                    )
4                                   )
     August Technology Corporation, )   File No. CV-05-1396
5    a Delaware corporation, and    )         (MJD/AJB)
     Rudolph Technologies, Inc., a  )
6    Delaware corporation,          )
                                    )   Minneapolis, Minnesota
7            Plaintiffs,            )   February 9, 2009
                                    )   9:30 a.m.
8    vs.                            )
                                    )
9    Camtek, Ltd., a foreign        )
     corporation,                   )
10                                  )
             Defendant.             )
11                                  )
                                    )
12   -------------------------------------------------

13

14

15

16      BEFORE THE HONORABLE MICHAEL J. DAVIS and a Jury
           UNITED STATES DISTRICT COURT JUDGE

17

18

19                  **(TRIAL - VOLUME VI)**

20

21

22

23

24      Proceedings recorded by mechanical stenography;
     transcript produced by computer.
25

LORI A. SIMPSON, RMR-CRR
(612) 664-5104

1   Q.  They don't have it?

2   A.  It went back to the headquarters.

3   Q.  Within the United States market for MEP product, how

4   many companies does Camtek compete with for sales?

5   A.  In the U.S.?

6   Q.  In the U.S.A.

7   A.  I will name it as far as I know.  Four -- I'm sorry.

8   Three.

9   Q.  What would those be?

10  A.  RVSI, Solvision, August.  I would like to add one more,

11  ICOS, I-C-O-S.

12  Q.  Okay.  Have you ever competed with Solvision for a

13  particular tool -- sale by you I mean MEP -- in the U.S.?

14  A.  Yes.

15  Q.  Can you identify that target customer?

16  A.  For that I would like to rephrase it a little bit.  When

17  you're saying "compete," you mean -- what you mean,

18  "compete"?  In what level of competition?

19  Q.  I mean where you have some awareness that MEP and

20  Solvision are both trying to sell a tool to the same

21  customer.

22  A.  Yes, I did.

23  Q.  Can you identify who what customer is?

24  A.  TI.

25  Q.  Do you know when you became aware of that?

1    A.   I became aware about a couple of years back when I

2    started with TI, penetrated to TI.

3    Q.   Besides what you just described, are there any other

4    instances in which Solvision has been competing with MEP in

5    the U.S.?

6    A.   I understand that they tried to compete with me also in

7    Unitive.

8    Q.   To your knowledge, has Solvision sold a tool in the

9    United States?

10   A.   I don't know.

11   Q.   Have you competed directly with ICOS for any sales?  And

12   again by "you" I mean MEP.

13   A.   Yes.

14   Q.   Can you identify the customers?

15   A.   C-r-e-e Research.

16   Q.   Do you recall -- let me ask you this.  What kind of

17   tool, which of your models were you trying to sell to Cree?

18   A.   The Falcon.

19   Q.   Within the Falcon, which kind?

20   A.   The Falcon PD.

21   Q.   PD?

22   A.   PD stands for post dicing.

23   Q.   Does that -- is that going to be a 500 series PD or one

24   of the earlier 200 or 300?

25   A.   We are targeting the 500 series.

1    A.  We had tools at -- we still have equipment machines at

2    Cree, but for this new application, this was going to

3    require a very substantial amount of custom development for

4    this very small market.  So we bid on it, but we bid, you

5    know, a large number to do this custom development work.

6    Q.  Do you recall how much, approximately, you were going to

7    have to charge the customer to customize a tool for them?

8    A.  To do this custom development for Cree, it was going to

9    be almost a million dollars; and that was in addition to the

10   cost of the machine itself.

11   Q.  Aside from the sale to Cree, are you aware of any other

12   sales by ICOS in the United States from 2005 to date?

13   A.  I know of none.

14   Q.  Are you even -- are you aware of any bids by ICOS during

15   this time period of 2005 to 2008 in the U.S.?

16   A.  Of all the bid opportunities, we only saw them one other

17   time and that was at FlipChip, who I believe FlipChip did

18   not consider them a viable alternative.

19   Q.  To your knowledge, does ICOS have a sales and support

20   structure in the U.S. of any size?

21   A.  None at all.

22   Q.  Based on your experience, if ICOS had a fast, flexible,

23   and accurate finished wafer inspection machine and strong

24   support in the U.S., would you have likely seen them more in

25   competitive bids in the United States?

1    A.  You would think you would, but it's amazing how they

2    have just -- they're not on the radar screen at all.  We

3    don't see them.

4    Q.  Okay.  Again, we're talking about a market of 50

5    potential customers?

6    A.  Correct.

7    Q.  Okay.  Are you familiar with a company called RVSI?

8    A.  I am.

9    Q.  What is RVSI?

10   A.  They make a 3D bump height inspection system.

11   Q.  Is RVSI currently in operation?

12   A.  No.  They filed bankruptcy in 2005.  They were bought by

13   a private equity company, who then tried to make a go of it

14   with them, and then RVSI basically disbanded and August

15   bought the assets, the 3D inspection assets, from RVSI and

16   it's now a product of ours.

17   Q.  When was that acquisition?

18   A.  January of 2008.

19   Q.  Did RVSI have a 2D capability on its machine, to your

20   knowledge?

21   A.  They do, very young, very immature.  When we acquired

22   them, we wanted -- we were interested in the 3D technology.

23   Q.  Are you planning on maintaining the 2D capability that

24   came with the RVSI machine?

25   A.  What we're eventually going to do is take the RVSI 3D

1       **CROSS-EXAMINATION**

2     BY MS. CHAPLIN:

3     Q.    Mr. Brooks, my name is an Ann Cathcart Chaplin and I'm

4     one of the lawyers representing Camtek in this matter.   Nice

5     to meet you.

6     A.    Good afternoon.

7     Q.    Now, you testified today that it's basically a

8     two-supplier market, right, with just Camtek and

9     August competing for sales of wafer inspection devices,

10    correct?

11    A.    In the U.S., yes.

12    Q.    And it's been that way since 2005 to the present; is

13    that your testimony?

14    A.    It is.

15    Q.    And wafer inspection devices include machines that do

16    both two-dimensional and three-dimensional inspection,

17    correct?

18    A.    Correct.

19    Q.    And I'd like to talk about this two-supplier market with

20    you for a little while, and first I'd like to discuss ICOS.

21          And ICOS is a competitor of August's NSX tools in

22    the United States, isn't it?

23    A.    I don't think so.   They made one sale to CREE and

24    essentially we've never seen them again.

25    Q.    So, you admit, though, from 2005 to the present you had

1055

1    one sale in which you were competing with ICOS, correct?

2    A.    Correct.

3    Q.    You bid on a machine -- you bid a machine to CREE,

4    right?

5    A.    Correct.

6    Q.    And ICOS bid a machine to CREE.

7    A.    Correct.

8    Q.    And ICOS won that sale, right?

9    A.    Correct.  And we did also a lot of custom development

10   for that machine.

11   Q.    Right.  And that bid was for actually eight machines to

12   ICOS, right?

13   A.    That's correct.

14   Q.    And eight machines is a big order in this industry,

15   isn't it?

16   A.    It is.

17   Q.    And in considering why August lost the sale to CREE,

18   August realized that CREE's machine had a technical advantage

19   over August's NSX machine, isn't that right?

20   A.    I think you said the CREE machine.

21   Q.    I'm sorry.  The ICOS machine.  Thank you, sir.

22   A.    Okay.  Can you state it again and make sure I'm clear?

23   Q.    I will, I will.

24         In considering why August lost the sales,

25   August realized that ICOS's machine had a technical advantage

1    over August's NSX machine, isn't that right?

2    A.    It's my understanding, my recollection of why we lost

3    the order is that the ICOS machine had developed a handler

4    which could -- a wafer handler which could service two

5    inspection machines, which we did not have.  In addition,

6    there was a large custom development project associated with

7    it of which we bid to do the development work, and it's our

8    understanding that ICOS did that development work for free.

9    Q.    Okay.  Now, this wafer handler that you just

10   mentioned -- so one advantage of the ICOS machine was the

11   fact that it had this wafer handler, correct?

12   A.    That could service two inspection machines.

13   Q.    That's right.  And that wafer handler, would that also

14   be called a film frame handler?

15   A.    In this case, yes.

16   Q.    Okay.  And do you recall that ICOS's machine also had an

17   advantage over August's NSX machine in terms of alignment?

18   A.    Alignment was a challenging issue for the CREE

19   application, a very specialized computer chip manufacturing,

20   and yes, I believe it did.

21   Q.    Okay.  So I'd like to look in a little more detail at

22   this competition for the CREE sale, and if you could turn in

23   your book -- we won't put it on the screen just yet until you

24   have a chance to look at.  It's Defendant's Exhibit 178, so

25   it will be DX in your book 178.

1  bring up the top portion of 178 down to the line, please.

2  Thank you.

3  BY MS. CHAPLIN:

4  Q.   So, Mr. Brooks, just so we're all on the same page, on

5  Defendant's Exhibit 178, which is now up on the screen for

6  everyone to see, this is an e-mail that you wrote on

7  October 30th, 2005, correct?

8  A.   Correct.

9  Q.   And the subject of this e-mail is "CREE competitive

10  loss," is that right?

11  A.   That's correct.

12  Q.   And I'd like to draw your attention to that first

13  paragraph where you wrote:

14        "I know that both Todd and Rajiv can give some more

15  specifics on the comparison of ICOS to our NSX-95 and

16  NSX-105.  My understanding is that the ICOS tool is

17  faster/performs better than our NSX-95 and NSX-105.  It will

18  take an NSX-115 to see if we can better ICOS."

19        Do you see that?

20  A.   Yes.

21  Q.   And that's what you wrote, correct?

22  A.   Correct.

23  Q.   And you don't claim to know every single sale of ICOS in

24  the United States, do you?

25  A.   I believe I know them all.

1    Q.    But you don't have access to ICOS's records to honestly

2    know what sales they made in the United States.

3    A.    I do not have access to their records.

4    Q.    And you don't have access to their records to know every

5    single bid that they made to sell a machine in the United

6    States, correct?

7    A.    That's correct.

8    Q.    And are you aware that Tessera bought ICOS's machine

9    recently in the United States?

10   A.    I'm not.

11   Q.    And are you aware that Silicon Microstructure in

12   California bought an ICOS machine recently?

13   A.    I'm not familiar with the company, so no, I didn't know.

14   Q.    Okay.  And in 2005, ICOS was also in the running for the

15   sale of a backend inspection device to Flip Chip in the

16   United States, correct?

17   A.    I knew that Flip Chip looked at them, but in

18   conversations with Flip Chip and visits to Flip Chip, it's my

19   understanding that the only legitimate competitors were

20   Camtek and August.

21   Q.    But you understand that ICOS tried to get that business

22   and sell a machine to Flip Chip, correct?

23   A.    Yes.

24   Q.    Would you turn with me, please, in your book to

25   Defendant's Exhibit 198.

1   status for RVSI and that Rudolph or August acquired certain

2   assets of RVSI in early 2008, is that right?

3   A.   That's correct.

4   Q.   And that included purchasing RVSI's 3D inspection

5   capability.

6   A.   That's correct.

7   Q.   Would you turn in your book with me to Defendant's

8   Exhibit 742, please.

9   A.   (Witness complies).

10   Q.   Sir, do you recognize Exhibit 742 as a press release

11   issued by Rudolph Technologies about the RVSI acquisition?

12   A.   I do.

13   Q.   All right.

14        MS. CHAPLIN:   Your Honor, we move for admission of

15   Defendant's Exhibit 742.

16        MR. GRUMBLES:   No objection.

17        THE COURT:   Be admitted.

18   Q.   Mr. Brooks, I'd like to draw your attention first to the

19   first paragraph in this press release by Rudolph talking

20   about the acquisition of RVSI, and I'd like to look

21   specifically at the last sentence of it.  It states:

22        "The addition of RVSI's industry standard WS-3800

23   3D bumped wafer inspection system to its product portfolio is

24   expected to strengthen Rudolph's established presence in the

25   high-growth, advanced packaging market."

1      Do you see that?

2  A.   I do.

3  Q.   And that was true, correct?

4  A.   Yes.  We said it.

5  Q.   And I'd like to look at the third paragraph, if you

6  would, please.  It states -- and it's a quote:

7      "'The RVSI WS-3800 tool is the perfect complement

8  to the Rudolph NSX A2D macro inspection system, which is the

9  workhorse tool of choice deployed in most of the leading fabs

10  around the world,' McLaughlin continued.  'We believe these

11  high-performance systems will give our customers a

12  comprehensive solution for both 2D and 3D inspection.'" .

13      Correct?

14  A.   Correct.

15  Q.   So you thought highly of the RVSI 3D inspection system,

16  correct?

17  A.   We had a high interest in their 3D inspection.

18  Q.   All right.  And before RVSI was acquired, it was located

19  on the east coast of the United States, right?

20  A.   Correct.

21  Q.   And IBM in the United States has an RVSI tool, doesn't

22  it?

23  A.   Yes, it does.

24  Q.   And the RVSI tool is the standard or benchmark for 3D

25  inspection at IBM, isn't it?

1    A.    Yes.

2    Q.    And you understand that Intel also has an RVSI machine,

3    correct?

4    A.    I don't -- I don't know that.  I've never seen a 3D

5    inspection tool from RVSI at Intel.

6    Q.    Okay.  Have you seen --

7    A.    We've got many 3D tools at Intel.

8    Q.    All right.  And RVSI's 3D machine affected August's 3Di

9    pricing, did it not?

10   A.    Yes.

11   Q.    And you're aware that no one claims that the RVSI

12   machine practiced the patented invention here, right?

13   A.    You mean the patent which -- the subject of this case?

14   Q.    Yes, sir.

15   A.    That's correct.

16   Q.    Sir, could you turn in your book with me to Defendant's

17   Exhibit 177, please.

18   A.    (Witness complies).

19   Q.    Are you there?

20   A.    I am.

21   Q.    All right.  And do you recognize this document as a

22   document that you wrote?

23   A.    I do.

24        MS. CHAPLIN:  Your Honor, we move for admission of

25   Defendant's Exhibit 177.

1    A.    Correct.

2    Q.    And the article was apparently on packaged IC and WLP

3    Inspection Trends.  Do you see that?

4    A.    I do.

5    Q.    And what does IC stand for?

6    A.    Integrated Circuit.

7    Q.    And WLP, sir?

8    A.    Wafer level packaging.

9    Q.    Thank you.  Let's look at the next paragraph together,

10   if we could.  It states:

11          "In the article, they show a picture of Camtek's

12   Falcon PD (a direct competitor to our NSX) and SolVision's

13   Precis 2D/3D tool (a direct competitor to the NSX)."

14          Do you see that?

15   A.    I do.

16   Q.    And you wrote that paragraph, correct?

17   A.    I do.  I don't believe I was correct in the statement.

18   Q.    Do you remember sending an e-mail that corrected that

19   statement?

20   A.    No.

21   Q.    All right.  Let's look at the next paragraph, if we

22   could.  It says:

23          "Nowhere in the article are we mentioned and at the

24   end of the article they show a table listing all of the

25   inspection companies and we are not listed," correct?

1    Q.    And it states that Camtek is focused on August's

2    weaknesses, right?

3    A.    Correct.

4    Q.    And it identifies those weaknesses as Probe Mark

5    Inspection, Wafer and Die alignment, Au Bump Nodule and

6    Crater Detection --

7    A.    Gold Bump.

8    Q.    Thank you.   -- WLP inspection, and 3D Solder Bump,

9    correct?

10   A.    Correct.

11   Q.    All right.   So the Au Bump Nodule means gold bump

12   nodule --

13   A.    Correct.

14   Q.    All right.   And WLP again was wafer level packages?

15   A.    Correct.

16   Q.    And the next competitor listed is RVSI, right?

17   A.    Correct.

18   Q.    And after RVSI it states:   "Bulk of wins based on

19   incumbency, IBM win in 200x led to wins at IBM process

20   licensees or subcontractors - Toshiba, Sony CSE, AMD, Amkor

21   Singapore, ASE, SPIL, Unitive, correct?

22   A.    Yes, all in Asia.

23   Q.    And the next competitor listed is ICOS Vision, right?

24   A.    Correct.

25   Q.    And the last one listed is SolVision, right?

1    usability, lower false defects, color variation."

2           Do you see that?

3    A.   I do.

4    Q.   Now, the next one says 3u optics overcomes lower

5    throughput (faster than NSK at 2u)."  Do you see that?

6    A.   I do.

7    Q.   And I assume the "u" is microns?

8    A.   That's correct.

9    Q.   All right.  And the next bullet point says:  "Better at

10   PMI," which is probe mark inspection, right?

11   A.   Correct.

12   Q.   "One pass and better debris filtering."  Do you see

13   that?

14   A.   Correct.

15   Q.   Let's look under ICOS.

16   A.   There are three more items on there.

17   Q.   There are.  We can talk about those if you'd like.

18           The last three say:  "Review images on the fly, not

19   good for Gold Bumps, and buggy and unstable software," right?

20   A.   Correct.

21   Q.   Let's talk about ICOS.  The first bullet says:  "Faster

22   than NSX-95 for 3" wafer," right?

23   A.   Correct.

24   Q.   It says:  "Handling is faster and more reliable than the

25   UFHs," right?

1084

1   A.   Film frame handlers.

2   Q.   Thank you.  "Better alignment, easier recipe creation

3   (auto teach)," right?

4   A.   Correct.

5   Q.   And it says:  "Image capture on the fly" for ICOS's

6   machine, doesn't it?

7   A.   Correct.

8   Q.   And then it says:  "Unstable software is viewed as a

9   temporary situation," right?

10   A.   Correct.

11   Q.   All right.  And then it talks about Toray as a

12   competitor, correct?

13   A.   Correct.

14   Q.   Sir, I'd like to turn your attention to page AUG 49507,

15   so it's just the next page.

16   A.   I see it.

17   Q.   And it says:  "What do we need to do to counter Camtek?"

18   Do you see that?

19   A.   I do.

20   Q.   And right in the middle of the page there's a bullet

21   point -- or there's a number of bullet points, one of which

22   says:  "Install Version 11 in key accounts," right?

23   A.   Correct.

24   Q.   So you wanted to upgrade your software.

25   A.   Correct.

1   with customer demands, right?

2   A.   I don't know if I said 18 months, but the statement is

3   generally true.

4   Q.   All right.  I'm using it from your deposition, sir.

5   A.   Okay.  All right.

6   Q.   Do you remember testifying that every 18 months you

7   needed a new tool with new capabilities to keep up with

8   demand?

9   A.   Correct.  I agree with that statement.

10  Q.   And you said that one size does not fit all for all

11  customers, right?

12  A.   Ah, boy, nothing can be truer.

13  Q.   Now, customers have expressed certain things that they

14  did not like about August's 3Di machine, right?

15  A.   Correct.

16  Q.   And let's take a look at some examples of those problems

17  at Defendant's Trial Exhibit 184.

18  A.   (Witness complies).

19  Q.   Do you recognize Defendant's Exhibit 184 as an e-mail

20  that you received on or about April 6th, 2006?

21  A.   From R-ken Huang in Taiwan.

22  Q.   Yes.

23  A.   Right.

24       MS. CHAPLIN:  Your Honor, we move for admission of

25  Defendant's Trial Exhibit 184.

1    MR. GRUMBLES:  No objection.

2    THE COURT:  Be admitted.

3  Q.   Now, sir, Mr. Huang stated numerous reasons why

4  customers don't like the 3Di series, right?

5  A.   Correct.

6  Q.   And let's look at those in his e-mail.  It says:

7    "There are couples disadvantage why customer don't

8  like our 3Di series:  Throughput - RCS is much slower than

9  laser."

10  A.   Correct.

11  Q.   "RCS," is that the confocal sensor?

12  A.   Rapid confocal sensor.

13  Q.   That you told me about.

14  A.   Correct.

15  Q.   All right.  And then the next bullet with a little arrow

16  says:  "We can not do 3D defect detection - we can just

17  measure bump high and coplanarity which is not accurate

18  enough," right?

19  A.   There's a little bit of broken English.  This guy is

20  Taiwanese.  What he's referring to is we can do bump high

21  measurement, which is what most 3D tool customers want, to

22  look for defects off the bump itself.  They want to be able

23  to do probe mark inspection on a bump, which no one really

24  offers now, so there's a little bit of broken English.

25  Q.   But the 3Di can't do that kind of inspection?

1  A.    Right, can only do bump height.

2  Q.    And that was not accurate enough for customers.

3  A.    I believe what he's meaning -- it's not proper English.

4  What he's saying it's not enough.  They want to do defect

5  detection on the bump.

6  Q.    And he states that the price of the 3Di was too high?

7  A.    Correct.

8  Q.    And that the software was not stable or realizable,

9  right?

10  A.    I'm not sure what he means by realizable, but I agree

11  with the first comment.

12  Q.    That it was not stable?

13  A.    Correct.

14  Q.    And he says those were the main reasons why customers

15  did not like the 3Di tool?

16  A.    Right.

17  Q.    Now, you never sent a response disagreeing with

18  Mr. Huang about the 3Di's ability to do 3D defect detection,

19  right?

20  A.    I don't recall.

21  Q.    But you don't recall sending one?

22  A.    Correct.

23  Q.    And you understood from this e-mail that your 3Di

24  machine had a lot of competition, isn't that right?

25  A.    Correct, in Taiwan.

1126

1    acquiring Camtek, did you not?

2    A.   I'm sure I had follow-up discussions, sure.

3    Q.   And I believe that you made a list of topics that you

4    provided to your boss on that issue, isn't that right?

5    A.   I'm sure I did.  I don't recall the specifics.

6    Q.   Okay.  And let's look at the last one.  It says,

7    acquire Topcon, who I know you have mentioned earlier, and

8    it notes, they are making a move into the United States,

9    isn't that right?

10   A.   They were considering it.  We had intelligence that

11   told us that they were evaluating the U. S. market which

12   they never followed, never did.

13   Q.   To your knowledge?

14   A.   To my knowledge.

15   Q.   All right.  Let's look at the next page, 41125, please,

16   sir.  Again under, other ideas it says, acquire Camtek.

17   Have I mentioned this before?  Do you see that?

18   A.   I do.

19   Q.   A popular idea, apparently.  Now, Mr. Brooks, your

20   sales team is pretty aggressive, is it not?

21   A.   But professional.

22   Q.   But August employees have certainly taken the

23   opportunity to look inside of the Camtek Falcon when they

24   had the chance, didn't they?

25   A.   Only if escorted by a customer.

1158

1                           I N D E X

2                        VOLUME VI

3

4    <u>Plaintiffs' Witnesses:</u>                       <u>Page</u>

5

6      TOMMY WEISS 30(b)(6)

7          Deposition read into record     932

8      DAVID MAYSON BROOKS
          Direct Exam by Mr. Grumbles     960
9          Cross-Exam by Ms. Chaplin       1054
          Redirect Exam by Mr. Grumbles   1136

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT
    DISTRICT OF MINNESOTA
2

3   --------------------------------------------------------------
                                        )
4                                       )
    August Technology Corporation,      )   File No. CV-05-1396
5   a Delaware corporation, and         )          (MJD/AJB)
    Rudolph Technologies, Inc., a       )
6   Delaware corporation,               )
                                        )   Minneapolis, Minnesota
7             Plaintiffs,               )   February 10, 2009
                                        )   9:30 a.m.
8   vs.                                 )
                                        )
9   Camtek, Ltd., a foreign             )
    corporation,                        )
10                                      )
             Defendant.                 )
11                                      )
                                        )
12  --------------------------------------------------------------

13

14

15

16        BEFORE THE HONORABLE MICHAEL J. DAVIS and a Jury
             UNITED STATES DISTRICT COURT JUDGE

17

18
                      **(TRIAL - VOLUME VII)**
19

20

21

22

23

24        Proceedings recorded by mechanical stenography;
    transcript produced by computer.
25

LORI A. SIMPSON, RMR-CRR
(612) 664-5104

1   yesterday, customer concerns, so insurmountable that you

2   would not have been able to resolve them and make the sales

3   that were identified?

4   A.   Some are short fixes, some are a little longer, but we

5   always resolve all the issues.

6   Q.   If Camtek had not been selling against you with August's

7   own technology, you would have been able to make those

8   sales?

9   A.   Very much so.

10          MR. GRUMBLES:   No further questions, Your Honor.

11                    **RECROSS EXAMINATION**

12   BY MS. CHAPLIN:

13   Q.   Good morning, sir.

14   A.   Good morning.

15   Q.   I just have a couple of questions.   I'll try to be

16   brief.

17          Yesterday with Mr. Grumbles you talked about Intel

18   having high specifications, correct?

19   A.   Correct.

20   Q.   And IBM certainly has demanding specifications like

21   Intel, right?

22   A.   Similar.

23   Q.   And you understand that RVSI's tool is the benchmark for

24   IBM, right?

25   A.   That's correct.

1    Q.  And you're certainly aware that ICOS purchased KLA in

2    2008 -- I'm sorry -- that KLA purchased ICOS in 2008?

3    A.  That's correct.

4    Q.  And that now ICOS operates as a division of KLA, right?

5    A.  That's my understanding.

6    Q.  And you're aware that ICOS has a sales and support

7    office in California, right?

8    A.  I know that's where KLA is headquartered, so I would

9    have to assume they moved into the KLA facility.

10   Q.  And ICOS certainly displayed at the Semicon West show in

11   2008, didn't it?

12   A.  I don't recall.  I don't go see all the competitors'

13   booths.

14   Q.  Now, you do know that Texas Instruments in Dallas

15   evaluated an ICOS machine in 2006; isn't that right?

16   A.  I have no knowledge of that.

17   Q.  Mr. Brooks, I've handed you what is Defendant's

18   Exhibit 1035 and that is an e-mail that you received on or

19   about August 25, 2006; isn't that right?

20   A.  Correct.

21          MS. CHAPLIN:  Your Honor, we move for admission of

22   Defendant's Exhibit 1035.

23          MR. GRUMBLES:  No objection, Your Honor.

24          THE COURT:  Be admitted.

25   BY MS. CHAPLIN:

1    see that?

2    A.   I do.

3    Q.   And let's look under Action Items of the meeting, the

4    next section.  The first action item for August Technology

5    was to provide Mary K. at Texas Instruments a Rudolph

6    Technologies vs. Camtek vs. ICOS comparison; isn't that

7    right?

8    A.   That's what it says.

9    Q.   And do you recall that August Technologies was trying to

10   get business from Fairchild Semiconductor in the United

11   States in 2006?

12   A.   I do.

13   Q.   And August was in direct competition with Camtek and

14   ICOS for that business; isn't that right?

15   A.   I don't recall.

16   Q.   Now, you talked about Topcon as a foreign competitor,

17   right?

18   A.   Correct.

19   Q.   And there came a point in 2006 when you were notified

20   that one of your salespeople had been contacted by a

21   distributor who wanted to distribute Topcon products in the

22   United States, right?

23   A.   That's correct.

24   Q.   And indeed that distributor was looking for a U.S. sales

25   manager to represent the Topcon line of inspection systems

1    in the U.S., right?

2    A.  Correct.

3    Q.  And you were notified that Topcon was going to open

4    offices in San Jose and Chicago, right?

5    A.  I don't recall Chicago.  I would certainly assume

6    San Jose.

7    Q.  Now, Mr. Brooks, I've handed you what's been marked as

8    Defendant's Exhibit 1028.  And do you recognize that as an

9    e-mail that you received, sir, on or about January 7, 2006?

10   A.  I do.

11          MS. CHAPLIN:  Your Honor, we move for admission of

12   Defendant's Exhibit 1028.

13          MR. GRUMBLES:  No objections.

14          THE COURT:  Be admitted.

15          MS. CHAPLIN:  Thank you.

16   BY MS. CHAPLIN:

17   Q.  And, sir, this is the e-mail that you received about

18   Topcon calling one of your salespeople, correct?

19   A.  Correct.

20   Q.  And we've already talked about some of the top of the

21   e-mail, so I will skip over that.  Let's talk about the

22   third paragraph from the bottom.  It says, "He also stated

23   that Toray is coming to the U.S. market this year as well.

24   Can't confirm this.  He does not rep Toray.  Just the rumor

25   he passed on to me."  Correct?

1    A.  That's what it says.

2    Q.  And let's look at the next paragraph.  I'll jump to the

3    second to the last sentence.  It says, "I am guessing that

4    he was here calling on Cree and Unitive.  This is shaping up

5    to become a very interesting year for the U.S. and for

6    August from a competitive standpoint in general."  Right?

7    A.  That's what it says.

8    Q.  And let's look at the last paragraph.  It states, "We

9    had better get engineering on board with delivering on all

10   the enhancements we need.  We are looking down the barrel

11   and we are not as good as our competitors and we will most

12   certainly experience lots of pricing pressure this year.

13   Relationships and salesmanship is only going to carry us so

14   far."  Right?

15   A.  Correct.

16   Q.  And that was written to you by one of your sales force?

17   A.  Correct.

18             MS. CHAPLIN:  Thank you.

19             THE COURT:  Anything further?

20             MR. GRUMBLES:  Just a couple questions, Your

21   Honor.

22                  **FURTHER REDIRECT EXAMINATION**

23   BY MR. GRUMBLES:

24   Q.  Mr. Brooks, to your knowledge, did RVSI sell any

25   products in the United States during the time period 2005 to

1    customer wanted.

2         So first of all I looked at -- if we can phase in

3    the first line there.  We know that August was offering the

4    NSX and the 3Di machines.  They had a significant support

5    structure in the U.S. with customer service and training and

6    very hands-on support.  They made 54 system sales in the

7    period of time that we're talking about and customers

8    obviously felt that this was an acceptable product.  It was

9    used exclusively at some customers.

10        Second of all, Camtek, which also -- which sells

11   the Falcon system in the U.S., they had a U.S. support

12   system.  They provided on-site technicians just like August

13   did.  They made sales -- 36 sales of systems and their

14   product was considered acceptable by customers.

15        And then we've also heard about some other

16   companies.  We've heard about ICOS.  Based on what I've seen

17   and what Mr. Brooks testified to, ICOS was not really a

18   presence in the United States other than at the company

19   called Cree they made a sale and that was a specialized

20   installation.  But other than that sale, they've made no

21   other sales.  Whether they've been considered or whether

22   they tried to make a sale, they never made another sale and

23   so therefore there must have been something about their

24   product that was not acceptable.  And as far as we know,

25   Mr. Brooks said that he didn't believe that ICOS had the

1    mix here.  Do you remember that?

2    A.    Right.

3    Q.    And I know you mentioned on your direct testimony about

4    ICOS selling eight tools to CREE in the United States,

5    correct?

6    A.    Right.

7    Q.    And other than Texas Instruments, are you aware of any

8    Camtek customer that bought eight or more machines?

9    A.    I don't think so.

10   Q.    And eight machines is a big sale of these devices,

11   right?

12   A.    Yes, certainly.

13   Q.    And you looked at public information available about

14   ICOS, didn't you?

15   A.    Yes.

16   Q.    And I presume you would have looked at ICOS's web site,

17   right?

18   A.    Right.

19   Q.    And thus you would have seen that in 2005 ICOS was named

20   a recipient of Intel Corporation's Preferred Quality Supplier

21   Award for its efforts in supplying Intel with semiconductor

22   inspection equipment.  Do you remember that?

23   A.    Yes.

24   Q.    And you're aware then that ICOS has an office in Redwood

25   City, California, right?

1    was not an acceptable alternative, correct?

2    A.  Right.

3    Q.  And yet Cree bought eight of those machines.  So it was

4    acceptable to them apparently, right?

5    A.  It was acceptable to Cree for the purpose that they were

6    using it.

7    Q.  That's right.  And the August machine, in order to get

8    it ready for Cree's purposes would have taken 1 million

9    dollars' worth of development, correct?

10   A.  Right.  And I think the ICOS machine was also going to

11   require modification, but ICOS was willing to do it for no

12   charge.

13   Q.  Okay.  Are you aware that ICOS sold the machine to

14   Tessera in the United States during the period at issue

15   here?

16   A.  I've never heard of Tessera.

17   Q.  Okay.  Are you aware that ICOS sold the machine to

18   Silicon Microstructure in the United States during the

19   relevant period here?

20   A.  I've never heard of that company either and I don't

21   believe that Mayson Brooks, who is more familiar with this

22   marketplace, had ever heard of those two companies.

23   Q.  And you certainly looked at August's documents talking

24   about competition in this marketplace, correct?

25   A.  Yes.

1    to it, that talked about 100 million dollars' worth of sales

2    in the United States by August.  Do you remember that?

3    A.   Yes.

4    Q.   And yet we've talked about the sales of 54 machines by

5    August during the relevant time period, right?

6    A.   Right.

7    Q.   And just to be clear, the sale of 54 machines would not

8    come out to $100 million, correct?

9    A.   That's right.  The 100 million is a combination of all

10   the inspection machines that August sells, both the AXi and

11   the NSX and the 3Di.

12   Q.   And the AXi machine is the front-end machine, right?

13   A.   That's right.  It's for a different application.

14   Q.   Okay.  Now, as part of your damages analysis, in your

15   report you included an opinion that August should be awarded

16   a reasonable royalty if the jury determines that lost

17   profits are not appropriate, correct?

18   A.   Yes.

19   Q.   And you did not present that analysis on reasonable

20   royalty here earlier today, correct?

21   A.   That's right.  I didn't think that it was necessary

22   because I thought that lost profits on all of the sales, the

23   36 Falcon systems, was appropriate.

24   Q.   And you understand that Camtek's expert, damages expert,

25   has opined that a reasonable royalty is the appropriate

I N D E X

W I T N E S S E S:                                              PAGE


**DAVID MAYSON BROOKS**
        Redirect Examination (continued)
              by Mr. Grumbles . . . . . . . . . . . . .   1164
        Recross-Examination by Ms. Chaplin . . . . . . .   1168
        Further Redirect Examination by Mr. Grumbles . .   1174

**FRANCES McCLOSKEY**
        Direct Examination by Mr. Grumbles . . . . . . .   1176
        Cross-Examination by Ms. Chaplin . . . . . . . .   1205
        Redirect Examination by Mr. Grumbles . . . . . .   1277

**PLAINTIFFS REST** . . . . . . . . . . . . . . . . . .   1278

**MOSHE AMIT**
        Direct Examination by Mr. Bannon . . . . . . . .   1294
        Cross-Examination by Mr. McDonald . . . . . . .   1318


* * * * *

E X H I B I T S

PLAINTIFFS'              FOR ID   IN EVIDENCE


107, 110, 123, 126-129,
131-132, 134-136, 168, 180,
194, 240, 245-248, 260, 278,
272, 275, 285, 290-293, 469,
471, 475-476, 586-588, 619-637     1188

278                                         1278


DEFENDANT'S              FOR ID   IN EVIDENCE

1035                                        1170
1028                                        1173
1025                                        1226
930                                         1246
1009                                        1252
1036                                        1258
1024                                        1263
37                                          1306
72                                          1308
74, 269, 283                                1318

1349

1    UNITED STATES DISTRICT COURT
     DISTRICT OF MINNESOTA
2

3    ---------------------------------------------------------

4                                    )
                                     )
5    August Technology Corporation,  )   File No. CV-05-1396
     a Delaware corporation, and     )        (MJD/AJB)
     Rudolph Technologies, Inc., a   )
6    Delaware corporation,           )
                                     )   Minneapolis, Minnesota
7         Plaintiffs,                )   February 11, 2009
                                     )   9:35 a.m.
8    vs.                             )
                                     )
9    Camtek, Ltd., a foreign         )
     corporation,                    )
10                                   )
          Defendant.                 )
11                                   )
                                     )
12   ---------------------------------------------------------

13

14

15

         BEFORE THE HONORABLE MICHAEL J. DAVIS and a Jury
16            UNITED STATES DISTRICT COURT JUDGE

17

18
              **(TRIAL - VOLUME VIII)**
19

20

21

22

23

24

         Proceedings recorded by mechanical stenography;
25   transcript produced by computer.

1438

1   time.

2   Q.  Okay.  Well, let's move to a different topic of

3   conversation here.  Now, you have been involved in sales

4   support for the Falcon in the United States, as I

5   understand.  Is that correct?

6   A.  Yes.  That's correct.

7   Q.  And in that job, do you interact directly with Camtek's

8   customers?

9   A.  Yes, I do.

10  Q.  And are you involved in competitive bid situations for

11  the Falcon tool where you're competing, you may be

12  competing against other competitors of Camtek's in order to

13  make a Falcon sale?

14  A.  Yes, I am involved in that.

15  Q.  Now, apart from August have you seen anyone else in the

16  marketplace that makes a machine that competes with

17  Falcon's machine?

18  A.  Unfortunately, yes.  I have seen RVSI many times.  ICOS

19  has been a large competitor for us.  KLA has become a

20  competitor at some point.  Topcon.  Those are the ones that

21  I've met personally.

22  Q.  Okay.  Let's start with ICOS.  Is that ICOS?

23  A.  Yes, ICOS.

24  Q.  Okay.  How do you know that ICOS competes with the

25  Falcon?

1439

1    A.  If I go back about three years, we were trying to sell

2    a system to a company called Cree, and two years back we

3    lost the sale to ICOS, and they ended up selling about

4    eight systems to Cree.  ICOS also took our business at a

5    company called Tessera.  That was the end of 2008,

6    actually, very fresh, and we also took business from ICOS

7    and Cree at early to mid 2008 where we went and had a

8    head-to-head evaluation at ICOS and Cree, and we sold our

9    systems there.

10   Q.  You mentioned Tessera?  What is Tessera?

11   A.  Tessera is a company in North Carolina.  They

12   manufacture optical devices such as chips that are actually

13   a lens, for example, so they will manufacture a chip that

14   are going to be a spot on your cell phone or a camera on

15   your cell phone, very nice, and they are something called a

16   licensee.

17          They develop the technology, and then later on

18   they sell the technology to anyone that is willing to buy

19   the technology.  So they don't directly manufacture large

20   quantities of these wafers.

21   Q.  Was Tessera going to use this system itself?

22   A.  Yes, they were.  They were going to use this system.

23   Q.  Okay.  How do you know that Topcon and KLA compete with

24   the Falcon?

25   A.  We were competing against Topcon and KLA at a business,

1440

1    at a facility called Polar Fab, which is over here in

2    Minnesota.  We were competing against a Topcon system, a

3    KLA, two KLA systems, actually.  One was a 213X model, and

4    there was another one called an AIT 1.  Those are two

5    models that we competed against.  There was kind of an

6    evaluation.  They were looking for very small defects, and

7    at the end of this evaluation, Topcon took the business.

8    Q.  You mentioned Topcon, KLA and Camtek being involved in

9    this bid situation.  Was there any other wafer inspection

10   tool manufacturer involved in that evaluation?

11   A.  No, not that evaluation.  There were four machines, two

12   KLA systems, one Topcon and Camtek.

13   Q.  And the head-to-head bid against ICOS at Tessera, when

14   did that happen?

15   A.  That evaluation was late 2008.  So last, last -- last

16   part of the year of 2008.

17   Q.  And with respect to KLA, you mentioned a couple of

18   model numbers of machines.  Do you recall that?

19   A.  Yeah.

20   Q.  What type of defect was the customer, was Tessera

21   interested in trying to inspect?

22   A.  Tessera was looking to find broad, a broad range of

23   defects.  They were looking for anything that could

24   contaminate their chips or the dies or the lens, any kind

25   of surface contamination, all the normal scratches and

1442

1    Q.  All right.  You mentioned RVSI earlier.

2    A.  Yes.

3    Q.  How do you know that RVSI has competed against the

4    Falcon machine?

5    A.  We were in some evaluations against RVSI as well.  For

6    example, at FlipChip or SCI had an RVSI system, and we were

7    compared against that system before we were selling them a

8    system.  So we were asked to outperform the RVSI system.

9    IBM had purchased four or five or I think even six RVSI

10   systems when we were trying to penetrate or sell them a

11   system, and we did not succeed.

12           Delphi had an RVSI system that we were compared

13   against.  What else?  That's pretty much what I recall.

14   Q.  So you said IBM and Delphi, right?

15   A.  Texas Instruments also was one that had an RVSI system,

16   two of them, and we were compared against them or were in

17   an evaluation against them when we sold the systems to

18   Texas Instruments.

19   Q.  Did you do training at any point at FlipChip?

20   A.  Yes, I did.

21   Q.  Okay.  And did you compete in a -- did you get involved

22   in a competitive bid situation at any time at FlipChip?

23   A.  Yes.  We were trying to sell them a system at FlipChip,

24   and they were comparing us against the RVSI system, and

25   eventually we were able to sell them a system.

1443

1   Q.  And did you at some point get involved in a competitive

2   bid situation at a company called Unitive?

3   A.  Yes.  Unitive also had an RVSI system.  They also had

4   an August system, and we were competing in Unitive for the

5   business.  We were compared against RVSI systems because of

6   their 3D capabilities, and eventually we outperformed them

7   and we were able to sell them a system.

8   Q.  Excuse me.  Now, let's turn to Texas Instruments.  You

9   mentioned that they had evaluated the Camtek Falcon against

10  an RVSI system, is that right?

11  A.  Yes.

12  Q.  All right.  Why don't you turn in your witness binder

13  to Exhibit A, it is a blue tab in your binder.  You should

14  be able to turn to it.  Exhibit A to Exhibit 930 which is

15  in evidence.

16  A.  Okay.

17  Q.  And I have the first page of that up on the screen.

18  Can you explain, what is this document?

19  A.  Okay.  This document was a document that was presented

20  to us at the end of the evaluation that was done at TI in

21  Houston.  This document was presented to us just in order

22  to inform us that we did win the evaluation.  The business

23  was awarded to us, and it just explains why.

24  Q.  Okay.  In the upper left-hand corner of what has been

25  blown out here, it says, Author: Chris Gerling.  Do you

1  Q.  And I think we're finished with that document.  Let me

2  just ask you one more question.  At some point -- let me

3  step back, I'm sorry.  Now, just to recap in that document,

4  who finished first in the competitive evaluation?

5  A.  In this document?

6  Q.  Yes.

7  A.  Camtek finished first.

8  Q.  And who finished second?

9  A.  RVSI.

10  Q.  I want to ask you whether you were ever involved in a

11  competitive bid situation with a company called Freescale.

12  A.  Yes, I was.

13  Q.  When was that?

14  A.  I can't recall exactly, but I think it was somewhere

15  2007.

16  Q.  Okay.  And was this a competitive bid situation

17  involving the Falcon system?

18  A.  Yes, it was.

19  Q.  Who were the other competitors in that bid situation, to

20  your knowledge?

21  A.  According to what I remember, we competed against ICOS

22  in that bid.

23  Q.  Did you compete against anyone else other than ICOS for

24  that bid?

25  A.  Not that I recall.

 1    Q.   And what was the outcome of that bid situation?

 2    A.   We lost, Camtek lost on that bid, and ICOS gained the

 3    business.   It was a multiple machine order, I remember, so

 4    more than one system was at stake.

 5              MR. GARRETSON:   Your Honor, at this time we would

 6    move the admission of Defendant's Exhibit 720 and also

 7    Defendant's Exhibit 345.

 8              MR. McDONALD:   No objection, Your Honor.

 9              THE COURT:   Be admitted.

10              MR. GARRETSON:   Thank you, Your Honor.

11              THE COURT:   You may examine.

12                        **CROSS EXAMINATION**

13    BY MR. McDONALD:

14    Q.   Good afternoon, Mr. Mazor.

15    A.   Good afternoon.

16    Q.   I would like to walk through the parts of the Falcon

17    system with you for a few minutes.   You're very familiar

18    with the Falcon system, right?

19    A.   I am.

20    Q.   And with respect to the animation you talked about today

21    and the other aspects of the operation of the Falcon

22    machine, is it fair to say that all the different Falcon

23    models work the same way?

24    A.   I wouldn't say exactly the same way, but some aspects of

25    them work the same.

1536

1    I N D E X

2    VOLUME VIII

3

4    Plaintiffs' Witnesses:                        Page

5

6        MOSHE AMIT

7            Cross-Exam (Resumed) by McDonald      1362

8            Redirect Exam by Mr. Bannon           1378

9            Recross Exam by Mr. McDonald          1382

10

11       YARON MAZOR

12           Direct Exam by Mr. Garretson          1384

13           Cross-Exam by Mr. McDonald            1454

14           Redirect Exam by Mr. Garretson        1524

15           Recross Exam by Mr. McDonald          1529

16

17

18

19

20

21

22

23

24

25

1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA

2

3      -------------------------------------------------------------

                          )

4                        )

      August Technology Corporation,  )  File No. CV-05-1396

5      a Delaware corporation, and    )        (MJD/AJB)

      Rudolph Technologies, Inc., a   )

6      Delaware corporation,         )

                        )  Minneapolis, Minnesota

7          Plaintiffs,        )  February 12, 2009

                        )  10:00 a.m.

8      vs.                   )

                        )

9      Camtek, Ltd., a foreign      )

      corporation,             )

10                       )

          Defendant.        )

11                       )

                        )

12     -------------------------------------------------------------

13

14

15

         BEFORE THE HONORABLE MICHAEL J. DAVIS and a Jury

16           UNITED STATES DISTRICT COURT JUDGE

17

18

                 **(TRIAL - VOLUME IX)**

19

20

21

22

23

      Proceedings recorded by mechanical stenography;

24   transcript produced by computer.

25

1   layer?  I didn't understand.

2         THE WITNESS:  Passivation layer.  This is

3   something that protects the wafer.  And you can see here,

4   for example, touching the edge breaking the passivation or

5   too big area here.  Algorithm is identifying it, software,

6   and telling this is no good and disqualifies the die.

7   BY MR. BANNON:

8   Q.  So you've talked about inspection of solder bumps, gold

9   bumps, surface defects, and probe marks; and those are all

10  2D inspection, right?

11  A.  Those are surface inspection, yeah.

12  Q.  Did the BIS do all four of those surface inspections --

13  A.  Yes.

14  Q.  -- 2D inspections?

15  A.  Yes, the BIS had 2D inspection.

16  Q.  And the Falcon also does all four of those inspections,

17  right?

18  A.  Yes.  This is a presentation prepared in 2003 on the

19  Falcon, which is a continuation of the BIS.

20  Q.  Now, you also mentioned 3D inspection; is that right?

21  A.  Yes.

22         MR. BANNON:  Now, if we can go to page 8 of

23  Exhibit 608, please.

24  BY MR. BANNON:

25  Q.  Can you explain, sir, to the jury what is shown on this

1    page.

2    A.   Yes.   You can see here the bumps that we showed before

3    and you see that we measure the height.   And this is

4    three-dimensional, meaning it's the surface and the height,

5    this makes it the third dimension.   And we have means to

6    inspect and measure the height of the bumps and also the

7    co-planarity.   You see here three points, which actually

8    represent the tallest bumps on the die, and you can have the

9    co-planarity, which is the plane that you put it on.   I may

10   [inaudible].

11              COURT REPORTER:   I'm sorry.   I didn't understand

12   you because you dropped your voice.

13              THE WITNESS:   In different demonstrative that I

14   prepared, I think, on how the co-planarity is achieved.

15   BY MR. BANNON:

16   Q.   Now, did the BIS do 3D inspection?

17   A.   The BIS had the means to do CCS, confocal chromatic

18   sensor.

19   Q.   So that was the technology that was used in the BIS --

20   A.   Yes.

21   Q.   -- the CCS, confocal chromatic sensor technology?

22   A.   Yes.   This actually was patented when we acquired

23   Inspectech.

24              MR. McDONALD:   Objection, Your Honor.   Pursuant

25   to -- this is an issue that came up earlier and the Court

1   Falcon.  Was there any effort to sell that machine before it

2   was officially introduced at a trade show?

3   A    Well, the first one was actually upgrade for the BIS

4   that was installed in tower semiconductors and we upgraded

5   it with all of the addition things that came with the

6   Falcon, which just shows that it's based on the BIS.

7   Because we had it there, we upgraded the optics and the

8   software in order to get a better machine than the BIS that

9   was there.

10  Q    So, were you here for the testimony of Mr. Mayson

11  Brooks?

12  A    Yes, I was.

13  Q    And did you hear Mr. Brooks testify that TopCon does

14  not have a preference or any sales in the U.S.?

15  A    Yes, I heard this.

16  Q    Do you believe that was correct?

17  A    I don't think so.

18  Q    Why not?

19  A    Because every year I participate in seminar for test,

20  which is called the Southwest Test Workshop in San Diego and

21  they have a table-top exhibition for suppliers.  And I give

22  a paper there and also Rudolph does, Mr. Rajiv Roy.  So, I

23  was there.

24      On the table top there was our stand, next to us was

25  Rudolph and next to them was TopCon represented by a guy

1    from Arizona and one of our ex-engineers, Mike Wellington is

2    advising and working for them.  So, I know for sure that

3    they exist in the U.S. and they are selling in the U.S., so

4    I don't think what he said was right.

5    Q    Do you know about any sales by TopCon?

6    A    Yesterday, Mr. Mazor told you about competition where

7    that Polar Fab here in Minneapolis that we eventually lost

8    to TopCon.

9    Q    Did you compete against TopCon for a sale to Freescale?

10   A    In Freescale we competed against ICOS and ICOS won.

11   Q    Okay.  Now, I asked you previously when you started

12   your sales efforts for the Falcon.  And that was before the

13   Falcon was introduced at the --

14   A    Yes.

15   Q    -- 2003 Semicon West trade show, right?

16   A    Yes, is was -- we got waivers for application study

17   from for Atmel from Analog Devices, and I visited here in

18   the U.S., Atmel, Micron, Dexmark, Delphi.  So, all of this

19   was offered and later on installed on some of them.

20   Q    All right.  Did there come a time that you learned

21   about the '6298 patent that's in suit in this case?

22   A    Yes.

23   Q    And when was that?

24   A    In February 2005.

25   Q    And did you have any personal involvement in

1708

```
 1              I N D E X

 2              VOLUME IX

 3


 4     Plaintiffs' Witnesses:                      Page

 5


 6        AMIR GILEAD

 7           Direct Exam by Mr. Bannon           1541
             Cross-Exam by Mr. McDonald          1601
 8           Redirect Exam by Mr. Bannon         1657
             Recross Exam by Mr. McDonald        1663
 9
          MICHAEL BLOOMHILL
10           Direct Exam by Mr. Francescani      1665
             Cross-Exam by Mr. Grumbles          1667
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
2

3    ------------------------------------------------
                                  )
4                                 )
     August Technology Corporation,  )   File No. CV-05-1396
5    a Delaware corporation, and      )         (MJD/AJB)
     Rudolph Technologies, Inc., a    )
6    Delaware corporation,            )
                                  )   Minneapolis, Minnesota
7            Plaintiffs,           )   February 13, 2009
                                  )   10:20 a.m.
8    vs.                           )
                                  )
9    Camtek, Ltd., a foreign       )
     corporation,                  )
10                                 )
             Defendant.            )
11                                 )
                                  )
12   ------------------------------------------------

13

14

15

16       BEFORE THE HONORABLE MICHAEL J. DAVIS and a Jury
            UNITED STATES DISTRICT COURT JUDGE

17

18

19              **(TRIAL - VOLUME X)**

20

21

22

23

24       Proceedings recorded by mechanical stenography;
     transcript produced by computer.

25

LORI A. SIMPSON, RMR-CRR
(612) 664-5104

1    that's true.

2    Q.  Let's take a look at some documents, then.  Let's turn

3    to Defendant's Trial Exhibit 169 in your book, please, and

4    we will put it on the screen as well.  I believe it's the

5    second page of this document that is a lost order report.

6    Did you consider that document, sir?

7    A.  Yes, that's really where I started.  As I said, I looked

8    at all the lost order reports.  And if you look at the one

9    at Texas Instruments, it's particularly important because 16

10   of those 36 units that are claimed as lost sales would have

11   gone to Texas Instruments.

12          So the lost order report points out here that the

13   most important single reason that the sale was lost was

14   because they wanted -- because they, Texas Instruments,

15   wanted an on-site dedicated service engineer.

16          And then they list quite a number of other items.

17   They wanted 3D, as I said before.  They wanted better

18   usability.  They wanted better throughput.  They wanted --

19   they had service issues with Rudolph.  They were offered a

20   free demo by Camtek.  On-site software development from

21   Camtek.  They were all factors as to why Camtek won and

22   Texas Instruments lost.

23          Now, I mentioned many of these before when I

24   compared that -- if you recall the slide comparing were

25   these part of the patented features and I won't repeat that,

```
 1                    *    *    *    *    *

 2        (11:20 a.m.)

 3                      IN OPEN COURT

 4                     (JURY PRESENT)

 5      (At sidebar.)

 6            THE COURT:  Counsel, so you don't get scared or

 7      anything, what happens in long jury trials, the jurors bond.

 8      They're cooking.  They are having a potluck.

 9            MS. CHAPLIN:  That's nice.

10            MR. McDONALD:  I have olive cheese balls I could

11      have brought.

12            MR. BANNON:  If the jurors are enjoying

13      themselves, that's good.

14      (In open court.)

15            THE COURT:  Members of the Jury, I was just

16      telling the lawyers that you were going to party without

17      them.

18            All right.  You may continue.

19            MS. CHAPLIN:  Thank you, Your Honor.

20      BY MS. CHAPLIN:

21      Q.  Now, Mr. Troxel, when we took our break we were on this

22      slide and I believe you had just talked through that first

23      column about what August claims as damages.  Would you

24      please explain why you deducted tools from that number

25      claimed by August.
```

1    A.  Yes.  Well, what I did after looking at the total claim

2    when preparing this chart, then I simply listed the ones

3    that I thought should be deducted because they were 3D

4    related.  In other words, the NSX/3Di is there because the

5    Camtek tool had a 3Di capability.  And the 3Di, the five of

6    those that were claimed obviously were there because of the

7    3D capability.  So I deducted a total of 21.

8         I then said there was one item that was listed as

9    an NSX item that was a replacement.  Camtek put that machine

10   in as a no-charge replacement.  And so certainly there

11   shouldn't be any lost profits claimed on that one.

12        And then finally, I said there were nine machines

13   that I could comfortably look at the lost sales reports and

14   identify specifically reasons that those were sold that had

15   nothing to do with a patented technology.  So I have

16   deducted those nine.

17        And that leaves then the five NSX machines that if

18   lost profits are going to be awarded, which I don't think

19   they should be for other reasons, but if they were going to

20   be awarded, it seems to me that the most that would be used

21   as the claimed units would be five.  And then plus, again,

22   that demo, for which a reasonable royalty should be assessed

23   if damages are awarded.

24   Q.  Could you briefly describe that column that you have

25   marked Would Seek Alternative, the nine machines.

1    Factor number 2, is there an absence of acceptable

2    noninfringing substitutes.  It seems to me that it's clear

3    that there were RVSI machines out there, there were ICOS

4    machines available, and others that clearly had been

5    available, but particularly the RVSI and ICOS.  There's a

6    lot of evidence supporting the fact that those would have

7    been available, so I put a big X there.

8    In other words, to pass the Panduit test you've

9    got to have a "yes" for every one of those four.  I think

10   you've got "no's" for the first two at least.

11   Does the patent owner have adequate production and

12   marketing capacity?  Yes, so I checked that.  Certainly they

13   did.

14   And factor number 4, I have no particular problem

15   with the fact that the data were available, but as I just

16   finished discussing, I differed with the way it was

17   calculated.

18   Q.  Let's turn, then, to reasonable royalty damages that you

19   talked about at the beginning of your testimony.  Can you

20   please describe what you mean by "reasonable royalty."

21   A.  Well, a royalty, to start with, is just no more than a

22   rent that somebody pays for intellectual property.  It can

23   be a copyright.  It can be a trademark.  It can be a trade

24   secret or a patent.  You pay a certain rent in order to use

25   that.

1    A reasonable royalty, on the other hand, is a term

2    that's very specific to litigation and that's where a jury

3    or a court assigns a reasonable royalty in order to

4    compensate the patent owner for the unauthorized use of that

5    property.

6    Q.  And would you please describe the approach that you

7    followed in coming to your reasonable royalty conclusion in

8    this case.

9    A.  I followed the usual methodology, which is to establish

10   what's called a hypothetical negotiation and that is simply

11   going back in time to the date of the hypothetical

12   negotiation and deciding what the negotiators would have

13   arrived at reasonably given the evidence and the facts of

14   the case.

15   Q.  And what would be the date of that hypothetical

16   negotiation?

17   A.  I agree with Ms. McCloskey that it should be November of

18   2004, which is the date that the patent was issued.

19   Q.  And is that the same as the date that you start

20   calculating damages from?

21   A.  Oh, no, no.  That's a different issue.  Damages start

22   when notification takes place to the alleged infringer.  In

23   this case August did not mark its product with the patent

24   number, so that damages would start when August notified

25   Camtek that they felt that their product was -- that their

1    patent was being infringed and that would have been February

2    of 2005.

3    Q.  Would you describe the factors, then, that you

4    considered for this hypothetical negotiation.

5    A.  What you try to do is to put yourself in the shoes of

6    these negotiators back in November of 2004, what would they

7    have considered.  And you've got all this data and all these

8    facts and so you really use the hypothetical negotiation as

9    a vehicle to collect all these data and to assimilate them

10   and to compare them and to come up with an answer.

11         And what you are really looking for, then, is all

12   the considerations that should be established.  If you think

13   about a negotiation, whether it be a real life negotiation

14   that you might have in buying a house or whether you think

15   about a hypothetical negotiation, you've got the same

16   considerations.

17         There's quantitative considerations, dollar

18   related.  In the patent world that might mean other licenses

19   that are out there.  It might mean the profitability of the

20   products that they make.  And there's qualitative

21   considerations, such as how valuable is this patent.

22         And those are the factors, really, that you can

23   sort of categorize all of these considerations into,

24   quantitative and qualitative, which is what I tried to do.

25   Q.  And when you get these qualitative and quantitative

1    factors, how do you put it all together?

2    A.   What I try to do, if the data supports this, is to

3    construct a range of data out of the quantitative factors

4    that would give me a low and an upper limit to what this

5    royalty range might be and then I use the qualitative

6    considerations to decide where in that range is a reasonable

7    number to pick.

8    Q.   And for quantitative factors, what type of information

9    did you consider?

10   A.   In this matter I know that there were -- I believe it

11   was 11 or 13 licenses that were submitted by Rudolph and

12   August.  And also then I looked at the profitability

13   factors.

14          Now, when you look at those licenses in detail, as

15   I did, I read them all, you realize that most of them relate

16   to software.  I don't think software licensing has much to

17   do with inspection machines, so I didn't think that any of

18   the software licenses were appropriate.

19          There were other licenses that were for what's

20   called joint development agreements wherein Rudolph and/or

21   August joined with another company to produce something.

22   And there again, the relationship doesn't have any royalty

23   involved in it.  They're simply forming this company in

24   order to produce a product and that's no help, really, in

25   trying to establish a reasonable royalty.

1    So none of these licenses, I felt, had any place

2    in my process.

3    Q.   Did Ms. McCloskey use those licenses in her analysis?

4    A.   In her report Ms. McCloskey said these licenses may have

5    some influence on the report or on the answer and so she did

6    list them on a chart showing the different ranges and the

7    range went from 3 and a half percent, the lowest one, to 12

8    and a half percent I think was the highest one.  And so that

9    was a bar on the chart that she did prepare in her report.

10   Q.   And did you think that using that range was appropriate?

11   A.   I do not think that's appropriate.  I think the expert

12   has to look at the license and say is this license

13   appropriate, yes or no.  If it's yes, then you put it in

14   your chart.  If it's no, you don't.  Then you say why it's

15   not appropriate.

16        I don't think you say, well, these might be and so

17   I'll put them down because it's got a big number, 12 and a

18   half percent.  I think that -- I don't think that's

19   appropriate.

20   Q.   Now, you mentioned the 12 and a half percent license.

21   Why did you not think that was appropriate?

22   A.   Well, that license was a very peculiar one.  It was a

23   license between August and UT, University of Tennessee,

24   Battelle to develop a new product or a new software, really,

25   is what it was related to.  That never happened.  No

1   software was developed.  There was never any money paid

2   under the license and it's for software.  So I don't see why

3   that should even be considered.  I think that you properly

4   ought to just drop that and consider it no further.

5   Q.  Now, I know Ms. McCloskey and I discussed some licenses

6   from a source *RoyaltySource* that she used.  Do you have an

7   opinion on the information obtained from that source?

8   A.  Sure, I do.  I've worked around or with *RoyaltySource*

9   for years.  This is an online computer service that

10  assimilates licensing rates from publicly available sources.

11  That means that all the nonpublic licenses that are out

12  there in the world don't get counted.

13        And it also means that you don't -- if you look at

14  this data, you don't know if it's coming from a patent or

15  not.  It says maybe 5 percent.  You don't know if that's

16  5 percent of gross sales or net sales.  There are many

17  problems with *RoyaltySource*, let's put it that way.

18        Now, there are also -- occasionally in

19  *RoyaltySource* you will find licenses that are on target and

20  then you say, fine, I'll take a look at those.  And I think

21  that was the case here.  I think there were four or five

22  licenses that were for machines, testing machines, in the

23  semiconductor industry and I thought those ought to be

24  considered.

25  Q.  Could you tell us a little bit about those licenses,

1    then, please.

2    A.  I prepared a chart.

3         THE COURT:  Before we get into this chart, let's

4    stop here.  We'll start up at 2:00, at 2:00.  All rise for

5    the jury.

6        (Lunch recess taken at 11:45 a.m.)

7                         *    *    *    *    *

```
 1        (2:15 p.m.)

 2                        IN OPEN COURT

 3        (Jury enters)

 4             THE COURT:  Good afternoon.

 5             THE JURY:  Good afternoon.

 6             THE COURT:  Good afternoon, counsel.

 7             ALL COUNSEL:  Good afternoon, your Honor.

 8             THE COURT:  Let's continue.

 9             MS. CHAPLIN:  Thank you, your Honor.

10   BY MS. CHAPLIN:

11   Q.   Mr. Troxel, when we took our break we were just about to

12   talk about the licenses you learned about from Royalty

13   Source.

14             Could you please tell us what you learned from that

15   source.

16   A.   Yes.  These were four licenses that were -- I selected

17   out of the licenses that were reviewed by Ms. McCloskey from

18   Royalty Source.  As I mentioned before, Royalty Source is an

19   online database of licensing information, and I thought these

20   licenses were particularly relevant to the industry,

21   semiconductor, and to test equipment.

22             For example, the first one is -- the licensor was

23   Credence Systems Corp., and that product was test systems,

24   including optional hardware and software products, used in

25   the production of semiconductors.  It sounded like sort of
```

1   what we were talking about here.  The royalty rate for that

2   particular license was five percent and it declined to three

3   percent.

4          The second license on my list is Irvine Optical

5   Corp., which covers an automatic wafer handling and

6   inspection system, again, somewhat related to our work here.

7   The royalty rate for that was a $250,000 lump sum front-end

8   payment, plus a three percent running royalty rate.

9          The third license in the group is from Scanner

10  Technologies Corp. for an -- electronic test equipment for

11  the semiconductor industry, and that license was five

12  percent.

13         And finally, the fourth one was V-i-z Manufacturing

14  Company for business and assets of Viz's test equipment

15  division, including products produced by the test equipment

16  division, and that called for a $575,000 payment, plus two

17  and a half percent to a max of $250,000.

18         And I observed the range of licenses here was from

19  a low of two and a half percent to a high of five percent,

20  which gave me some comfort in the fact that my five percent

21  was certainly not out of line with what actually had happened

22  with these four licenses, and I also observed that these were

23  maybe, what, a third of the nine percent that Ms. McCloskey

24  had espoused.

25  Q.   Now, Mr. Troxel, I know you were here when Ms. McCloskey

1    testified.  Do you recall in her testimony and in her report

2    her use of an article that talked about revolutionary and

3    major and minor improvement patents?

4    A.    Yes.  It was a Degnan & Horton article.  It traces back

5    many years.  1997, I believe, was when that was first

6    published.

7              The authors are two economists who were trying to

8    update their database on licensing rates, and one of the

9    questions they asked in their survey was for the participants

10   to rate their patents either as minor improvement, major

11   improvement, or revolutionary.

12             And then they did a study, if you will, in

13   correlation analysis and they established that there was a --

14   the revolutionary patents were somewhere in the range of five

15   to ten percent, their major improvements were somewhere in

16   the range of I believe three to seven percent, and the minor

17   improvement was in the range of one to three percent.

18             Now, I know Ms. McCloskey testified that she was

19   told by the August people that this particular invention was

20   a revolutionary type of invention and she so classified that

21   and therefore that brought it into the five to ten percent,

22   which is the figure that then was used in her analysis.

23             I certainly am no -- I'm not expert in the patent

24   technology, but I remember reading the testimony by

25   Mr. O'Dell in his deposition when he was asked the difference

1  between the NSX-90 and the NSX-95 which was -- you know, is

2  the first machine that used the strobing technology.  Well,

3  Mr. O'Dell was unable to recall any particular reason why

4  there was a difference between those two.  He said you should

5  talk to the engineers.  He said he knows that there's a

6  different camera and a different computer used, but he didn't

7  say there was a revolutionary strobing light that was

8  suddenly developed that went on this 95.  So it struck me

9  that if the inventor of the patent wouldn't come up with the

10 fact that this was a breakthrough technology, I didn't --

11 seemed to me that revolutionary might be stretching the

12 definition a little bit.

13        Anyway, I don't think five to ten or the

14 revolutionary category seems to me to be particularly

15 applicable, although I'm sure other people are more qualified

16 to determine that from a technical point of view.

17 Q.  Now, in this scope of quantitative considerations that

18 you looked at, I think you also mentioned looking at

19 profitability of the products.

20 A.  Yes.  I think that should be the major basis that we use

21 to try to determine a royalty.  It ought to be how we're

22 going to split up the profit between the two companies

23 appropriately in order to determine a royalty rate.

24 Q.  And what did you determine about the profitability of

25 the products?

1763

1   A.   The -- this is really the bottom line of what I came up

2   with.

3        If I look at the operating income of these

4   companies -- now, I need to be sure you're with me on the

5   terms here, because when we're talking about lost profits,

6   we're talking about an incremental figure.  We're taking

7   sales, we're subtracting cost of sales, and then subtracting

8   certain incremental expenses out of the operating expenses.

9        Here, when we talk about a reasonable royalty,

10  we're talking about sales, less cost of sales, less all of

11  the operating expenses.  And Ms. McCloskey did this the same

12  way.  I mean, we have no difference of opinion here on this

13  matter.  And in fact, her figure and mine are very similar.

14       From Camtek in 2004, they had a negative operating

15  income.  The NSX machine had 26.1 percent operating income.

16  This is after you deduct costs of manufacturing and all of

17  the operating expenses of selling, general and

18  administrative.  This is before tax and before any other

19  expenses, but it's what's called operating income.

20       And then in 2005, Camtek had an operating income of

21  16.8 percent and NSX had an operating income of 21.8.

22       Now, Ms. McCloskey and I differ somewhat on this

23  Camtek technical issue which we could discuss if necessary,

24  but we don't agree.  I didn't want to mislead you.  We do

25  agree on the NSX numbers, however.

1       So, what I wanted to do then was to determine how

2   to reasonably split up that income between the two companies.

3   Excuse me.

4       There's an old rule of thumb that developed out of

5   negotiations called the 25 percent rule, which was also

6   mentioned, if you recall, in Ms. McCloskey's testimony.  This

7   is a result of practitioners who actually negotiate licenses,

8   real licenses, and they found looking back in history that

9   that was pretty much the average or it was a reasonable

10  approximation of what they determined to be the value of a

11  patent when they were negotiating it.  So 25 percent is a

12  rule of thumb that oftentimes is applied in these situations.

13      Now the 25 percent, however, you got to remember,

14  includes -- this is a deal between people who want to do a

15  deal.  This is a deal between a patent holder who wants very

16  much for his licensee to succeed -- so the patent owner gives

17  all sorts of other intellectual property, typically.  They'll

18  give know-how, they'll welcome them back to their factory to

19  see it being made, they may given them marketing materials.

20  So the 25 percent subsumes, sort of, that that will happen.

21      So, it seemed to me that in this case -- and I have

22  found in litigation it's not a question of both parties

23  wanting to succeed.  The patent owner is not that anxious for

24  the licensee to succeed.  There's an animosity, obviously.

25  That's why we're here.  Then they don't give them any extra

```
 1    benefits.  It's a naked license.  You're getting a license to
 2    a patent, period, none of these other benefits.
 3           So, I said probably 20 to 25 percent is a more
 4    reasonable range to use, and I applied that.  And if you
 5    notice, 20 percent then of the NSX number is 5.2 percent; 25
 6    percent of the NSX number is 6.5 percent.
 7           Similarly, I made the same calculations in 2005 and
 8    really developed a range then of rates from 3.4 percent to
 9    the 6.5 percent.  That's a range that I came up with, was
10    looking at this profitability figure applying the 20 to 25
11    percent allocation methodology.
12           The average and median of that particular range is
13    4.5 percent, just to put it into perspective.
14    Q.   Now, I know you mentioned that you used this 20 to 25
15    percent.  Did Ms. McCloskey make a similar adjustment?
16    A.   She used 25 to 33 percent, which is used sometimes.  In
17    our book, Dr. Kerr and I acknowledged that people do use a 25
18    to 33 percent and it varies.
19           Now, the only -- I've looked back in literature and
20    the only place I ever have found the origin of the 33 percent
21    was one negotiator who said he applies 25 percent when he's
22    arguing for the licensee and he uses 33 percent when he's on
23    the side of the licensor, which doesn't strike me as
24    particularly a very objective basis to start with.  So I have
25    never used 33.  I don't personally think 33 is appropriate.
```

1   I think you ought to use 25 and adjust it downwards as you

2   think the impact of the other intellectual property that you

3   don't get is appropriate.

4   Q.   Now, once you got this range of rates and the mean and

5   median that you have on your chart, what did you do with that

6   information?

7   A.   Well, that formed, therefore, the range that I would use

8   for determining a reasonable royalty.

9            You recall before I said that in the hypothetical

10  negotiation you ought to look at quantitative factors and

11  qualitative factors.  This is to me my quantitative factors.

12  I've got a range 3.4 percent to 6.5 percent.

13           Then I like at qualitative factors, and one of the

14  things that you look at is what's called the **Georgia Pacific**

15  factors -- there's 15 of those -- and this asks all sorts of

16  questions about qualitative factors.  And I went through

17  those factor by factor, I considered all the other factors

18  that were not included in **Georgia-Pacific**, and then selected

19  a rate within that range.

20  Q.   And were there certain factors you considered during

21  that analysis that were the most important to coming up with

22  your royalty rate?

23  A.   Yes, indeed.  It seems to me that -- and in fact this is

24  the instruction of Judge Tenney in the **Georgia-Pacific** case

25  -- that you ought to -- these are very general factors and

1    that you ought to select what's the most important factors in

2    order to select your rate.

3           And first, I thought that the patented feature not

4    being the driving motivation for purchase was very important

5    in considering a royalty rate.  In other words, I'm licensing

6    from you, but yet your license isn't going to do a whole lot

7    for me because other people are going to buy my product for

8    other reasons:  They want my 3D capability.  They don't like

9    your service capability.  So that struck me as being --

10   therefore, I would argue that the rate ought to be lower.

11          Secondly, I notice that the NSX machine never

12   collected a premium.  In other words, it was the same price

13   as the NSX-90.  And one would think that if you had a really

14   valuable patent and you want me to license that patent,

15   you're going to say I'm going to make some more money by

16   using that.  Well, if you sell the product at the same price

17   you sold it at before, that doesn't argue that you've got a

18   gold mine there as a patent feature.  So I think it's

19   relatively important to recognize that the NSX-95 did not --

20   was unable to collect any premium because it started

21   practicing the patented technology.

22          And thirdly, I thought the operating income

23   percentages were similar enough between the Falcon and the

24   NSX, that that should guide our reasonable royalty rather

25   than other outside industry measurements.

1    So, here again, the range of the negotiation was

2    3.4 to 6.5 with an average of 4.5, so I said and concluded

3    that the reasonable royalty should be five percent.  That's

4    higher than the average.  I think that you could probably

5    argue for a lower rate than five percent, frankly, but I

6    think this is conservative and I think this is -- recognizes

7    the various factors that both parties would be looking at in

8    the hypothetical negotiation.

9    Q.   Now, Mr. Troxel, do you recall Ms. McCloskey's

10   reasonable royalty determination?

11   A.   It was nine percent.

12   Q.   And do you recall applying her nine percent what the

13   total dollars would be?

14   A.   Yes.  That came up in her testimony.  If you apply nine

15   percent against the selling price of the units that were

16   imported, the Camtek units that were imported, her reasonable

17   royalty would be $2,117,561.

18   Q.   And can you describe why there's such a difference

19   between your royalty rate and Ms. McCloskey's royalty rate?

20   A.   Well, it really boils down to two things.  One is the

21   difference between using 20 to 25 percent as the allocation

22   basis and using 25 to 33 percent.  Also, I used both years'

23   profitability for the NSX equipment, whereas 2005 was lower

24   than 2004, you recall.  I think that's on the chart.  Right

25   there.

 1            In 2005 the NSX was only 21.8 percent.  In 2004 it

 2     was 26.1 percent.  She used only the 2004 data, not the 2005,

 3     and I used both years, although it didn't change the range

 4     any.  But those two factors, really, were the only -- the big

 5     differences between us.

 6            Now she included in her considerations a number of

 7     other licenses, that is, the 2.5 to 12.5 percent licenses

 8     that were the August licenses, and also the other sources

 9     that she used for her bases, although actually it boils down

10     to using the profit figures and that's really the difference

11     between our two calculations.

12     Q.   And did you then calculate the reasonable royalty figure

13     that would result from applying a five percent royalty?

14     A.   Yes.  In contrast to this I did essentially the same

15     thing.  I took 37 units that were imported.  You recall that

16     figure -- you recall that there are 37 units imported.  The

17     average selling price of those units is $635,904, so 37 times

18     635, 36,000, is about 23 and a half million dollars.  I

19     applied five percent against that 23 and a half million

20     dollars and came up with my royalty at five percent of

21     $1,176,423.

22            So, I guess in summary it's a question for the jury

23     as to using the nine percent rate for the reasonable royalty

24     of 2,117,000, or a five percent right at a million 176 would

25     be the contrast between our two calculations.

1827

I N D E X

**W I T N E S S E S**:                                            **PAGE**

**RICHARD TROXEL**

     Direct Examination by Ms. Chaplin . . . . . . .   1713

     Cross-Examination by Mr. Grumbles . . . . . . .   1770

     Redirect Examination by Ms. Chaplin . . . . . .   1786

     Recross-Examination by Mr. Grumbles . . . . . .   1786


**DAVID L. ADLER**

     Direct Examination by Mr. Garretson . . . . . .   1787

\* \* \* \* \*

E X H I B I T S

**DEFENDANT'S**                          **FOR ID   IN EVIDENCE**

  1044                                        1715

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA
2

3    ---------------------------------------------------------

4                           )

        August Technology Corporation,  )  File No. CV-05-1396
5      a Delaware corporation, and    )      (MJD/AJB)
        Rudolph Technologies, Inc., a  )
6      Delaware corporation,         )
                         )  Minneapolis, Minnesota
7          Plaintiffs,        )  February 24, 2009
                         )  10:40 a.m.
8    vs.                      )
                         )
9    Camtek, Ltd., a foreign       )
        corporation,             )
10                         )
          Defendant.         )
11                         )
                         )
12    ---------------------------------------------------------

13

14

15

          BEFORE THE HONORABLE MICHAEL J. DAVIS and a Jury
16            UNITED STATES DISTRICT COURT JUDGE

17

18
                  **(TRIAL - VOLUME XII)**
19

20

21

22

23

      Proceedings recorded by mechanical stenography;
24  transcript produced by computer.

25

            LORI A. SIMPSON, RMR-CRR
              (612) 664-5104

1    A.   That's correct.

2    Q.   And it says you reviewed the company's operations,

3    including a discussion of key competitive factors.  Do you

4    see that?

5    A.   I do.

6    Q.   And then it says, "The company has sent a letter to

7    Camtek, Inc., one of its more aggressive back-end

8    competitors, claiming that Camtek is infringing the

9    company's patents."  Do you see that?

10   A.   I do.

11   Q.   "Toray continues to be strong in Japan and the board

12   discussed the company's effectiveness in competing with

13   Toray outside of Japan."  Do you see that?

14   A.   I do.

15   Q.   So is it fair to say that Camtek was a competitor of

16   August?

17   A.   Yes.

18   Q.   And that Toray was a competitor of August?

19   A.   Yes.

20   Q.   Were there any other competitors of August?

21   A.   There were others.  A company called Electroglass was

22   actually exiting the space there, but they had product lines

23   in there.  We mentioned a merging competitor, ICOS

24   Innovation, who was looking to apply macro inspection

25   technology here.

1      A.   It did, but I can't tell what you it was.

2      Q.   Jersey?

3      A.   That's too obvious.  I don't think it was if you're

4      trying to keep it secret.

5      Q.   I think it was Jersey, though.

6      A.   Okay.  You may be right.

7      Q.   Can we go back to Exhibit 93, which was the --

8      A.   Yep.

9      Q.   Okay.  On the second page of Exhibit 93 there is a

10     paragraph 3 which is "A. Johnson, Marketing"?

11     A.   Yes.

12     Q.   And under that there's a reference to competition?

13     A.   Um-hmm.

14     Q.   And earlier you mentioned ICOS, that they were an up and

15     coming competitor; is that right?

16     A.   That's -- yes.

17     Q.   Okay.  So now I guess we're talking about June of 2005

18     in Exhibit 93.  Have they become a legitimate competitor to

19     August in the marketplace?

20     A.   I guess I'm having trouble with legitimate and up and

21     coming.

22     Q.   Okay.

23     A.   First off, this is Ardy Johnson talking to -- he's the

24     VP of marketing -- talking to Nathan.  So that question is

25     better directed to him.  But I can tell you in investor

1    notes I acknowledged ICOS as someone with capability to be a

2    legitimate competitor, a viable competitor.

3    Q.   Okay.

4    A.   But in terms of specifics, what tools and installware at

5    what time, that's beyond my grasp.

6    Q.   Would Mr. Brooks be able to answer those questions?

7    A.   Mr. Brooks would be able to answer those questions.

8    Q.   Let's mark as Exhibit Number 97 a document bearing

9    production numbers AUG021712 through 1726.  Have you ever

10   seen Exhibit 97 before?

11   A.   I have.

12   Q.   Now, I believe you testified before the break that if a

13   name appeared on the bottom right-hand corner, this was that

14   person's copy?

15   A.   Personal copy, that's correct.

16   Q.   Okay.  So does it look like this copy of the board

17   meeting information for Friday, April 16, 2004, was yours?

18   A.   Yes.

19   Q.   Do you recognize the information that's contained in

20   this document?

21   A.   I recognize certain information more than others, and by

22   the ones I say certain are the ones I know I prepared.

23   Q.   Okay.  And just so that we're clear, which slides or

24   which categories of information did you prepare in

25   Exhibit 97?

1    Q.  To put it into context, it appears on the first page of

2    the memo you say, "New records were set again in Q2" and

3    then you go dot, dot, dot and then there are a couple of

4    charts and on the next page you were then referring to signs

5    of stress?

6    A.  Right.

7    Q.  All right.  Now, you have -- "Competition" is bolded in

8    a bullet below there.  "Increased significantly with new

9    introductions/announcements from Rudolph, Camtek, ICOS

10   Vision, and RVSI."  Do you see that?

11   A.  Yes.

12   Q.  ICOS Vision, is that one company or two?

13   A.  It's one.

14   Q.  Okay.  Now, the two-ton elephant that you refer to, is

15   that KLA?

16   A.  That's my brother, yeah.  That's KLA.

17   Q.  Okay.

18   A.  That's the big guy.

19   Q.  And was the concern that they are going to come in as a

20   competitor as well?

21   A.  They actually -- do you see the name Viper macro

22   inspection?

23   Q.  Yes.

24   A.  Macro means, you know, a tool that does those big

25   defects as we described before.  They were actually the

```
 1    way, was the time frame when I was the acting sales
 2    coordination in the field when Jeff O'Dell was sick, which
 3    is why I am --
 4    Q.  That's why you are copied here?
 5    A.  That's right.
 6    Q.  Okay.  So --
 7    A.  Trust me, they didn't write it because I could solve
 8    their usability issues.  You probably knew that.
 9    Q.  The second to last page contains an e-mail from Rajiv to
10    you and several others.
11    A.  Um-hmm.
12    Q.  Do you see that?
13    A.  Right.
14    Q.  It's dated November 15, 2004?
15    A.  Yes.
16    Q.  And he is -- in paragraph B there right in the middle of
17    the page --
18    A.  Yeah.
19    Q.  -- it says, "We have customers frustrated with us for
20    our inability to respond to them in a timely manner.  It
21    frustrates them to the point of action against us.  Cree
22    bringing in ICOS, Samsung," et cetera.
23    A.  Um-hmm.
24    Q.  Are these issues that the company was having a problem
25    with at this time?
```

1

## I N D E X

DAVID ADLER                                              PAGE
    Cross Examination (Cont.) by Mr. McDonald           2040
    Redirect Examination by Mr. Garretson               2097
    Recross Examination by Mr. McDonald                 2108

FRANK DeROSA
    Direct Examination by Mr. Francescani               2113
    Cross Examination by Mr. Grumbles                   2141

STANLEY PIEKOS
    (Deposition read into record)                       2153


PLAINTIFFS' EXHIBITS                                    REC'D
    122                                                 2153
    793                                                 2095
    794                                                 2095
    795                                                 2095


DEFENDANT'S EXHIBITS                                    REC'D
    79                                                  2178
    84                                                  2178
    93                                                  2178
    97                                                  2178
    98                                                  2178
    104                                                 2178
    105                                                 2178